**FILED**

ᴵᴸᴱᴰ

2018 AUG 30  AM 11: 43

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FL
OCALA FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

2018 AUG 30  AM 9: 11

FOUNDATION RESOLUTION CORP., f/k/a
Citrus Memorial Health Foundation Inc.,

        Plaintiff,

v.

AON HEWITT INVESTMENT CONSULTING, INC.,
f/k/a Hewitt EnnisKnupp, Inc. and ALIGHT
SOLUTIONS LLC, f/k/a Hewitt Associates
LLC,

        Defendants.

Case No.: 5:18-cv-458-oc-30PRL

## COMPLAINT

Plaintiff Foundation Resolution Corp., f/k/a Citrus Memorial Health Foundation, Inc.

("FRC"), sues Defendants Aon Hewitt Investment Consulting, Inc., f/k/a Hewitt

EnnisKnupp, Inc. ("Aon Investing") and Alight Solutions LLC, f/k/a Hewitt Associates LLC

("Aon Consulting" and, together with Aon Investing, collectively, "Aon" or "Defendants"),

and pursuant to Rule 8, Federal Rules of Civil Procedure, alleges:

### I. OVERVIEW OF ACTION

1.   This action primarily concerns Aon's deceptive, imprudent and incompetent

performance of its obligations as a fiduciary to the Citrus Memorial Health Foundation, Inc.

Pension Plan (the "Plan"), and violations of the Employee Retirement Income Security Act

of 1974, as amended ("ERISA").  FRC hired Aon to terminate the Plan, which entailed a

combination of paying lump sum benefits to eligible Plan participants who chose that option,

as well as purchasing a terminal annuity to cover future periodic benefit payments to Plan

participants who did not elect lump sums, and to invest and manage the Plan's assets accordingly up until the time of termination.

2.     Aon Investing presented and sold FRC on a liability-driven "Hedge Path" investment strategy in which Aon Investing was to monitor and adjust the duration of Plan assets in relation to its liabilities so as to "lock in" improvements in the Plan's funded status as interest rates rose.   In that regard, Aon Investing acted as a fiduciary in designing, implementing, and monitoring its "Hedge Path" strategy; and Aon Investing was a fiduciary investment manager with respect to Plan assets that it invested in the Aon Hewitt Group Trust mutual funds ("AHGT funds"), including the AHGT Long Credit Bond ("Long") Fund and AHGT Mid Duration Long Credit Bond ("MidL") Fund.

3.     The complete breadth and depth of Aon Investing's misconduct is not yet fully known.   Despite its status as a fiduciary, Aon Investing has refused to provide all its investment-related records for the Plan in pre-suit dispute resolution and other proceedings. From the information that Aon Investing has provided to date, however, FRC has discovered that Aon Investing pursued a different, far more risky investment strategy than it presented and sold to FRC as being a suitable, prudent approach to take in light of the Plan's needs— one that ultimately resulted in millions of dollars of losses to the Plan.

4.     Adding to that harm, in reliance on Aon's advice, FRC did not make an early lump sum benefits offer to eligible Plan participants.   Such an offer would have quickly reduced over $25 million in Plan liabilities by satisfying benefit obligations to hundreds of participants at a favorable discount rate and spared ongoing investment management fees that Aon Investing levied on Plan assets under its management.   Yet, in reliance on Aon's advice,

the lump sum election window was delayed for approximately 18 months, awaiting an (unnecessary) IRS determination letter. Rather than warn FRC of the significant risks and costs associated with delaying the lump sum window, Aon advised FRC to pursue a "Hedge Path" strategy to improve the Plan's funded status.

5. Contrary to Aon's representations, Aon Investing did not tailor its "Hedge Path" strategy to the actual or weighted duration of the Plan's liabilities; nor did Aon Investing closely monitor and increase the "hedge" as the Plan's funded status improved. Rather, Aon Investing purchased assets with improperly weighted durations, thereby exposing the Plan to serious, latent mismatches between the duration of assets and liabilities. As a consequence of Aon Investing's deficient design, implementation, and monitoring of its "Hedge Path" strategy, the Plan's funded status unexpectedly deteriorated by about $3.3 million in the six months, *after* the Plan achieved a funded status at which Aon, as it proposed, should have hedged the Plan to a degree that it was practically immune from interest rate volatility.

6. Moreover, after its handling of the "Hedge Path" strategy demonstrably failed to work, Aon Investing continued to let the strategy ride to a bitter end – culminating in millions of dollars more in losses at times when: (a) Aon Investing knew of the Plan's approaching need to pay lump sum benefits and purchase a terminal annuity with cash at a cost of more than approximately $89 million; (b) Aon Investing was predicting an imminent (observable) increase in interest rates that would result in declining fixed income (bond) values; (c) such declining values could make it difficult to liquidate Plan holdings; (d) Aon Investing had invested most of the Plan's assets in proprietary AHGT funds with a

very small pool of authorized investors (comprised of other pension plans); and (d) the proper alternative was to shift to cash and cash equivalents to secure the value of Plan assets and provide immediate liquidity.

7.      Adding insult to injury, after Aon agreed to perform a comprehensive communications campaign to notify Plan participants of a lump sum benefit option, Aon later tried to exact additional fees to perform the same scope of work it originally contracted to perform. Then, Aon quietly failed to carry out the comprehensive communications campaign as originally agreed, after FRC refused to pay more for the same scope of services. As a consequence, even with FRC's own last-minute efforts to notify participants, only 67% of eligible participants elected to take lump sums – a take rate far short of the 80% rate that Aon touted its comprehensive notice program would yield. FRC did not get the services or reasonably anticipated results on which it relied in deciding to hire Aon.

8.      In the interim, due to Aon's investment-related advice and failure to disclose associated risks, over $25,000,000 more in Plan assets remained at risk in Aon Investing's deficient "Hedge Path" strategy for an additional 18 months, the Plan paid Aon Investing many thousands of dollars more in investment management fees, and fewer participants were eligible to elect, and ultimately did not elect, to take cost-saving lump sum benefits.

## II. PARTIES, JURISDICTION AND VENUE

9.      Plaintiff FRC is a Florida not-for-profit corporation with its principal place of business in Citrus County, Florida. FRC, through the Pension Committee of its Board of Directors, is the sponsor and administrator of the Plan. For purposes of diversity, FRC is a citizen of the State of Florida.

10.    Defendant Aon Investing (Aon Hewitt Investment Consulting, Inc., f/k/a Hewitt EnnisKnupp, Inc.) is an Illinois Corporation with its principal place of business in Chicago, Illinois. For purposes of diversity, Aon Investing is not a citizen of the State of Florida.

11.    Defendant Aon Consulting (Alight Solutions LLC, f/k/a Hewitt Associates LLC) is an Illinois limited liability company. Upon information and belief, all of Aon Consulting's constituent members – including the natural persons or corporations who are members or partners of any limited liability company or partnership that is a member of Aon Consulting – are citizens of the State of Illinois or, at a minimum, not citizens of the State of Florida. Accordingly, for purposes of diversity, Aon Consulting is not a citizen of the State of Florida.

12.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this case arises under the laws of the United States, including Section 502 of ERISA, 29 U.S.C. § 1132.

13.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000, exclusive of interest, costs and attorneys' fees; and there is complete diversity of citizenship inasmuch as Plaintiff FRC is not a citizen of the same state as either Defendant.

14.    This Court also has supplemental jurisdiction under 28 U.S.C. § 1367, because it has original jurisdiction over Plaintiff FRC's ERISA claims and Plaintiff FRC's other claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

15.     This   Court   has   personal   jurisdiction   over   Defendants   because Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), provides for nationwide service of process and Defendants have continuous and systematic contacts with the United States; and Defendants transact business in this District, which is also where the Plan is administered and Defendants' breaches occurred.

16.     Venue is proper in the U.S. District Court for the Middle District of Florida because, pursuant to 28 U.S.C. § 1391(b), this is the district in which a substantial part of the events or omissions giving rise to Plaintiff FRC's claims occurred and Defendants are subject to the Court's personal jurisdiction; and pursuant to 29 U.S.C. § 1132(e)(2), this is the district in which the Plan is administered and the place where Aon breached its fiduciary obligations.

### III. SUBSTANTIVE ALLEGATIONS

### The Hospital, its Employees & the Plan

17.     In 1949, the State of Florida created the Citrus County Hospital Board ("CCHB") as an independent special district charged with operating hospitals and related healthcare facilities for the benefit of the citizens and taxpayers of Citrus County.   CCHB thereafter developed the real property, improvements, and other property comprising the Citrus Memorial Health System, an approximately 200-bed inpatient facility and healthcare system located in Citrus County, Florida (the "Hospital")

18.     In 1987, FRC was incorporated as a separate and distinct not-for-profit corporation to assist CCHB in carrying out the purposes of CCHB's enabling act.

19.     Before 1990, CCHB operated the Hospital and Hospital employees participated in the Florida Retirement System.

20.    In 1990, CCHB leased the Hospital to FRC, which began to operate the Hospital pursuant to a long-term lease. FRC established and became the sponsor of the Plan, and certain Hospital employees who previously participated in the Florida Retirement System began instead participating in the Plan.

21.    On October 1, 2004, FRC closed the Plan to new entrants and, as of December 31, 2010, "froze" the Plan, such that its approximately 1,100 participants ceased accruing new benefits. As a result, the duration of expected benefits to participants (Plan liabilities) predictably began to decrease every year.

### The HCA Transaction

22.    In October 2012, CCHB commenced an independent evaluation to determine whether Citrus County residents would benefit from the sale or lease of the Hospital in accordance with Section 155.40, Florida Statutes (2012). That evaluation eventually led CCHB to solicit and receive qualified proposals, including a proposal from affiliates of Hospital Corporation of America ("HCA").

23.    CCHB and FRC negotiated a long-term lease of the Hospital and sale of related property to HCA. The agreements for the transaction were ultimately executed at its closing on October 31, 2014 (the "HCA transaction").

24.    Before the HCA transaction closed, CCHB and FRC anticipated it would no longer be feasible for FRC to administer the Plan because, after the HCA transaction, FRC was set to wind down its operations and dissolve. Accordingly, FRC solicited proposals for professionals to administer and terminate the Plan.

**Aon's Proposal & Engagement**

25.     On May 29, 2014, FRC received a proposal for services from Aon (the "Proposal"). In it, Aon touted itself as having the experience to provide turnkey pension management services towards the objective of plan termination after a hospital sale; touted that FRC could save an estimated "$6 million through execution of a strategic lump sum window relative to annuitizing the entire liability"; and touted that Aon Investing's delegated investment program would result in substantial savings to the Plan.

26.     At the time of the Proposal, Aon was aware of the HCA transaction, and was aware that FRC's resources for Plan management would be limited after the HCA transaction, and that FRC's primary objective for the Plan was to terminate it as quickly and cost-effectively as possible after the HCA transaction.

27.     In regard to Plan termination, Aon understood that the Plan's active participants would become terminated vested participants ("TVPs") upon the closing of the HCA transaction, and that each TVP would be eligible to elect a lump sum benefit, if offered, unless or until becoming eligible and electing to receive periodic retirement benefits. At the time of the Proposal, Aon estimated that the Plan's termination liability was about $120 million (based on interest rates as of April 30, 2014), if TVPs were not given the opportunity to elect lump sums, or $114 million, if 80% of TVPs elected to take lump sum benefits.

28.     From the outset, Aon informed FRC that an 80% lump sum take rate was consistent with Aon's experience with over 100 lump sum offerings since 2012. And, to illustrate the financial effect of incremental increases in the lump sum take rate, Aon

estimated that the Plan's termination deficit would decrease $900,000 for every 10% increase in the take rate.

29.     Aon proposed a "turnkey delivery model" in which a single point of contact would coordinate a "comprehensive" scope of services through a so-called "Delegated Pension Manager" solution.  Aon's Delegated Pension Manager solution was to include components of "Plan Administration," "Actuarial and Compliance Services," "Investments," "Participant Communications," and "Plan Termination."  Aon presented the Delegated Pension Manager solution as designed to guide FRC through three phases of plan management (pre-transaction, preparation for plan termination, and plan termination) from the Plan's then-current state to, and through, plan termination as quickly and cost effectively as possible.

30.     As to the Investments component of Aon's Delegated Pension Manager solution, an Aon affiliate would serve as a fiduciary in, among other things, asset-liability modeling, funded status monitoring and reporting, and execution of "glide and hedge paths."

31.     As to the Plan Termination component of Aon's Delegated Pension Manager solution, an Aon affiliate would provide professional services including, among other things, advice on lump sum window strategy and execution, participant communications and benefit calculations, and managing the lump sum election process.

32.     At the time of the Proposal (and at all other times), FRC's board of directors was composed of volunteers who served as a public service and without compensation; they were not, and never have been, investment professionals, pension consultants, or actuaries.

33.     In light of the purported quality and comprehensive scope of the services Aon

offered, in reliance on Aon's purported expertise, and with a view toward making an early

lump sum benefits offering to Plan participants, FRC hired Aon on October 8, 2014, by

executing a Master Consulting Agreement ("MCA") that Aon prepared.

34.     A true and correct copy of the MCA is attached hereto as **Exhibit 1**.

### Aon's Scope of Services & Delegated Investment Management

35.     Under the MCA, the scope of Aon's agreed-upon services were broken down

into the following six general categories: (1) investment consulting and delegated investment

management, (2) actuarial services, (3) ongoing pension administration services, (4)

implementation and administration of lump sum window, (5) communications consulting

services regarding lump sum window, and (6) plan termination services.

36.     In providing delegated investment management, Aon's investment

management affiliate, Aon Investing, agreed to serve as the Plan administrator's attorney-in-

fact and agent to perform investment consulting, investment management, and other services

in lieu of FRC.  In doing so, Aon Investing acted in the Plan administrator's place and stead

with the same force and effect, as if FRC, as designated fiduciary, had taken the action

directly on behalf of the Plan. As such, Aon described the associated duties as including,

among others, to:

     a.     Develop a customized investment strategy and program with a view toward achieving the Plan's investment objectives – namely, to improve and sustain the Plan's funded status;

     b.     Implement the program according to its description and design,

     c.     Assess changes in the estimated valuation of Plan liabilities on a daily basis, using the best available information; and

-10-

     d.     Monitor the program daily and implement changes to portfolio allocations as necessary.

37.     Aon Investing also had the duty to monitor and recommend changes to the program it originally recommended, if appropriate.  As a fiduciary, it could not simply stand by if, after implementing an initial strategy, its strategy failed to work as anticipated and latent risks in the strategy surfaced, as an appropriately vigilant fiduciary would note.

38.     In providing its services, Aon Investing knew or should have known that Aon Consulting's services and recommendations could have an impact on whether it was appropriate to undertake or continue with Aon Investing's recommended investment strategy.

39.     In providing consulting services related to Plan Termination, Aon Consulting knew or should have known that Aon Investing's services and recommendations could be undermined or rendered more risky by Aon Consulting's recommendations or the manner in which Aon Consulting executed its services.

40.     Aon Investing and Aon Consulting, as Aon, presented themselves as acting in a coordinated and integrated fashion in advising FRC through Aon's Delegated Pension Manager solution, so as to reduce risk exposure through multiple phases of plan management up to and including Plan Termination.  Indeed, Aon representatives were routinely copied on, or participated as a group in, communications with FRC about the coordinated process.  Accordingly, references herein to "Aon" intentionally refer to both Aon Investing and Aon Consulting acting in a coordinated fashion though a small integrated group of representatives or single delegated point of contact.

## Aon's Investment Strategy

41.     In early proposal materials, Aon previewed that its customized investment strategy and program for the Plan would involve using actively managed long duration corporate fixed income assets (including bonds capable of supposedly being transferred in-kind) as the best way to hedge the Plan's portfolio against interest rate changes and in relation to the lump sum widow, if one were offered.

42.     As to the lump sum window, Aon previewed that its customized investment strategy and program would evolve once the rate basis for paying out lump sums was set, and contemplated that investment management fees would be reduced by the lump sum payout, as Aon Investing's fees were based on the amount of assets under management.

43.     Aon also previewed that it estimated a $72 million annuity purchase would be required to satisfy the Plan's pension liabilities after lump sum payments, and that Aon would monitor the Plan's funded status and investments daily to ensure that it properly executed its liability hedging strategy.

44.     At the time FRC engaged Aon, FRC had decided to make a lump sum offering.  FRC also contemplated, and was led by Aon to believe, that Aon Investing would develop a customized investment strategy and program for the Plan as Aon had previewed – including, in particular, a strategy that would be customized to mitigate the risk of funded status deterioration primarily up until the interest rate basis for paying out lump sums was set.

45.     At the time of its engagement, Aon contemplated that an early lump sum window would be offered to the Plan's TVPs in mid-2015 and that the lump sum window

would substantially reduce the amount of Plan liabilities and exposure to interest rate risk. Indeed, many of the Plan's participants with the highest anticipated future benefits (corresponding to future Plan liabilities) would be among the Plan's TVPs. Accordingly, with a shorter management horizon in mind for a significant portion of the Plan's assets, Aon Investing began the phase of developing a customized investment strategy and program.

46.     In February 2015, however, Aon Consulting recommended a different timeline for the lump sum window. Rather than having an early lump sum window for TVPs in 2015, Aon Consulting urged FRC Pension Committee Board Members to wait for an IRS determination letter – confirming whether the Plan was "qualified" for tax purposes – which Aon anticipated would take 12 to 18 or more months to receive. While an IRS determination letter is not needed to terminate a plan or offer lump sums, Aon Consulting presented the IRS determination letter as being an essential item that FRC Pension Committee Board members should wait for the Plan to receive.  Aon Investing was aware of Aon Consulting's recommendation and the associated delay it would have on the lump sum window.

47.     FRC did not have any experience with lump sum windows, let alone Aon Consulting's purported experience with over 100 lump sum windows since 2012.   In deciding to await for an IRS determination letter, FRC relied on Aon Consulting's expertise, without the benefit of any warning from Aon Consulting or Aon Investing about, among other things:

     a.     A likelihood that the number of TVPs would decline, as participants achieved retirement age and began taking periodic benefit payments in the intervening 12 to 18 or more months;

b.    A likelihood that the lump sum take rate would decline if Aon Consulting waited over a year after the HCA transaction to notify TVPs about the availability of a lump sum benefit option;

c.    A magnified risk of keeping Plan assets, including those needed to pay lump sum benefits, in Aon Investing's investment strategy and program over the longer time horizon;

d.    A likelihood that Aon Consulting would later demand more fees to perform a comprehensive communications campaign for the lump sum window; and

e.    The IRS determination letter was not essential or important under the circumstances, nor worth waiting for.

48.    Rather than mention such risks, Aon made repeated representations to FRC that interests rates were expected to rise from then-historic lows and that FRC could use a customized "Hedge Path" strategy to improve the Plan's funded ratio in the intervening period before the lump sum window and Plan termination.

49.    On or about February 20, 2015, as an example of how its proposed "Hedge Path" strategy would work, Aon gave FRC a presentation entitled "Asset-Liability Match Portfolio Analysis" (the "Hedge Presentation") along with a written explanation that provided, among other things:

a.    An estimate of $118 million in Plan assets as of January 1, 2015 (including $25 million that was not in the Plan trust but in a segregated pension escrow account under the control of CCHB);

b.    An estimate of $124 million in Plan liabilities as of January 1, 2015;

c.    A corresponding funded status of 95%, with a Plan deficit of $6 million;

d.    The strategy of investing in assets with a shorter duration than Plan liabilities (i.e., benefits to be paid in future years), so that the Plan's funded status would improve "as rates rise back to more expected levels";

-14-

e. Aon Investing would dynamically adjust the duration of assets using a "Hedge Path" to lock in gains along the way as the Plan's funded ratio improved;

f. So, for example, if rates increased by 1% (or 100 basis points or "bps"),

i. Plan assets at a duration of 7.2 years would drop in value from $118 million to $108 million, but

ii. Plan liabilities at a duration of 13.7 years would disproportionately drop from $124 million to $109 million, thereby

iii. Resulting in the Plan's funded ratio improving by $5 million to over 99%; and

g. Such gains would be "locked in" by incrementally increasing the hedge ratio as the Plan's funded status improved to the point that the durations of Plan assets and Plan liabilities matched.

50. Aon's Hedge Presentation reflected its representation that a 100% hedge ratio could be achieved under its investment strategy, and that the Plan's funded status could be "locked in" such that the ratio would not fluctuate materially with changes in interest rates – in other words, that, at a 100% hedge, the value of assets and liabilities would essentially move in lock step as rates fluctuated.

51. Latent defects in Aon's "Hedge Path" strategy included, *inter alia*, that it could not achieve a true hedged status for at least the following reasons:

a. First, Aon Investing did not, and would not, have custody or investment control over $25 million in cash or cash-equivalent funds that were held in a segregated escrow account under the control of CCHB and were not a part of Plan trust (the "Pension Escrow");

b. Second, implementing the proposed "Hedge Path," particularly as the Plan approached fully funded status, would entail investing in a manner in which the durational baskets of Plan assets matched or nearly matched the durational baskets of Plan liabilities (known as key rate interest rate duration investing); and

-15-

     c.     Third, Aon Investing invested in proprietary AHGT mutual funds in which the durational baskets of underlying assets did not match, nor were ever likely to match, the durational baskets of the Plan's liabilities.

52.     At that time, FRC was not aware of the latent defects in Aon's "Hedge Path" strategy. Rather, members of FRC's Pension Committee were concerned with Aon's estimate of the Plan deficit. In its initial Proposal (in mid-2014), Aon estimated Plan liabilities of $114 million and assets of $94 million, which would yield a *$5 million surplus*, when counting a $25 million fund set aside as part of the HCA transaction (i.e., the Pension Escrow). In contrast, Aon's Hedge Presentation (in early 2015) reflected a *$6 million deficit*, even with the inclusion of the $25 million Pension Escrow and notwithstanding that Plan assets stood barely changed at about $93 million.

53.     Aon led FRC to believe that the deterioration in the Plan's funded status was a result of failing to hedge against interest rate fluctuations. The effect was to present Aon's "Hedge Path" strategy and investment program as the most reasonable way to shield against such funded-status deterioration and "lock in" funded-status improvements.

54.     In a later, Aon-prepared Investment Policy Statement, dated effective March 30, 2015, Aon once again set out its "Hedge Path" strategy – to purchase liability-hedging assets with a *shorter* duration than Plan liabilities (so as to capture funded status improvements as interest rates rise), then adjust the hedge (asset duration) with "the primary goal . . . to reduce interest rate risk as funded status improves towards the end state and fixed income pricing becomes more attractive." In that regard, FRC would "accept *some* mismatch risk to seek improvements to the Plan's funded position" (emphasis added), but Aon did not set out, nor did FRC accept, the above-listed defects and risks in Aon's investment

strategy. Nor did FRC accept the risk that Aon would purchase liability-hedging assets with a *longer* duration than Plan liabilities, as Aon Investing later did. Far from "some" mismatch risk designed to improve the Plan's funded status with rising interest rates, Aon exposed the Plan to imprudent and unintended mismatch risks of a character that would, and ultimately did, cause significant funded status deterioration.

55.    Likewise, in quarterly investment reviews that Aon later gave FRC for the first and second quarters of 2015, Aon Investing reiterated its strategy to adjust the duration of Plan assets along a "Hedge Path" toward a 100% hedged state as the Plan's funded status improved toward 100%.

<u>Aon's Implementation & Management of the "Hedge Path" Strategy</u>

56.    In separate transactions on February 20 and 24, 2015, Aon Investing transitioned the Plan's trust assets from publicly traded funds into Aon's proprietary AHGT mutual funds. On or about February 20, 2015, Aon Investing purchased $41.9 million in the AHGT Long Fund and $37.4 million in the AHGT MidL Fund on behalf of the Plan. And, on or about February 24, 2015, Aon Investing purchased 9.5 million in the AHGT Long Fund on behalf of the Plan. At that time, the AHGT Long Fund comprised over 80% of the AHGT MidL Fund, such that $81.3 million – over 85% of Plan assets – were invested, directly or indirectly, in Aon's proprietary AHGT Long Fund.

57.    At about the time Aon Investing first purchased shares in the AHGT Long Fund and AHGT MidL Fund on behalf of the Plan, there were thirteen AHGT mutual funds, and fewer than 90 investors who were authorized and able to trade in those proprietary AHGT funds. This small pool of available investors limited the ability to trade in the AHGT

-17-

funds, including to purchase the composition of assets Aon Investing originally planned, to adjust the Plan's investments as the Plan's funded status changed, and then, ultimately, to liquidate the Plan's AHGT fund holdings.

58.     Later, in May and June 2015, Aon Investing undertook a multi-step process to swap AHGT MidL Fund holdings for AHGT Long Fund holdings by directing the Plan to buy $3 million in the AHGT MidL Fund on or about May 7, 2015, sell $1 million in AHGT Long Fund on or about May 18, 2015, then sell $34 million in the AHGT MidL Fund on or about May 18, 2015, buy $14 million in AHGT Long on or about May 18, 2015, and buy $20 million more in the AHGT Long Fund on or about May 20, 2015.  In June 2015, Aon Investing directed the Plan to sell a further $5 million in AHGT MidL and to buy $5 million more in the AHGT Long Fund.  The end result of these transactions was that, by the end of June 2015, Aon Investing further increased the Plan's holdings in the AHGT Long Fund to a concentration of over **97%** of Plan assets.

59.     On or before the end of June 2015, the Plan was near fully funded on an actuarial basis, assuming (as Aon did) that 70% of TVPs elected to take lump sum benefits. According to the Investment Policy Statement, the Plan's Committee was, on the side of investing in shorter duration assets, "willing to accept some mismatch risk to seek improvements to the Plan's funded position, but once fully funded an objective of the investment policy [was] to minimize mismatch risk to the extent possible using investment derivatives where necessary."  In apparent recognition of the Plan's fully or near fully funded status, Aon Investing began a program of trading in derivatives on about July 1, 2015.

60.     In the six months after June 2015, however, the Plan's funded status deteriorated. Specifically, Plan liabilities increased by about $300,000 due to a slight decline in interest rates. Yet, rather than experience the anticipated (albeit lesser) corresponding increase in the value of the Plan's fixed-income (bond) assets, Plan assets *declined* by over $3 million. In other words, rather than the value of assets and liabilities moving, as anticipated, in or near lock step and in the same direction, Plan assets declined by at least ten (10) times the magnitude of an opposing increase in Plan liabilities.

61.     In and after at least June 2015, Aon Investing failed properly to hedge the Plan against interest rate volatility. Indeed, Aon Investing knew or should have known that its method of hedging – primarily through the use of its AHGT funds – was incapable of achieving the "Hedge Path" that Aon presented to FRC.

62.     In addition, despite initial assurances that it would carefully monitor and adjust the Plan's hedge to "lock in" improvements in funded status, Aon Investing did not make any significant adjustments to the composition of Plan assets as the Plan's funded status significantly deteriorated from June 2015 through December 2015. During that time, Aon Investing merely cashed the Plan out of $350,000 from the AHGT MidL Fund and $650,000 (less than 1%) from its AHGT Long Fund holdings.

63.     By no later than the second half of 2015, Aon knew or should have known that its investment strategy was flawed and bore far greater risk of durational mismatch than reflected in its "Hedge Path" materials. Aon nevertheless failed to disclose the risk, or call attention to, or explain the real cause of the deterioration in Plan's funded status. Indeed, while Aon Investing gave FRC investment review presentations for the first and second

quarters of 2015 – when the Plan's funded status improved – Aon Investing did not do so for the third quarter of 2015 – when most of the Plan's funded status deterioration in 2015 occurred.

**Aon's Continued Hedge-Duration Error & Failure to Timely Liquidate**

64.     A contributing factor in the deterioration of the Plan's funded status in 2015, and in its funded status failing to improve before Plan termination, is that Aon Investing caused or allowed the effective duration of the Plan's invested assets to shift from having a shorter to a longer effective duration than Plan liabilities.

65.     Aon expected and predicted a rise in interest rates in 2016.

66.     As Aon's Hedging Presentation reflects, such a rise in interest rates would result in: (1) the Plan's liabilities declining, due to an increase in the yields of fixed-income assets (bonds) used to fund future pension benefits; (2) an equal rate of decline for assets and liabilities of equal duration; (3) a smaller decline for assets of shorter duration versus longer duration liabilities; (4) a larger decline in assets of longer duration versus shorter duration liabilities; and (5) cash and cash equivalents, as liquid (i.e., zero-duration) assets, holding fairly steady value as (long-term) pension liabilities declined substantially.

67.     In January 2016, Aon Investing cashed out $16 million of the Plan's holdings in the AHGT Long Fund.  At that point, a combined one-third (over $40,000,000) of Plan assets and the Pension Escrow were in cash.  This was consistent with – indeed, reflects the bullishness of – Aon's expectation that interest rates were bound to increase in 2016.

68.     Through the first half of 2016, Aon Investing nevertheless kept essentially the same mix of invested Plan assets – overwhelmingly concentrated in the AHGT Long Fund,

with a longer effective duration than Plan liabilities – that had contributed to the Plan's funded status deteriorating significantly from July 2015 to December 2015.

69.      Mostly by inaction, and contrary to its promises to closely monitor and dynamically adjust the Plan's hedge, Aon Investing caused a gross durational imbalance to develop and persist between Plan liabilities and assets in 2016.  On the liability side, the Plan had batches of periodic (mostly monthly) benefit payments that fluctuate in amount over an expected span of years as participants start and cease receiving benefits.  On the asset side, with about one third (over $40,000,000) of Plan assets and the Pension Escrow in cash, Aon Investing kept about three-quarters (roughly $75,000,000 on average) in the AHGT Long Fund.  In effect, rather than invest in assets keyed to the duration of Plan liabilities, Aon Investing broke with prudent hedging strategy, and kept the Plan's invested assets at a longer effective duration than Plan liabilities and that was far longer in duration than the sizable blocks of (zero-duration) cash held in the Plan trust and Pension Escrow.

70.      Not only did the polarized mix of assets present a risky durational mismatch and threat to the Plan's funded status – that is, a bad hedge – it failed to account for the Plan's need for liquidity to terminate and had no likelihood of improving the Plan's (deteriorated) funded status, particularly when interest rates rose as Aon expected.  By leaving the Plan's invested assets heavily concentrated in the AHGT Long Fund rather than shifting to needed cash, Aon Investing could well expect that the Plan's invested assets, at a longer effective duration, would decline in value more than Plan liabilities and would wipe out most or all of the relative gains from holding cash as interest rates rose.

71.     By about July 2016, with interest rates still having been at or near historic lows, Aon Investing all the more expected that interest rates would snap upward in the second half of 2016.  At that point, six months before the Plan was to pay lump sum benefits to electing TVP's and purchase a terminal annuity to cover the Plan's remaining participants, Aon Investing was (according to its own schedule) supposed to review the Plan's need for liquidity with the FRC.  It did not.

72.     Also, by August 2016, FRC was already scheduling meetings with Aon for early- and mid-December 2016, in order to review annuity proposals, select an annuity provider, and purchase an annuity to cover the remaining Plan participants who were not eligible for, or did not elect, lump sum benefits.  Aon Investing well knew that the Plan needed liquidity.

73.     Continuing into the second half of 2016, however, Aon Investing left the Plan's investments virtually unchanged, with substantially all the Plan's invested assets directly or indirectly in the AHGT Long Fund, while interest rates rose as Aon expected.

74.     As a consequence, between July and December 2016, when interests rose as Aon expected, the Plan experienced an approximately $6 million decline in the value of its AHGT fixed-income assets.

75.     Further exposing the Plan to risk, the AHGT funds in which Aon Investing kept the vast majority of the Plan's assets were propriety funds, not publicly traded, and had a limited market of fewer than 90 other pension clients, all of whom were owed fiduciary duties by Aon.  It was foreseeable to Aon that, in a rising interest rate environment, it may well be difficult to move these clients into fixed income assets that were declining in value.

-22-

Likewise, Aon could also imminently foresee that it may well be difficult to generate market interest to purchase underlying long-duration bonds that were declining in value.

76.     Yet, as interest rates rose month after month in the second half of 2016, Aon let the Plan's portfolio continue to ride with over $72 million invested primarily in Aon's proprietary AHGT Long Fund up through the date lump sums were paid on December 1, 2016. In fact, on December 14, 2016, at what was to be the final FRC Pension Committee meeting to approve the purchase of an annuity at a cost of more than $89 million and direct payment therefor, Aon Investing surprised FRC with the news that it had not yet liquidated over $70 million of the Plan's assets from the AHGT funds. Aon was unable to complete the annuity purchase according to Aon's own schedule because of Aon Investing's failure to liquidate. By then, the Chair of the FRC Pension Committee had been demanding, for weeks and weeks, that Aon Investing liquidate the Plan's assets for final distribution. Aon Investing should have done so months earlier.

77.     In effect, Aon Investing failed to liquidate Plan assets at times when: (a) Aon knew of the Plan's approaching need to pay lump sum benefits and purchase a terminal annuity; (b) Aon's hedging strategy had demonstrably revealed itself to pose serious durational mismatch risks; (c) Aon was predicting an imminent (observable) increase in interest rates, which would naturally result in a decline in fixed income (long-duration bond) values; (d) the pool of available investors to purchase AHGT funds was so small as to limit the ability to trade in AHGT funds; (e) the declining value of long-term fixed income holdings would likely make it difficult to liquidate such holdings; and (f) while Plan

-23-

liabilities were declining (as the interest rate yields improved), liquid cash and cash equivalents would retain their value and immediate availability.

78.     All the while, up until it finally liquidated the Plan's holdings, Aon Investing continued to charge the Plan significant investment management fees.

79.     The Plan thus suffered significant losses, expenses, and consequent damages from Aon Investing's faulty design, implementation, and monitoring of the Plan's asset mix.

<u>**Aon's Deficient Lump Sum Initiative**</u>

80.     Alongside Aon Investing's investment management, Aon Consulting agreed to provide professional services to design, administer, and promote the lump sum window.

81.     The basic goal of the lump sum window was to maximize the lump sum election (take) rate among eligible participants, TVPs.  Aon estimated that for every 10% increase in the take rate, the Plan's liabilities would be reduced by $900,000.  Initially, Aon estimated that its comprehensive communications campaign would yield an 80% take rate among TVPs.  As bases for its take rate estimates, Aon cited its experience in over 100 lump sum windows since 2012.

82.     As to the design of the lump sum window, Aon agreed to advise FRC on the strategy and execution of the lump sum windowing, including its requirements and timing. In that regard, as indicated in Paragraphs 45 – 47 above, Aon urged FRC in early 2015 to delay implementation of the lump sum window until after receipt of an IRS determination letter, which was expected to come between 12 and 18 months later.

83.     At the time Aon recommended delaying the lump sum window, it was aware of the risks, among others, that delay could result in a reduced lump sum election rate; that

the amount of Plan assets needed to pay lump sum benefits would remain at risk in Aon's investment strategy and program; that the Plan would incur greater investment management fees; and that the foregoing risks could contribute to the Plan deficit. Aon, however, did not disclose those risks to FRC. Rather, Aon advised delay in implementation of the lump sum window as part of a broader theme that the additional time would supposedly permit the Plan's funded status to improve through Aon's "Hedge Path" strategy and anticipated increases in interest rates.

84.    Over the next year and several months up to mid-2016, each of the foregoing undisclosed risks or consequences of delay came to pass, with the result that fewer Plan participants were eligible and/or ultimately elected to take lump sums; and the Plan's deficit was greater than if Aon had disclosed such risks and properly advised FRC to proceed with a lump sum window at the outset. An early lump sum window would have avoided these undisclosed risks and consequences and resulted in an increased lump sum take rate and associated savings.

85.    By mid-2016, Aon admitted that further delay would result in a significant increase in Plan liabilities and recommended that FRC move ahead with implementing the lump sum window, notwithstanding the lack of an IRS determination letter. Indeed, the IRS determination letter never came.

86.    As to the administration and promotion of the Plan and lump sum window, Aon Consulting agreed to, among other things:

a.    Produce and distribute a lump sum window announcement;

b.    Collect participant election paperwork and review for completeness;

c.     Operate a call center for participants that was staffed by consultants educated on the specific features of the Plan's lump sum offering; and

d.     Carry out a comprehensive communications campaign to announce, inform, and remind participants of the lump sum window through:

     i.   Announcement flyers,
    ii.   Delivery of election kits,
   iii.   Reminder flyers and post cards,
   iv.   Reminder calls and emails,
    v.   On-site meetings,
   vi.   1-on-1 discussions,
  vii.   Webinars, and
 viii.   Posters, banners, and other printed materials.

87.     Over a year after the MCA was signed, and as the (delayed) time approached when Aon Consulting would finally begin the lump sum communications campaign, Aon Consulting sought to increase its fees by $105,000 to perform communications services. In the MCA, Aon Consulting had agreed to provide the lump sum administration services for $177,500, and to provide the lump sum communications campaign services for $110,000.

88.     In response to Aon Consulting's demand, FRC initially discussed potential cost savings efforts, and Aon Consulting eventually dropped its demand to $60,000 in additional fees, based on a proposal to limit its communications campaign with participants.

89.     FRC, however, declined to pay Aon Consulting the additional $60,000 in fees and demanded that Aon Consulting timely perform its obligations under the MCA in full.

90.     Thereafter, Aon Consulting failed to implement the "robust" and "comprehensive" communications campaign that it agreed (and was paid) to perform. Specifically, Aon Consulting failed to implement a communications plan, with multiple participant touch points and reminders, as to attain election levels reasonably approximating those that Aon Consulting opined the Plan could achieve.

91.     Aon Consulting failed accurately to identify and contact participants, failed to send the number of communications promised, failed to conduct webinars or one-on-one meetings, failed to post notices on site at the Hospital, failed to staff the call center with a sufficient number of staff members and sufficiently knowledgeable staff, and failed to adequately follow up with participants who returned incomplete election forms.

92.     As an example of Aon Consulting's basic failure to execute a comprehensive communication campaign, Aon Consulting failed to locate and notify a Plan participant who had long worked at, and remained working at, the Hospital for more than about 20 years.

93.     In addition, Aon Consulting's deficient call center performance led to FRC receiving repeated complaints about the call center's failure to answer or return calls and complaints that the call center lacked familiarity with features of the lump sum window or the basic terms of the Plan.  In fact, one participant's experience with Aon Consulting's call center led him to report at an FRC meeting: "They don't know jack.  I've tried talking to Aon.  They are like mammary glands on a bull."

94.     In light of the above-referenced delay and likelihood that participants would be less attuned or attentive to the later-scheduled lump sum election opportunity, it was important for Aon Consulting to perform the entire scope of comprehensive communications campaign services that they initially agreed to perform.

95.     In the end, Aon Consulting's communications campaign yielded an election rate of less than 67%.  Indeed, in light of Aon Consulting's deficient performance, FRC took upon itself Aon Consulting's (unfulfilled) contractual duties to reach out to dozens of participants whose election forms would otherwise have been rejected.  As a result of FRC

performing duties that Aon Consulting agreed to and should have performed, FRC was able to obtain dozens more valid lump sum elections, with the result of an approximately 67% election rate.

96.     This final lump sum take rate, however, was far less than Aon Consulting opined as being consistent with its experience in over 100 lump sum windows since 2012. In light of its deficient efforts, Aon Consulting claimed fees to which it was not entitled and caused the Plan to have fewer lump sum elections and a greater deficit than would otherwise have resulted.

### IV. SCOPE OF LOSSES, CONDITIONS PRECEDENT & ATTORNEYS' FEES

97.     Aon's failure to properly manage and prudently invest the Plan's assets and failure to implement a timely, comprehensive campaign for lump sum benefit elections caused an unanticipated, multi-million dollar shortfall in Plan assets. As a result, the Plan ultimately needed to borrow millions of dollars to fulfill its obligations to Plan participants.

98.     All conditions precedent to the bringing of this action have occurred, been waived or satisfied, or would be futile to further attempt to satisfy (including, but not limited to, the pre-suit dispute resolution process in Section 10 of the MCA).

99.     FRC has retained counsel from the law firm of King, Blackwell, Zehnder & Wermuth, P.A. and agreed to pay same their reasonable attorneys' fees to represent FRC in this action on behalf of itself and the Plan.

100.     FRC is entitled to an award of reasonable attorneys' fees pursuant to ERISA and/or Section 13(h) of the MCA.

## COUNT I – VIOLATIONS OF ERISA
### (Against Aon Investing)

101.   FRC re-alleges and incorporates the allegations set forth above in Paragraphs 1 – 100 as though fully set forth herein.

102.   Under Section 3(21) of ERISA, 29 U.S.C. § 1002(21), Aon Investing was an ERISA fiduciary as to the Plan and Plan assets invested as part of Aon's "Hedge Path" strategy and in the AHGT funds.

103.   As a fiduciary and as an investment manager under ERISA, Aon Investing owed a duty of care and loyalty to the Plan with respect to the management of, and communications about, the investments of the Plan and the AHGT funds.   Pursuant to Section 404(a) of ERISA, 29 U.S.C. § 1104(a), Aon Investing was obligated to discharge its responsibilities as a fiduciary with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

104.   Aon Investing breached its duties to the Plan, in violation of Section 404(a) of ERISA, 29 U.S.C. § 1104(a), by *inter alia*: (a) failing adequately to investigate the suitability of the "Hedge Path" strategy in relation to the Plan's stated goals and lack of control over the assets in the Pension Escrow; (b) misrepresenting the quality, character, and suitability of the "Hedge Path" strategy and failing to notify FRC of latent defects in that strategy; (c) exposing the Plan to excessive undisclosed risks; (d) failing to monitor and appropriately adjust the investments of the Plan; and (e) failing timely to liquidate and convert Plan assets from the AHGT funds into cash.

105.    Pursuant to Section 409 of ERISA, 29 U.S.C. § 1109, any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by ERISA is personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and is subject to such other equitable or remedial relief as the Court may deem appropriate.

106.    Under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), a civil action may be brought by a fiduciary for appropriate relief under Section 409 of ERISA, 29 U.S.C. § 1109. FRC is a fiduciary with respect to the Plan within the meaning of Section 502(a)(2).

107.    Under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), a civil action may be brought by a fiduciary to enjoin any act or practice that violates any provision of ERISA or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or the terms of the plan. FRC is a fiduciary within the meaning of Section 502(a)(3) of ERISA.

108.    FRC has a legal and equitable right to obtain relief on behalf of the Plan for losses resulting from Aon Investing's violations of ERISA.

**WHEREFORE,** Plaintiff FRC respectfully requests that this Court enter judgment in favor of FRC and against Aon Investing (Aon Hewitt Investment Consulting, Inc., f/k/a Hewitt EnnisKnupp, Inc.), providing that:

A.      Aon Investing shall pay and restore to the Plan an amount to be determined by the Court that will effect full restitution and compensation for the losses to the Plan resulting from Aon Investing's violations of ERISA, together with pre-judgment interest running from the dates such losses were incurred;

-30-

B.    FRC shall be awarded its attorneys' fees and costs, pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g); and

C.    FRC, in its capacity as a fiduciary on behalf of the Plan, shall be awarded such other and further relief as the Court deems just and proper.

### COUNT II – VIOLATIONS OF ERISA
### (Against Aon Consulting)

109.    FRC re-alleges and incorporates the allegations set forth above in Paragraphs 1 – 100 as though fully set forth herein.

110.    Notwithstanding any language in the parties' MCA to the contrary or otherwise purporting to disclaim Aon Consulting's status as a fiduciary, under Section 3(21) of ERISA, 29 U.S.C. § 1002(21), Aon Consulting acted as an ERISA fiduciary in rendering investment advice as to the Plan and Plan assets invested as part of Aon's "Hedge Path" strategy and in the AHGT funds.

111.    As a fiduciary under ERISA, Aon Consulting owed a duty of care and loyalty to the Plan with respect to communications about the investments of the Plan and the AHGT funds.  Pursuant to Section 404(a) of ERISA, 29 U.S.C. § 1104(a), Aon Consulting was obligated to discharge its responsibilities as a fiduciary with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

112.    Aon Consulting breached its duties to the Plan, in violation of Section 404(a) of ERISA, 29 U.S.C. § 1104(a), by *inter alia*: (a) failing adequately to investigate the suitability of the "Hedge Path" strategy in relation to the Plan's stated goals and lack of control over the assets in the Pension Escrow; (b) misrepresenting the quality, character, and

-31-

suitability of the "Hedge Path" strategy and failing to notify FRC of latent defects in that strategy; (c) exposing the Plan to excessive undisclosed risks; and (d) failing to coordinate with Aon Investing the timely liquidation and conversion of Plan assets from the AHGT funds into the cash required to purchase a terminal annuity.

113.   Aon Consulting also breached its duties to the Plan in recommending that FRC delay the lump sum window, when Aon Consulting knew or should have known and failed to disclose to FRC, among other things, that delay could result in a reduced lump sum election rate; that the amount of Plan assets that would be used to pay lump sum benefits would remain at risk in Aon's investment strategy and program; that the Plan would incur greater investment management fees; and that the foregoing risks were likely to causes losses to the Plan.

114.   Rather than disclose the foregoing risks, Aon Consulting advised delay in implementation of the lump sum window as part of a broader theme that the additional time would supposedly permit the Plan's funded status to improve through Aon's "Hedge Path" strategy and anticipated increases in interest rates.

115.   Pursuant to Section 409 of ERISA, 29 U.S.C. § 1109, any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by ERISA is personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and is subject to such other equitable or remedial relief as the Court may deem appropriate.

116.   Under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), a civil action may be brought by a fiduciary for appropriate relief under Section 409 of ERISA, 29 U.S.C. § 1109.  FRC is a fiduciary with respect to the Plan within the meaning of Section 502(a)(2).

117.   Under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), a civil action may be brought by a fiduciary to enjoin any act or practice that violates any provision of ERISA or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or the terms of the plan.  FRC is a fiduciary within the meaning of Section 502(a)(3) of ERISA.

118.   FRC has a legal and equitable right to obtain relief on behalf of the Plan for losses resulting from Aon Consulting's violations of ERISA.

**WHEREFORE,** Plaintiff FRC respectfully requests that this Court enter judgment in favor of FRC and against Aon Consulting (Alight Solutions LLC, f/k/a Hewitt Associates LLC), providing that:

A.   Aon Consulting shall pay and restore to the Plan an amount to be determined by the Court that will effect full restitution and compensation for the losses to the Plan resulting from Aon Consulting's violations of ERISA, together with pre-judgment interest running from the dates such losses were incurred;

B.   FRC shall be awarded its attorneys' fees and costs, pursuant to Section 502(g) of ERISA, 29 U.S.C. § 1132(g); and

C.   FRC, in its capacity as a fiduciary on behalf of the Plan, shall be awarded such other and further relief as the Court deems just and proper.

### COUNT III – PROFESSIONAL MALPRACTICE
**(Against Aon Consulting)**

119.    FRC re-alleges and incorporates the allegations set forth above in Paragraphs 1 – 100 as though fully set forth herein.

120.    At relevant times, FRC was a client of Aon Consulting, and hired Aon Consulting for, among other things, professional advice and consulting services regarding lump sum windows and related matters.

121.    Aon Consulting provided its advice and consulting services through licensed professionals, with qualifications including chartered financial analyst, professional actuary, and enrolled agent, who acted in those capacities in providing advice and consulting services regarding lump sum windows and related matters.

122.    Through the course of its engagement, Aon Consulting owed FRC and the Plan a duty of care to exercise the competence and diligence normally exercised by professional advisors under similar circumstances. Included in that duty is the duty to notify of risks that Aon Consulting knew or should have known were posed by its advice.

123.    Aon Consulting breached its duty to FRC and the Plan, and rendered negligent professional advice, when Aon Consulting recommended FRC delay the lump sum window, when Aon Consulting knew or should have known and failed to disclose to FRC, among other things, that delay could result in a reduced lump sum election rate, that the amount of Plan assets that would be used to pay lump sum benefits would remain at risk in Aon Investing's investment strategy and program, the Plan would incur greater investment management fees, and these foregoing risks could contribute to the Plan deficit.

124.    Rather than disclose the foregoing risks, among others, Aon Consulting advised delay in implementation of the lump sum window as part of a broader theme that the additional time would permit the Plan's funded status to improve through Aon's "Hedge Path" strategy and anticipated increases in interest rates.

125.    FRC and the Plan were injured by reason of Aon Consulting's breach of its duty of care; and, as a direct and proximate result of Aon Consulting's negligent and incomplete advice, FRC and the Plan suffered losses.

**WHEREFORE,** Plaintiff FRC respectfully requests that this Court enter judgment in favor of FRC and against Aon Consulting (Alight Solutions LLC, f/k/a Hewitt Associates LLC), providing that:

A.    Aon Consulting shall pay an amount to be determined by the finder of fact that will remunerate FRC for the losses resulting from Aon Consulting's negligent and incomplete advice, together with pre-judgment interest running from the dates such losses were incurred;

B.    Aon Consulting shall pay and disgorge to FRC an amount to be determined by the finder of fact equal to all fees and other amounts Aon Consulting received for providing services in connection with the lump sum window, together with pre-judgment interest running from the dates such amounts were received;

C.    FRC shall be awarded its attorneys' fees and costs pursuant to the MCA; and

D.    FRC shall be awarded such other and further relief as the Court deems just and proper.

## COUNT IV – BREACH OF CONTRACT
### (Against Aon Consulting)

126.   FRC re-alleges and incorporates the allegations set forth above in Paragraphs 9, 11 – 16, 33 – 35, 80 – 81, and 86 – 100 as though fully set forth herein.

127.   Aon Consulting materially breached the MCA by failing to provide the comprehensive communications campaign as agreed for the Plan's lump sum window, including each and every element outlined in Schedules 4 and 5 of the MCA.

128.   In addition, in the course of administering the lump sum window and associated communications campaign, Aon Consulting materially breached the MCA in failing appropriately to carry out contractual obligations, including but not limited to adequately notifying Plan participants of the lump sum option and working with participants to complete lump sum election forms.

129.   FRC and the Plan were injured by reason of Aon Consulting's breach of its contractual duties; and, as a direct and proximate result of Aon Consulting's incomplete and deficient contractual performance, FRC and the Plan suffered losses.

**WHEREFORE,** Plaintiff FRC respectfully requests that this Court enter judgment in favor of FRC and against Aon Consulting (Alight Solutions LLC, f/k/a Hewitt Associates LLC), providing that:

A.   Aon Consulting shall pay an amount to be determined by the finder of fact that will remunerate FRC for the losses resulting from Aon Consulting's breach of the MCA, together with pre-judgment interest running from the dates such losses were incurred;

B.   Aon Consulting shall pay and disgorge to FRC an amount to be determined by the finder of fact equal to all fees and other amounts Aon Consulting received

for providing services in connection with the lump sum window, together with pre-judgment interest running from the dates such amounts were received;

C.       FRC shall be awarded its attorneys' fees and costs pursuant to the MCA; and

D.       FRC shall be awarded such other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

To the extent not precluded by the parties' MCA or applicable law, Plaintiff FRC respectfully demands a trial by jury as to all matters so triable (if any) pursuant to Rule 38, Federal Rules of Civil Procedure.

Dated:  August 30, 2018.

Respectfully submitted,

/s/ Taylor F. Ford
Taylor F. Ford
Florida Bar No.: 0041008
Frederick S. Wermuth
Florida Bar No.: 0184111
KING, BLACKWELL, ZEHNDER & WERMUTH, P.A.
P.O. Box 1631
Orlando, FL 32802-1631
Telephone:  (407) 422-2472
Facsimile:  (407) 648-0161
tford@kbzwlaw.com
fwermuth@kbzwlaw.com

*Counsel for Plaintiff Foundation Resolution Corp.,*
*f/k/a Citrus Memorial Health Foundation Inc.*

# EXHIBIT 1
## MASTER CONSULTING AGREEMENT

### IN SUPPORT OF PLAINTIFF'S COMPLAINT

# Master Consulting Agreement

This Master Consulting Agreement, including the General Terms and Conditions and any Schedules attached hereto or incorporated by reference, (collectively, the "Agreement"), effective the 8th day of *Oct*, 20*14* ("Effective Date"), sets forth the terms and conditions related to the provision of consulting services to the Plan Administrator of the Citrus Memorial Health Foundation, Inc. ("Client") Pension Plan ("Plan") by Hewitt Associates LLC and Hewitt EnnisKnupp, Inc. (collectively, "Aon Hewitt").

This Agreement will cover all services provided by Aon Hewitt to Client ("Services"), excluding any administrative services covered by a separate agreement signed between the parties. The General Terms and Conditions of this Agreement may be amended only by a writing signed by the parties. Terms related to specific Services and the fees associated therewith may be added by Schedules or other communication between the parties. Each email, proposal letter, attachment to this Agreement or other writing mutually agreed upon between the parties that contains a description of Services constitutes a "Schedule" to this Agreement.

Any notices which may be required under this Agreement shall be considered as having been given if faxed with follow-up original mailed by U.S. First Class mail or by hand delivery, addressed as follows:

If to Client:
Citrus Memorial Health Foundation, Inc.
Pension Committee
502 West Highland Boulevard
Inverness, FL 34452
Attn.: Mark Williams
Facsimile: 352-341-6199

If to Aon Hewitt:
Aon Hewitt
100 Half Day Road
Lincolnshire, IL 60069
Attn.: General Counsel
Facsimile: 847-554-1462

IN WITNESS WHEREOF, authorized representatives of the parties have executed this Master Consulting Agreement:

**Plan Administrator of the**
**Citrus Memorial Health Foundation, Inc. Pension Plan**

By:  Pension Committee

By: *Carlton E Fairbanks*

Name: Carlton E Fairbanks

Title: Chairman Pension Committee

Date: 10/9/14

**Hewitt Associates, LLC**
**Hewitt EnnisKnupp, Inc.**

By: *Matt Miller*

Name: Matt Miller

Title: Authorized Signatory

Date: 10/17/14

**Citrus Memorial Health Foundation, Inc., as to financial obligations of this Agreement not paid by the Citrus Memorial Health Foundation, Inc. Pension Plan**

By: _____

Name: _Mark Williams_____

Title: _Chief Financial Officer_____

Date: _10/8/14_____

# General Terms and Conditions

1. **Fees and Expenses**
   (a) Fees for Services included in Schedules 1, 2 and 3 shall be 0.3825% (38.25 basis points) of the total portfolio assets contained in the Plan's trust, except as expressly set forth in Schedule 1, 2 and 3. The fees for all other Services shall be set forth in the applicable Schedule. If no Schedule or other writing applies, fees will be determined on a time and materials basis in accordance with Aon Hewitt's standard billing rates and the value of our services based on our time, complexity, and the level of skill and urgency required. Aon Hewitt agrees to consult with Client and obtain its written consent before incurring fees or expenses for any services not described in a Schedule to this Agreement. Fees that are assessed based on the value of assets in the Plan shall be calculated and due and payable quarterly in arrears, based on the asset value of the Plan on the last business day of the quarter. Fees for any partial period shall be pro-rated accordingly. Fees will be payable from the Plan with the exception of any fees required to be paid from outside of the trust. Such fees will be paid by the Employer.

   (b) Fees and expenses are due and payable within thirty (30) days of the invoice date. Client will promptly notify Aon Hewitt of any questions regarding invoices so that Aon Hewitt can expect timely payment. Interest at nine percent (9%) per year will accrue after the invoice due date until payment is received.

   (c) Client shall pay all reasonable travel and related living expenses incurred by Aon Hewitt's personnel in performing Services for Client.

   (d) Client shall pay any and all taxes, however designated, that are based on this Agreement or on the charges set forth in any Schedule, except for taxes based on the net income of Aon Hewitt or employment taxes for Aon Hewitt personnel.

   (e) Aon Hewitt agrees that the Fees for Services described above and on attached Schedules represent the entire compensation that it will receive for providing services under this Agreement. Aon Hewitt will not receive any commissions, overrides or other payments from any third parties in connection with the services it provides under this Agreement.

   (f) Client's obligations and those of Citrus Memorial Health Foundation, Inc. (the "Hospital") are expressly conditioned on execution and closing of that anticipated agreement among the Hospital, Citrus County Hospital Board and [HCA Entity] for the sale/lease of substantially all assets of the Hospital (the "Closing"). Services under this Master Consulting Agreement and any Schedule hereto shall not begin until after the Closing, and up the direction of the Client.

2. **Additional Services and/or Change in Services**
   Client may, at any time, request additions and/or changes to the Services. Such additions and/or changes, including any fees or fee adjustments related to such additions and/or changes, shall be confirmed between the parties and may be documented with a Schedule, an amended Schedule, or other mutually agreeable writing.

3. **Term and Termination**
   (a) This Agreement shall commence on the Effective Date set forth above and shall continue until terminated by either party as provided in Section 3(b) or Section 3(c). For purposes of this Agreement, "Year" means the twelve (12) month period commencing on the Effective Date set forth above and each anniversary thereafter. Services under a particular Schedule shall commence as of the date indicated on the Schedule and shall continue for the period stated in such Schedule or until terminated by either party as provided in Section 3(b) or Section 3(c).

   (b) Either party may terminate this Agreement, or any Schedule or Service (or any part thereof), for convenience at any time upon thirty (30) days prior written notice to the other party.

   (c) Upon the effective date of termination, Client will pay Aon Hewitt for all fees and expenses due hereunder in connection with the terminated Services through the effective date of termination including any Service implementation fees and any mutually agreed upon transition assistance extending beyond such termination.

   (d) Completion or termination of any Schedule or Service under this Agreement shall not constitute termination of this Agreement, it being the intent of both parties to leave this Agreement in effect until terminated as specified herein. Each

Schedule shall terminate upon the earlier of its termination date or the termination date of this Agreement, provided however, if the term of a Schedule extends beyond the termination date of this Agreement, the applicable terms of this Agreement shall extend automatically for such Schedule until such Schedule's termination or expiration date.

(e) Client agrees and acknowledges that the pricing set forth herein represents a discount from the fees that Aon Hewitt would charge were the services being provided independently, rather than on a bundled basis. In addition to any termination fees set forth in Schedule 3 in the event Client terminates any of the services provided under Schedule 1, Schedule 2, Schedule 3 or Schedule 4, Aon Hewitt shall propose revised fees for any remaining services, adjusted for the removal of the bundled services discount inherent in the fees set forth above. Client and Aon Hewitt shall execute an amendment to this Agreement reflecting any adjustments to the fees for remaining services.

4. **Delays**
Neither party will be in breach of this Agreement or any Schedule as a result of, nor will either party be liable to the other party for, liabilities, damages, or other losses arising out of delays in performance caused by acts of God, government authority, strike or labor disputes, fires or other loss of facilities, telephone system, or Internet service provider or other utility outages, equipment malfunctions, computer downtime, and similar occurrences as long as such party was not the cause of the loss and is diligently attempting to correct the cause of the delay but in any event not longer than 15 days. During any such delay in performance, the delayed party will implement reasonable work-around plans, computer system disaster recovery, alternate sources, or other commercially reasonable means to facilitate the performance of its obligations under this Agreement until the delay has ended or failure has been corrected.

5. **Ownership and Control of Data and Work Product**
(a) Aon Hewitt has created, acquired or otherwise has rights in, and may, in connection with the performance of Services hereunder, employ, provide, modify, create, acquire or otherwise obtain rights in, various concepts, ideas, methods, methodologies, procedures, processes, know-how, and techniques (including, without limitation, function, process, system and data models); templates; software systems, user interfaces and screen designs; general purpose consulting and software tools; websites; benefit administration systems; and data, documentation, and proprietary information and processes ("Aon Hewitt Technology").

(b) Except as provided below, upon full and final payment to Aon Hewitt hereunder, the Deliverables, if any, shall become the property of Client. To the extent that any Aon Hewitt Technology is contained in any of the Deliverables, Aon Hewitt hereby grants to Client a perpetual, worldwide, paid-up, royalty-free, nonexclusive license to use such Aon Hewitt Technology solely for Client's internal use in connection with the Deliverables.

(c) To the extent that Aon Hewitt utilizes any of its property, including, without limitation, the Aon Hewitt Technology, in connection with the performance of Services, such property shall remain the property of Aon Hewitt and, except for the license expressly granted in the preceding paragraph, the Client shall acquire no right or interest in such property.

(d) Client will honor Aon Hewitt copyrights, patents, and trademarks relating to Services, Deliverables and Aon Hewitt Technology, and will not use Aon Hewitt's name, patents or trademarks without Aon Hewitt's prior written consent.

(e) Aon Hewitt acknowledges and agrees that all right, title and interest in and to any programs, systems, data, information and other materials furnished to Aon Hewitt by Client hereunder ("Client Information") are and shall remain Client's sole and exclusive property. With respect to the Services provided under a Schedule, during the period services are provided under such Schedule, Client grants to Aon Hewitt a non-exclusive, non-transferable license to use Client Information in connection with Aon Hewitt's performance of its obligations and exercise of its rights under the Schedule.

(f) Provided that Client promptly notifies Aon Hewitt of a claim that the Aon Hewitt Technology infringes a presently issued U.S. patent or copyright, Aon Hewitt will defend such claim at its expense and will indemnify Client for any costs and damages that may be awarded against Client in connection with such claim. Aon Hewitt will not indemnify Client, however, if the claim of infringement results from (i) use of other than the most recent version of the Aon Hewitt Technology made available to Client by Aon Hewitt; (ii) Client's alteration of the Aon Hewitt Technology; (iii) use of any Aon Hewitt Technology in combination with other software not provided by Aon Hewitt; or (iv) improper use of Aon Hewitt Technology.

(g) Nothing contained in this Agreement will prohibit Aon Hewitt from using any of its general knowledge or knowledge acquired under this Agreement (excluding Client's Confidential Information) to perform similar services for others.

6. **Confidentiality**

(a) For the purposes of this Agreement, "Confidential Information" includes: (i) the terms of this Agreement (including any Schedules); (ii) Client Information; (iii) Aon Hewitt Technology; (iv) oral and written information designated by a party as confidential prior to the other party obtaining access thereto; and (v) oral and written information which should reasonably be deemed confidential by the recipient whether or not such information is designated as confidential. Each party's respective Confidential Information will remain its sole and exclusive property.

(b) Each party will use reasonable efforts to cause its employees to minimize distribution and duplication and prevent unauthorized disclosure of the Confidential Information of the other party. Each party agrees that only employees who have a need to know the Confidential Information of the other party will receive such Confidential Information. No party will disclose the other party's Confidential Information to a third party without the prior written consent of the other party, which consent may be conditioned upon the execution of a confidentiality agreement reasonably acceptable to the owner of the Confidential Information, except that Aon Hewitt may use Client's Confidential Information in combination with other data, including the disclosure of such information to third parties, provided that no such Client Confidential Information is identifiable by Client or Client employee and that either party may disclose the other party's Confidential Information to its legal counsel and auditors. Aon Hewitt may also disclose Client's Confidential Information to any subcontractor or, as instructed by Client, to any other third party providing services to Client under this Agreement as reasonably necessary for such subcontractor or third party to perform its services, provided that any such subcontractor is subject to a confidentiality agreement. Aon Hewitt may retain a copy of all Client Confidential Information for archival purposes.

(c) Confidential Information does not include information if and to the extent such information: (i) is or becomes generally available or known to the public through no fault of the receiving party; (ii) was already known by or available to the receiving party prior to the disclosure by the disclosing party; (iii) is subsequently disclosed to the receiving party by a third party who is not under any obligation of confidentiality to the party who disclosed the information; or (iv) has already been or is hereafter independently acquired or developed by the receiving party without violating any confidentiality agreement with or other obligation to the party who disclosed the information.

(d) The receiving party may disclose Confidential Information of the disclosing party if required to as part of a judicial process, government investigation, legal proceeding, or other similar process, provided that the receiving party has given prior written notice of such requirement to the disclosing party. Reasonable efforts will be made to provide this notice in sufficient time to allow the disclosing party to seek an appropriate confidentiality agreement, protective order, or modification of any disclosure, and the receiving party will reasonably cooperate in such efforts.

7. **Representations and Responsibilities**

(a) Aon Hewitt represents and agrees that it: (i) is and shall, at all times during the term of this Agreement, remain in material compliance with all applicable federal, state, and local laws and regulations, including any required licenses, permits, or registrations, necessary for Aon Hewitt to be able to perform the Services; and (ii) has no outstanding commitment or agreement to which it is a party or legal impediment of any kind known to it which materially conflicts with this Agreement or is reasonably likely to limit, restrict, or impair the rights granted to Client hereunder. If a potential conflict should arise, Aon Hewitt will discuss the situation with Client.

(b) Client will submit to Aon Hewitt all Client Information in Client's control necessary for Aon Hewitt to perform the Services covered by this Agreement. Client will maintain in material compliance with applicable law relating to the Plan any and all benefit plan legal documents related to the Services. Client is responsible for the accuracy and completeness of any and all Client Information that is submitted to Aon Hewitt. Client agrees to notify Aon Hewitt as soon as possible of any problems or errors in Client Information submitted. Services performed by Aon Hewitt in correcting such problems or errors are additional services for which additional fees will be payable.

(c) Aon Hewitt will cooperate as reasonably requested with all existing vendors that currently perform services similar to those outlined in this Agreement in order to assure a smooth transition of work.

(d) Aon Hewitt acknowledges that all services hereunder are being provided to Client in connection with its status as Plan Administrator, and thus fiduciary, of a pension plan governed by the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). Aon Hewitt agrees that all services will be performed in a manner and according to time requirements designed to enable Client to satisfy its fiduciary obligations under ERISA.

8.  **Indemnification**

(a) Subject to Section 9, Aon Hewitt shall indemnify and hold Client and Citrus Memorial Health Foundation, Inc. and its employees, officers, board members and successors in interest harmless from and against any and all damages, losses, liabilities, and expenses (including reasonable attorneys' fees and expenses) (collectively, a "Loss" or "Losses") arising from Aon Hewitt's material failure to comply with the applicable terms and conditions of this Agreement (regardless of whether such Loss is based on breach of contract, tort, strict liability, breach of warranty, failure of essential purpose or otherwise)

(b) Subject to Aon Hewitt's indemnity obligations in Section 5(f) and 8(a), Client and Citrus Memorial Health Foundation, Inc shall indemnify, defend, and hold Aon Hewitt harmless from and against any and all Losses arising from (i) claims made by third parties, including, without limitation, Client's employees, affiliates, and plans with respect to the Services provided hereunder, or (ii) Client's failure to comply in material respects with the applicable terms and conditions of this Agreement, including without limitation, any infringement of Aon Hewitt Information by Client in violation of Section 5 or any breach by Client of the confidentiality provisions of Section 6.

(c) Any claim under this Section 8 must be asserted before the date that is three (3) years following the act or omission giving rise to the claim.

(d) Notwithstanding the foregoing, as applicable to the Client and the Services, Aon Hewitt will not be liable to Client for any amounts for which Client or any of its employee benefits plans would have been responsible to pay irrespective of any act, error or omission by Aon Hewitt, including interest adjustments.

(e) Both Aon Hewitt and Client agree to use reasonable efforts to mitigate their own, as well as each other's, liability, damages, and other losses suffered in connection with this Schedule, including where any damages can be mitigated by lawfully pursuing recovery from participants of Client or other third parties with whom Client has a relationship (i.e. vendors), and each of Aon Hewitt and Client will conduct or permit diligent efforts to so recover.

9.  **Liability**

(a) With respect to the Services provided under Schedules 1, 2 or 3, if Client suffers Losses (regardless of whether such Loss is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purpose or otherwise) as a result of Aon Hewitt's breach of its obligations hereunder with respect to the Services provided pursuant to such a Schedule, Aon Hewitt's liability to Client with respect to the Schedule for Losses incurred by Client during each sequential 12-month period in which the Schedule is in effect, commencing as of the first day of the provision of services thereunder ("Agreement Year") will not exceed an amount equal to the total fees paid or to be paid for such Agreement Year for the Services provided under Schedules 1, 2 and 3.

(b) With respect to any other Schedule under this Agreement, if Client suffers Losses (regardless of whether such Loss is based on breach of contract, tort, strict liability, breach of warranties, failure of essential purposes or otherwise) as a result of Aon Hewitt's breach of its obligations hereunder, Aon Hewitt's liability to Client and Citrus Memorial Health Foundation, Inc with respect to a Schedule for Losses incurred by client during each Agreement Year will not exceed an amount equal to the total fees paid or to be paid for such Agreement Year for the Services provided pursuant to such Schedule.

(c) The limitations on Aon Hewitt's liability contained in Section 9(a) and (b) will not apply to Losses arising from: (i) Aon Hewitt's willful, fraudulent or criminal misconduct; (ii) Aon Hewitt's breach of the confidentiality provisions of this Agreement; (iii) bodily injury, including death, or damage to tangible personal or real property incurred while Aon Hewitt is performing the Services and to the extent caused by the negligent or willful acts or omissions of Aon Hewitt's personnel or agents in performing the Services; or (iv) the infringement of the proprietary rights of a third party by use of the Aon Hewitt Information contemplated hereunder.

(d) In no event will either party be liable to the other party for incidental, consequential, special, or punitive damages (including loss of profits, data, business or goodwill, or government fines, penalties, taxes, or filing fees), regardless of whether such liability is based on breach of contract, tort, strict liability, breach of warranty, failure of essential purpose or otherwise, and even if advised of the likelihood of such damages.

10. **Dispute Resolution**

Except as provided in Section 13(h), the following procedures shall be used in the event of any dispute or controversy arising out of or relating to this Agreement. All negotiations between the parties conducted pursuant to the dispute resolution process described herein (and any of the parties' submissions in contemplation hereof) shall be kept confidential by the parties and shall be treated by the parties and their respective representatives as compromise and settlement negotiations for purposes of the applicable court rules of evidence.

(a) The parties shall attempt in good faith to resolve any dispute arising out of or relating to this Agreement promptly by negotiation between executives who have authority to settle the controversy and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement. Either party may give the other party written notice of any dispute not resolved in the ordinary course of business. Within fifteen (15) days after delivery of the notice, the party receiving the notice shall submit to the other a written response.

(b) Within thirty (30) days after delivery of the notice, the designated executives shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the dispute. All reasonable requests for information made by one party to the other shall be honored in a timely fashion.

(c) If the matter in dispute has not been resolved within sixty (60) days after delivery of the notice, or if the parties fail to meet within thirty (30) days, the dispute shall be referred to more senior executives who have authority to settle the dispute and who shall likewise meet in an attempt to resolve the matter in dispute. If the matter has not been resolved within thirty (30) days after it has been referred to the more senior executives, or if no meeting of such senior executives has taken place within fifteen (15) days after such referral, either party may seek alternative legal remedies as it deems appropriate.

11. **Insurance/Indemnity**

    (a) **Coverage.** Aon Hewitt shall maintain, at all times during the term of this Agreement, the following minimum insurance coverages and limits:

        (i) Workers' Compensation and related insurance as prescribed by the law of the state in which the Services are to be performed;

        (ii) General Liability in the amount of $1,000,000 per occurrence and $2,000,000 in the aggregate; and

        (iii) Professional Liability in the amount of $5,000,000 per occurrence and in the aggregate.

    (b) **Best Rating.** Aon Hewitt will place such insurance with carriers possessing a B+VII or better rating, as rated in the A.M. Best Key Rating Guide for Property and Casualty Insurance Companies.

12. **Successors and Assigns**

This Agreement shall inure to the benefit of and be binding upon the successors and permitted assigns of Aon Hewitt and Client. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed, except Aon Hewitt may assign its rights and obligations to an affiliate entity controlled by, controlling, or in common control with Aon Hewitt.

13. **Miscellaneous**

    (a) The headings used herein are for convenience only and will not affect the interpretation of this Agreement.

    (b) This Agreement has been entered into for the sole benefit of Client and Aon Hewitt, and in no event will any third-party benefits or obligations be created thereby.

(c) This Agreement and any Schedule hereunder may be executed in two or more counterparts, each of which will be deemed an original for purposes of this Agreement or the Schedule.

(d) The relationship between the parties is that of independent contractors. Nothing in this Agreement will be deemed or construed to create a joint venture, agency, or partnership between the parties for any purpose or between the partners, officers, members, or employees of the parties by virtue of either this Agreement or actions taken pursuant to this Agreement. Aon Hewitt personnel will remain Aon Hewitt's employees for all purposes, including, but not limited to, determining responsibility for all payroll-related obligations.

(e) Aon Hewitt may enter into subcontracts to perform a portion of the Services under this Agreement provided that Aon Hewitt shall remain responsible for the acts or omissions of such subcontractors as if such subcontracted activities had been performed by Aon Hewitt.

(f) Aon Hewitt may include Client and its trademarks and logos on Aon Hewitt's client lists, proposals and other communications not intended for general distribution.

(g) It is expressly understood and agreed that the obligations of Sections 5, 6, 8, 9, 10, 12 and 13 herein, as well as all payment obligations arising on or before the date of termination or expiration of the term of this Agreement, will survive the termination or expiration of this Agreement.

(h) Both parties agree that injunctive relief is appropriate in enforcing the confidentiality provisions of this Agreement. In the event of any action to construe or enforce this Agreement or any portion thereof, the prevailing party will be entitled to recover, in addition to any charges fixed by the court, its costs and expenses of suit, including reasonable attorneys' fees and expenses.

(i) If any provision of this Agreement or portion thereof is declared invalid, the remaining provisions will nevertheless remain in full force and effect.

(j) In the event any terms of any Schedule conflict with the terms contained in these General Terms and Conditions, the terms of such Schedule will prevail.

(k) This Agreement is subject to OFAC compliance (i.e., the laws and regulations enforced by the United States Office of Foreign Assets Control and each party's compliance policies relating thereto). Since Aon Hewitt can be held accountable under such laws and regulations in connection with its provision of the Services, Client confirms that it will not knowingly direct Aon Hewitt in providing the Services to interact with third parties that are shown on OFAC's list of Specially Designated Nationals and Blocked Persons. If a match to a person shown on such list is identified, Client shall notify Aon Hewitt, and the parties will cooperate with each other in resolving the matter (which may include adjustments to the Services or regulatory notifications).

(l) This Agreement will be construed and enforced in accordance with the internal laws and judicial decisions of the State of Illinois, excluding its conflict of laws rules that would refer to and apply the substantive laws of another jurisdiction. To facilitate judicial resolution and save time and expense, the parties irrevocably and unconditionally agree not to demand a trial by jury in any action, proceeding or counterclaim arising out of or relating to the Services or this Agreement.

(m) This Agreement, including any Schedules and the materials incorporated herein from time to time, constitutes the entire agreement of the parties and supersedes all previous oral or written negotiations and agreements relating to the subject matter hereof (including the subject matter of such Schedules). For the avoidance of doubt, this Agreement also supersedes the terms and conditions in any purchase order, engagement letter or general consulting services agreement between Aon Hewitt and Client. For the avoidance of doubt, the effective date of each Schedule shall be set forth therein. There have been no representations or statements, oral or written, that have been relied on by any party hereto except those expressly set forth herein.

As of the date of execution of this Agreement, the Schedules attached to this Agreement are:

Schedule No. 1 – Investment Consulting and Delegated Investment Management –Defined Benefit Plan

Schedule No. 2 – Actuarial Services
Schedule No. 3 – Pension Administration Services (Ongoing Services)
Schedule No. 4 – Pension Administration Services (Lump Sum Initiative)
Schedule No. 5 – Communication Consulting Services (Lump Sum Distribution)
Schedule No. 6 – Plan Termination Services

*[End of Document]*

## Schedule No. 1 – Investment Consulting and Delegated Investment Management – Defined Benefit Plan

This Schedule No. 1 ("Schedule No. 1") is entered into by and between by the Plan Administrator of the Citrus Memorial Health Foundation, Inc. Pension Plan ("Client") in its capacity as designated named fiduciary on behalf of the Citrus Memorial Health Foundation, Inc. Pension Plan (the "Plan"), and Hewitt EnnisKnupp, Inc. ("HEK") an affiliate of Hewitt Associates LLC ("Aon Hewitt"), pursuant to that Master Consulting Agreement between Client and Aon Hewitt dated _Oct  8th_ , 2014 (the "Agreement").

All definitions, terms and conditions in the Agreement are herein incorporated by reference. To the extent any provisions of the Agreement and this Schedule conflict, the terms of this Schedule shall govern with respect solely to this Schedule.

1. **Delegation of Authority.**

   As designating named fiduciaries, Client hereby appoints HEK to be its attorney-in-fact and agent, and as such to act in the designated fiduciaries' place and stead with the same force and effect as if the designated fiduciaries had taken the action directly on behalf of the Plan with regard to services described in Appendix A. More specifically, HEK is, for the purposes of this Schedule, designated as a named fiduciary ("Named Fiduciary") of the Plan solely for the services described in Section 4 of Appendix A, as that designation is described in Sections 402 and 405 of the Employee Retirement Income Security Act ("ERISA"). As a Named Fiduciary, HEK is delegated the exclusive authority to carry out the duties specified in Section 4 of Appendix A and to perform these services, but for no other purpose under the Plan.

   By executing this Schedule, Client hereby grants to HEK the requisite authority to take any and all actions on behalf of the Plan and/or Client to facilitate HEK's performance of all Services under this Agreement and to fulfill HEK's obligations as an investment manager to the Plan, including the engagement of any Sub-Advisers or investment of Plan assets on behalf of the Plan. Client also agrees, where necessary, to execute a letter of direction, or other appropriate instruments, to the Plan's Custodian (as defined herein) or to other third parties, that evidences or otherwise grants HEK's authority to act on behalf of the Plan and/or Client or as a named fiduciary of the Plan in a manner consistent with HEK's capacity described in this Schedule.

   By executing this Schedule, HEK hereby accepts the aforementioned designation as Named Fiduciary to the Plan, as described above.

2. **Services Provided**

   The specific services to be provided under this Schedule ("Services") are enumerated and detailed in the attached Appendix A to this Schedule.

3. **Fees and Expenses**

   The fees for the Services are set forth in Section 1 of the Agreement. Client and the Plan understand and agree that the fees payable by Client and/or the Plan hereunder do not include or cover the fees payable to any Sub-Advisers (as defined herein), and that Client and/or the Plan shall be exclusively responsible for compensating such Sub-Advisers in addition to compensating HEK hereunder.

4. **Term and Termination for Services Described under this Schedule**

   (a) Commencement Date of Services under this Schedule: Effective Date as defined in the Agreement

   (b) Completion Date of Services under this Schedule: The services covered under this Schedule shall commence on the Effective Date and run until terminated with 30 days prior notice by either party. For the avoidance of doubt, such termination shall not require any redemptions from a Locked-Up Fund, as defined herein, during any time that Interests therein are subject to any lock-up period provisions or other constraints on liquidity.

   (c) In the event that this Schedule is terminated pursuant Section 4(b) above or as otherwise allowed under the Agreement, the Client understands and agrees that the fees for the Services set forth in Appendix A shall be payable to HEK through the date of termination: **provided, however**, that subsequent to the date of termination, if any Plan assets remain invested in an HEK-managed fund or investment vehicle due to applicable fund lock-up period provisions or other constraints on liquidity (a "Locked-Up Fund"), the Client further

understands and agrees that any fees payable to HEK under Appendix A shall continue to be payable to HEK with respect to Plan assets invested in any such Locked-Up Fund through the date on which the Plan's interests are redeemed from the Locked-Up Fund. Upon the date on which proper notice of termination is received by HEK pursuant to this Section 4(c), HEK is authorized to direct the Plan's trustee to redeem all of the Plan's interests in any Locked-Up Fund as soon as reasonably possible following the expiration of the applicable lock-up period or removal of the liquidity constraint.

**5. HEK's Representations and Acknowledgments**

    (a)  HEK represents and agrees that it is, now and at all times during the term of this Schedule, will be a registered investment adviser under the Investment Advisers Act of 1940, as amended (the "Advisers Act") and covenants that with respect to the performance of its duties hereunder. HEK will promptly notify Client of any change in its status under the Advisers Act.

    (b)  HEK acknowledges that, at all times during the term of this Schedule, and with respect to all services provided under Appendix A, it is a "fiduciary" as defined under Section 3(21) of ERISA and represents that it is not subject to any disqualifications provided in Section 411 of ERISA.

    (c)  HEK acknowledges that it is an "investment manager" under Section 3(38) of ERISA with respect to the services described in Section 4 of Appendix A and for no other purpose.

    (d)  HEK represents and agrees that it is now, at all times during the term of this agreement, will be a "qualified plan asset manager" within the meaning of Prohibited Transaction Class Exemption 84-14, as amended (the "QPAM Exemption"), and that the QPAM Exemption (or other individual, statutory or class exemption) shall be applicable to any transactions carried out pursuant to the services described in Section 4 of Appendix A which would otherwise constitute "prohibited transactions" under Section 406 of ERISA.

    (e)  Services shall be in compliance with the provisions of the Agreement, this Schedule, the Advisers Act, ERISA, and applicable state and federal laws applicable to investment advisers.

    (f)  HEK will be responsible for, and will make, the selection, evaluation and replacement of the Sub-Advisers in an HEK-managed fund and the Sub-Advisers will be responsible for the day-to-day investment of the assets of the Plan allocated to them from time to time.

    (g)  In providing the Services, HEK will provide no services, information or guidance with respect to the securities of any individual company, including the securities of Client. HEK shall not provide any accounting or legal advice. Any documents prepared by HEK or received by HEK from third parties with respect to the operation of the Plan or Plan investments shall be submitted to Client and subject to review, at Client's determination, by its legal counsel.

    (h)  No Sub-Advisers appointed by HEK shall be affiliated with HEK. The Sub-Advisers will be independent contractors.

    (i)  HEK has full power and authority to enter into and perform this Schedule and the person signing this Schedule on behalf of HEK has been properly authorized and empowered to execute this Schedule.

**6. Client's and the Plan's Representations and Acknowledgments**

    (a)  The Plan is designed and at all times has been administered as a qualified retirement plan as described under the Internal Revenue Code and Client and/or Plan will promptly notify HEK of any change in its qualified status under Internal Revenue Code. The Internal Revenue Service issued a determination letter with respect to the Plan's tax qualified status dated March 16, 2012.

    (b)  Client acknowledges receipt of HEK's Form ADV Part 2A and appropriate 2Bs, which serves as HEK's brochure and supplements under the Advisers Act. Each of Client and the Plan has carefully read and understands this Schedule, including Appendix A, which outline the services to be provided by HEK, its fees and risks associated with this Schedule. The Client and the Plan are not relying on HEK, its affiliates or any other person with respect to the legal, tax and other economic considerations involved in entering into this Schedule, other than their own advisers. The Client and the Plan have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of entering into this Schedule and the Plan is able to bear such risks.

    (c)  Each of Client and the Plan acknowledge that absent (i) an action of HEK which is judicially-determined to be a breach of its fiduciary duty under ERISA, or (ii) HEK's willful misconduct, bad faith or negligence, HEK will not be responsible for any losses arising out of the risks described in this Schedule.

(d) Client acknowledges receipt of HEK's fee disclosures required by the applicable regulations promulgated under Section 408(b)(2) of ERISA.

(e) Client acknowledges that the fees payable to HEK hereunder are reasonable compensation for the Services performed by HEK for the Plan.

(f) Client acknowledges and agrees that HEK may, in its sole discretion, exercise the authority granted to it pursuant to Appendix A of this Schedule, by directing Plan assets to be invested in an affiliated collective trust or comparable investment vehicle.

(g) Client shall review each document provided by HEK and shall meet with HEK's investment consultants not less frequently than once a year.

(h) Client shall, at least annually, provide HEK with the Plan's financial statements and promptly provide HEK with any changes.

(i) Each of Client and the Committee has full power and authority to enter into and perform this Schedule and the person signing this Schedule on behalf of each of Client and the Committee has been properly authorized and empowered to execute this Schedule.

(j) Client acknowledges and represents that the Plan expressly provides for the authority for (i) the appointment by a named fiduciary or another named fiduciary, and (ii) the appointment by a named fiduciary of an "investment manager" as defined under Section 3(38) of ERISA and (iii) the allocation of fiduciary responsibilities among named fiduciaries and procedures for such allocation of responsibility.

(k) Each of Client and the Plan acknowledge that HEK renders investment advisory services for clients other than Client and the Plan. Client and the Plan understand that HEK may give advice and take action in performing its duties to other clients that may differ from advice or the timing or nature of action with respect to the Plan. Accordingly, Client and the Plan acknowledge that HEK has no obligation to recommend the retention or termination of any investment manager for the Plan which the officers or employees of HEK may employ or terminate for their own accounts or which HEK may recommend the employment or termination of for the account of any other client.

(l) Each of Client and the Plan further acknowledge that neither HEK nor the Sub-Advisers can predict future activity in the financial markets and that the performance of investments recommended and managed by HEK, investment advice given by HEK, and investment managers retained by the Plan are subject to various market, currency, economic, political and business risks, and that investment decisions made by HEK and the Sub-Advisers may not always be profitable. Thus, there can be no assurance as to any specific level of investment performance of any strategy or actions that HEK or any sub-adviser may take on behalf of the Plan or Client.

## 7. Liability/Indemnification.

(a) The Parties to this Schedule, and all Services provided under this Schedule shall be subject to the indemnification and liability provisions provided under Sections 8 and 9 of the Agreement or as otherwise provided under the Agreement. However, the Losses limitations provided in Section 9 of the Agreement or in any other provision of the Agreement or this Schedule will not apply to any breach of fiduciary duty of HEK to Client and the Plan. Client's and Plan's sole and exclusive remedy for any Losses and related indemnification related to this Schedule and the Services provided thereunder shall be against HEK. Client agrees not to pursue any Claims against HEK's parents, subsidiaries, or affiliates for breaches under or through this Schedule. HEK's liability will not exceed the percentage share that its breach of fiduciary duty bears to the total breach of fiduciary breach, if any, of Client and/or other employees and/or fiduciaries.

(b) Provided that HEK has not breached its fiduciary duty or engaged in willful misconduct, bad faith or negligence in its responsibilities hereunder with respect to the selection, retention or monitoring of Sub-Advisers. HEK shall have no liability to Client or Plan for any acts or omissions of any Sub-Adviser.

(c) Sponsor shall indemnify and hold HEK, its directors, employees, representatives, and affiliates harmless from and against any and all Claims and Losses which HEK may incur as a result of this Schedule, if and to the extent such Claims or Losses arise from (i) Client's or Plan representative's breach of fiduciary obligations to the Plan; (ii) Client's breach of any provision set forth in this Agreement; (iii) HEK's acts or omissions made or taken at the request or direction of Client (but excluding any request for services to be provided under this Schedule); or (iv) any action taken or omitted by Custodian.

**8.   Main Contacts at Client and HEK for the Services**

**Client Contact:**
Citrus Memorial Health System
502 West Highland Boulevard
Inverness, FL 34452
Attn: Mark Williams, Chief Financial Officer
Facsimile: 352-341-6199

**HEK Contact:**
Hewitt EnnisKnupp, Inc.
4 Overlook Point
Lincolnshire, IL 60069
Attn: General Counsel
Facsimile: 847-554-1462

**9. Miscellaneous**

a.   Nothing in this Agreement shall be construed as a waiver of any rights of Client under the Investment Advisors Act of 1940 or ERISA. In addition, there may be provisions of applicable law (including those of federal and state securities laws) that are intended to protect Client from certain acts and omissions of HEK (and which may impose liability even on persons that act in good faith), which provisions may not be lawfully waived or abrogated by contractual provisions to the contrary. To such extent, but only to such extent, HEK shall remain liable to Client for such acts and omissions.

**AGREED TO by the authorized representatives of the respective parties below:**

**Plan Administrator of the**
**Citrus Memorial Health Foundation, Inc. Pension Plan**

By: _____Pension Committee_____

By: _____Carlton E. Fairbanks_____

Name: __Carlton E. Fairbanks_____

Title: __Chairman Pension Committee__

Date: __10/9/14_____

**Hewitt EnnisKnupp, Inc.**

By: __Matt Miller_____

Name: __Matt Miller_____

Title: __VP Legal_____

Date: __10/12/14_____

**Citrus Memorial Health Foundation Pension Investment Committee**

By: __Carlton E. Fairbanks_____

Name: __Carlton E. Fairbanks_____

Title: __Chairman Pension Committee__

Date: __10/8/14_____

## Appendix A

## Statement of Services for Schedule Number 1

As governed by the Agreement and this Schedule 1, HEK shall provide the following Services to Client on behalf of the Plan:

**1.   Investment Program Review for the Plan**

HEK shall provide the following Services prior to implementing an investment strategy for the Plan:

(a)   Review the Plan's risk posture, asset allocation strategy, investment adviser structure, and current investment advisers;

(b)   Prepare a report that summarizes the investment program review and suggests changes in policies and/or investment allocation, as appropriate;

(c)   Meet with the Committee as needed to discuss the investment program review and suggest changes to asset allocation policies, investment adviser structure, and investment advisers;

(d)   Review the Plan's Investment Policy Statement and other Plan management-directed Plan parameters (collectively, "Investment Policy Statement") and make recommendations for changes thereto.

During the investment program review as described immediately above, HEK shall assess the existing Plan investment portfolio and investment options to determine Plan compliance with the then-current Investment Policy Statement. HEK's implementation of any changes to the Plan's investment strategy is dependent upon HEK completing the investment program review and receiving an updated Investment Policy Statement, approved by the Committee, upon completion of the asset-liability study noted in Section 2 below.

**2. Pension Risk Management Services**

(a)   Prior to implementation of any changes to the Plan's investment strategy, HEK will, with the assistance of the Plan's actuaries and other professionals employed by the Plan, who may be employees of HEK's parent company or one of its affiliates, conduct an asset-liability study to assist the Committee in determining the appropriate investment allocation and risk budgeting objectives for the Plan. Upon completion of the study, HEK will recommend to the Committee an investment structure to meet pension risk objectives as determined by the Committee. HEK will assist the Committee in creating a de-risking program for the Plan. HEK will update the assumptions and inputs for the asset-liability study and review any recommended changes with the Committee as needed over time.

(b)   HEK will assist the Committee in designing a customized investment strategy to hedge (reduce) pension surplus risk (volatility of pension assets relative to pension liabilities), including recommending changes to the Investment Policy Statement and guidelines for the mandate, and one or more Sub-Advisers to manage the customized hedging strategy.

(c)   Once the investment strategy is implemented, HEK will (i) monitor daily and measure any risk budgeting objectives set forth by the Committee; (ii) keep the Committee informed of any material changes in the estimated funded status of the Plan through quarterly performance reporting; (iii) monitor this program daily and implement portfolio allocation changes as necessary; and (iv) provide the Committee a written report on the above services on at least a quarterly basis, including, meeting with the Committee in person as needed.

(d)   In performing the Services described in subsection (c) above, HEK will rely on custodial reported asset values and estimated liability changes in order to determine the funded ratio for purposes of implementing the investment policy. Those asset values reported by the Plan Custodian on a daily basis may be unaudited values. To the extent that certain Plan assets are illiquid, the Custodian's valuation of such assets will be based on the Sub-Advisers' most current estimation of valuation, which is inherently subjective. HEK shall not be liable for any inaccuracies in the asset values provided by Custodian.

(e)   The estimated valuation of liabilities will be based on HEK's best assessment of the liability valuation based on its estimate of the daily change in the yield curve identified in the Investment Policy Statement. HEK will calibrate its daily estimate of the yield curve to the actual curve once it is published each month.

(f)   There are several factors that can cause HEK's estimated valuation of assets and liabilities to differ from actual ultimate valuation. Such factors include, but are not limited to, fluctuations in the value of the bonds underlying the calculation of the yield curve, fluctuations between the Custodian's initial and actual valuation of assets, changes in actuarial assumptions and the basic risk

inherent in daily estimation of the monthly yield curve. HEK will use the best available information to mitigate these factors, but cannot guarantee the impact such factors may have on the investment policy.

**3. Asset Allocation**

(a)   HEK will, with a view to achieving the Plan's investment objectives and subject to the Investment Policy Statement, but otherwise in HEK's sole discretion, determine allocation of the Plan assets to be managed by each of the Plan's Sub-Advisers (as defined below).

(b)   The Committee may, after consultation with HEK, amend the Investment Policy Statement by giving reasonable prior notice to HEK and such amendments shall take effect on the date specified in the notice to HEK. HEK shall, to the extent necessary and within a reasonable period (subject to then current market conditions) following receipt of a notice of such amendments, adjust the Plan's investment portfolio so that it complies with the amended Investment Policy Statement.

(c)   HEK reserves the right to decline to act on an instruction from the Committee if, in the reasonable opinion of HEK, the execution of that instruction would be contrary to applicable legal requirements.

(d)   HEK shall not take or omit to take any action which to the actual knowledge of HEK would prejudice the tax position of the Plan. Subject thereto, the Committee and any professional tax adviser to the Plan remain responsible for the management of the Plan's assets for tax purposes.

**4. Selection and Monitoring of Sub-Advisers**

(a)   HEK will be responsible for selection, evaluation and replacement of any investment managers (including transition managers) serving the Plan ("Sub-Advisers"). In connection therewith, HEK shall: (i) identify preliminary candidates favorably evaluated by HEK; (ii) evaluate preliminary candidates based upon the Committee's objectives and investment mandates; (iii) select, on behalf of the Plan, the Sub-Advisers within each asset class to invest the Plan assets which HEK believes have the appropriate knowledge and experience for investment of the Plan's assets; (iv) determine and notify each Sub-Adviser of any other investment guidelines or restrictions, in addition to the Investment Policy Statement applicable to its investment of its relevant portion of the Plan's assets; (v) monitor and evaluate the performance of each Sub-Adviser and report to the Committee as to whether in HEK's view such Sub-Adviser is performing its responsibilities under its investment management agreement; and (vi) replace, terminate, and/or add additional Sub-Advisers on an ongoing basis, as necessary or appropriate. The Sub-Advisers will be responsible for the day-to-day investment of the assets of the Plan allocated to them from time to time.

(b)   HEK is authorized to enter into agreements, on behalf of the Client and for the benefit of the Plan, with Sub-Advisers to provide services to the Plan, consistent with services such Sub-Advisers will provide to other HEK clients. HEK is responsible for negotiating the terms and conditions of such agreements, including, but not limited to, fees for services, indemnities and limitations on liability, with respect to the services provided by the Sub-Adviser.

(c)   In the event that Client requests HEK to retain an investment manager not recommended by HEK, the parties shall discuss the scope of HEK's services with respect to that investment manager and execute a writing evidencing HEK's responsibilities with respect to that investment manager and any fees to be paid HEK in connection therewith.

(d)   Client shall arrange for the Committee to execute a letter of direction to its Custodian (as defined herein), evidencing HEK's authority to act on behalf of the Plan in the capacity described in this Agreement.

(e)   HEK shall, in conjunction with the Sub-Advisers, determine the appropriate business structure from which the Sub-Advisers shall serve the Plan, whether it be through an investment company registered under the Investment Company Act of 1940, as amended, a separately managed account, a non-registered commingled fund or through an HEK-managed fund investment structure or an HEK-managed hedge fund. Upon satisfactory completion of subscription agreements (or comparable documentation) by the Plan, HEK may, in its sole discretion, exercise the authority granted to HEK under this Schedule by depositing Plan assets in the Aon Hewitt Group Trust or the Aon Hewitt Offshore Fund of Hedge Funds Ltd., as both are defined below. HEK may also direct the purchase, redemption, or sale of any interests or shares in the aforesaid instruments.

(f)   The Aon Hewitt Group Trust is a group trust held by Bank of New York Mellon as Trustee under a trust agreement between it and Aon Investment Consulting, Inc., the predecessor to HEK, dated April 13, 2010 (the "Aon Hewitt Group Trust" or "AHGT"). The Aon Hewitt Offshore Fund of Hedge Funds Ltd. is a Cayman Islands Exempted Company with The Bank of New York Mellon serving as custodian and administrator.

**5. Additional Reporting and Investment Communications**

HEK agrees to timely provide to the Client such information as may be reasonably requested by the Client for purposes of completing its annual Form 5500 (including any schedules or attachments hereto) or any other information reports or filings by the U.S. Department of Labor and by the auditor of the Plan's financial statements for the purposes of performing its audit.

HEK shall also provide Client with the following set of reporting and communications with respect to the investment performance of the Plan:

    (a)    Quarterly performance review report for the Plan.

    (b)    Meetings (at Committee's discretion, these will be annually, semi-annually or quarterly) to analyze and review the Plan. These meetings will include an appraisal of the investment results, a review of any changes to the investment program, an estimation of projected pension liabilities, and a discussion of any recommendations (e.g. the annual Investment Policy Statement review).

    (c)    HEK's investment staff will be available to answer questions and to discuss topics of interest to Client and the Committee on an as-needed basis. Routine discussions regarding investment policies and alternatives are included within the scope of the Services.

**6. Custody and Registration of Plan Assets**

    (a)    The appropriate designated Plan fiduciary shall appoint a custodian (the "Custodian"), which shall be responsible for arranging custody and safekeeping of the Plan assets, the collection of income and other entitlements and all other designated administrative functions in relation to such assets. HEK shall not have custody of any Plan assets nor provide any custodial services under this Schedule.

    (b)    HEK is authorized to deal on behalf of the Plan with the Custodian on an ongoing basis. In giving instructions to the Custodian, HEK shall comply with the relevant procedures set out in the current agreement between the Custodian and the Plan (the "Agreed Procedures"), a copy of which shall be supplied to HEK in a timely manner. HEK shall be notified in writing of any amendments to the Agreed Procedures within 10 business days of such amendment and shall thereafter be bound by such amendment unless HEK (acting reasonably) notifies the appropriately designated Plan fiduciaries within 10 business days such notice that such amendment is not acceptable, in which case such amendment shall not be effective.

    (c)    HEK shall not have any liability with respect to the acts or omissions of the Custodian provided that HEK has complied with its obligations under this Schedule and acts in good faith at all times in its dealings with the Custodian. All assets in registered form will be registered in the name of the Custodian or its nominee, or as the appropriately designated plan fiduciaries may otherwise arrange and notify to HEK. HEK shall not be responsible for the fees, charges, and expenses of the Custodian.

    (d)    HEK shall have no responsibility for management of cash assets of the Plan if Client has authorized and directed the Custodian to manage uninvested cash assets of the Plan. HEK shall be responsible to review/coordinate cash flow from the Custodian to the Sub-Advisers (as payment for their services) and cash movement among Plan investment accounts.

    (e)    Where the Plan gives any instruction or communication to or receives any communication from the Custodian in respect of the Plan assets to be invested pursuant to this Schedule it shall either copy the instruction or communication to HEK at the same time, or shall procure that the Custodian promptly does so, including the furnishing to HEK of copies of all statements issued by the Custodian to the Plan.

**7. Brokerage**

Except where the Plan requires HEK to use a particular broker or counterparty, if HEK is specifically required to execute brokerage transaction for the Plan, HEK shall comply with all Securities and Exchange Commission rules related to Best Execution applicable to HEK.   Where HEK is specifically engaged to select, review, and continue to engage third party brokerage firms, HEK shall act in good faith and with due diligence and care.   However, HEK shall not be responsible for any default on HEK's part of any third party brokerage or brokerage execution firms ("brokerage firms"), provided that HEK has acted in good faith at all times in dealings with such brokerage firms.

**AGREED TO by the authorized representatives of the respective parties below:**

**Plan Administrator of the**
**Citrus Memorial Health Foundation, Inc.**

By: _____ Pension Committee _____

By: _____ Carlton E. Fairbanks _____

Name: _Carlton E. Fairbanks_

Title: _Chairman Pension Committee_

Date: _10/9/14_

**Hewitt EnnisKnupp, Inc.**

By: _Matt Miller_

Name: _Matt Miller_

Title: _VP Legal_

Date: _10/17/14_

## Schedule No. 2 - Actuarial Services

**This Schedule No. 2 ("Schedule 2") is entered into by and between the Plan Administrator of the Citrus Memorial Health Foundation, Inc. Pension Plan (the "Plan") ("Client") and Hewitt Associates LLC ("Aon Hewitt"), pursuant to the Master Consulting Agreement between Client and Aon Hewitt and its Affiliates dated _Oct 8th_, 2014 (the "Agreement").**

All definitions, terms and conditions in the Agreement are herein incorporated by reference. To the extent any provisions of the Agreement and this Schedule conflict, the terms of this Schedule shall govern with respect solely to this Schedule.

## Services and Fees

| One Time Implementation Activity | Fees in accordance with Section 1 of the Agreement |
|---|---|
| **Transition, including set up of valuation systems and reproduction of prior year actuarial valuation, included in the fees set forth below.** | Included |

| Ongoing Activity | Fees in accordance with Section 1 of the Agreement |
|---|---|
| • ***Annual funding valuation:*** <br> – Collection, review, and processing of valuation data; assumes census data is clean and provided in one source <br> – Includes high level review of data for consistency and reasonableness <br> – Preparation of PPA method election letters as needed <br> – Determination of contribution requirements, excluding development of at-risk determinations (which are likely not needed if plan sponsor expects to avoid PPA benefit limitations) <br> – Development of Funding Target Attainment Percentage (FTAP) and development of one actuarial certification of the Adjusted Funding Target Attainment Percentage (AFTAP) <br> – Credit balance election support <br> – Routine communication with auditors relating to the plan audit (includes providing ASC 960 information) <br> – Preparation of valuation report <br> • ***Determine and provide documentation for the annual accounting liabilities and expenses:*** <br> – Development of ASC 715 pension expense (formerly FAS 87, FAS 158) <br> – Review of assumptions (basic economic assumptions, not full experience study) | Included |

| Ongoing Activity | Fees in accordance with Section 1 of the Agreement |
|---|---|
|     — Implementation of assumptions selected at the measurement date, including assistance with the discount rate and expected return on assets selections<br><br>    — Preparation of year-end disclosure<br><br>    — Preparation of valuation report<br><br>• ***Prepare the annual IRS Form 5500 filing:***<br>    — Includes Form 5558 to extend deadline for Form 5500 filing<br><br>    — Includes all required schedules and attachments<br><br>    — Includes support with electronic filing<br><br>• ***Prepare the annual IRS Form 8955-SSA filing***<br>• ***Prepare PBGC filings, including calculation of annual PBGC premiums and completion of all required schedules:***<br>    — Includes preparation of estimated and comprehensive premium filings to be filed electronically<br><br>• ***Complete the annual participant funding notice:***<br>    — Preparation of Defined Benefit Funding Notice | |

## Terms and Conditions for Actuarial Services

1. Term of Schedule.  Services covered by this Schedule will on the Effective Date and continue until the Agreement is terminated by either party upon thirty (30) days written notice to the other party.

2. For projects completed on a time and materials basis, fees will be determined on a time and materials basis in accordance with Aon Hewitt's standard billing rates and the value of our services based on our time, complexity, and the level of skill and urgency required, unless a different arrangement is agreed to by both parties.

3. Additional Services necessitated by regulatory changes, plan design changes, compliance failures not within the control of Aon Hewitt or the control of any of its affiliates or subcontractors, and application of PPA Section 436 benefit restrictions will result in additional one-time fees and may result in changes to ongoing fees. Aon Hewitt agrees to work with Client in developing a change control process to facilitate the budgeting and management of these events.

4. Except as expressly set forth in the Investment Management Services Schedule, Aon Hewitt will have no discretionary authority or control over the management or administration of the Plan, nor is it intended that Aon Hewitt be considered a fiduciary of the Plan in connection with the Services under this Schedule.

5. Client will be responsible for retaining duplicate copies of data or materials it sends to Aon Hewitt and for taking other precautions as it deems necessary in case such data or materials are lost or destroyed, regardless of cause or in case reprocessing is needed for any reason.

**IN WITNESS WHEREOF,** authorized representatives of the parties have executed this Schedule as of the last date set forth below:

**Plan Administrator of the**
**Citrus Memorial Health Foundation, Inc. Pension Plan**

**Hewitt Associates LLC**

By:   Pension Committee

By:   _Carlton E. Fairbanks_

By:   _____

Name:  _Carlton E. Fairbanks_

Name:  _Matt Miller_

Title:  _Chairman Pension Committee_

Title:  _VP-Legal_

Date:   _10/8/14_

Date:   _10/12/14_

## Schedule No. 3 – Pension Administration Services (Ongoing Services)

This Schedule No. 3 ("Schedule 3") is entered into by and between the Plan Administrator of the Citrus Memorial Health Foundation, Inc. Pension Plan (the "Plan") ("Client") and Hewitt Associates LLC and its Affiliates (collectively, "Aon Hewitt"), pursuant to the Master Consulting Agreement between Client and Aon Hewitt dated _Oct 8th_ , 2014 (the "Agreement").

All definitions, terms and conditions in the Agreement are herein incorporated by reference.  To the extent any provisions of the Agreement and this Schedule conflict, the terms of this Schedule shall govern with respect solely to this Schedule.

## Plan Covered (the "Plan")
Citrus Memorial Health Foundation, Inc. Pension Plan

**Services and Fees**

| One Time Implementation Activity | Fees in accordance with Section 1 of the Agreement |
|---|---|
| **One-Time Implementation Fee**<br>• Development of Requirements Document<br>• Active Participant Data Collection<br>• Inactive Participant Database Set-up<br>• Inactive Participant Data Load<br>• Development of DBCalc for use by Aon Hewitt.<br>• Trustee Interaction Set-up.<br>• Participant Call Center Set-up. | Included |
| **Participant Data Clean-up** | Time and materials (Options and budget will be provided in advance if services are needed) |
| **Manual Data Entry** | Time and materials (Options and budget will be provided in advance if services are needed) |

| Ongoing Activity | Fees in accordance with Section 1 of the Agreement |
|---|---|
| **Comprehensive benefit calculation services:**<br>• Pension data maintenance for all types of plan participants and beneficiaries<br>• Determination of benefit eligibility<br>• Event processing (including calculations and all personalized statements) for the following: terminations, lump sum cash outs, retirements, vested pension commencements, death of active participants, death of terminated vested participants, death of retirees<br>• Notification of terminated vested participants who are approaching normal retirement age<br>• Administration of required minimum distributions consistent with plan rules<br>• Calculation and administration of pension splits per QDRO<br>• Processing annual CPI increase in pensioner benefits, if applicable | Included |
| **Pension Payroll Services:**<br>• Sending pension payment instructions to trustee/check writer (includes pension amounts, payment address or bank account information, and tax elections)<br>• Reconciliation of pension payment instructions with trustee/check writer | Included |

| Ongoing Activity | Fees in accordance with Section 1 of the Agreement |
|---|---|
| **Call Center:**<br>• Intelligent call routing<br>• Handles inquiries on plan provisions and administrative rules<br>• Handles pension eligibility questions<br>• Provides procedural information<br>• Performs pension transactions including estimates, retirements, and commencements<br>• Processes death benefits<br>• Call recording<br>• Ability to track calls and unresolved issues | Includes up to 2,000[1] call minutes per calendar year; $5 per minute in excess of 2,000. |
| **Participant Communications:**<br>• Development and updating (as needed) of all personalized communication statements | Included |
| **Plan accounting/financial services:**<br>• Providing data files for actuarial valuations and data support for compliance filings<br>• Support for internal and external auditors | Included |
| **DBCalc Annual Maintenance:**<br>• Maximum benefit limitation, compensation limits, interest rate changes, etc | Included |

## Service Assumptions/Additional Terms and Conditions

1.  In addition to fees, Client is responsible for costs associated with the production/fulfillment of communication materials including but not limited to postage/shipping, printing, duplicating, folding, stuffing, and cost of materials such as paper and envelopes for mass mailings to more than 50 participants.

2.  The Services covered by this Schedule will be performed in accordance with the applicable requirements document(s) (the "Requirements Document") which will be prepared by Aon Hewitt after consultation with Client. Upon approval, the Requirements Document will be incorporated by reference into the Agreement. In the absence of any written comments or objections by Client within fifteen (15) business days of submission, the Requirements Document or portions submitted will be deemed to have been approved. The Requirements Document shall constitute Aon Hewitt Information. Amendments to the Requirements Document will follow a similar procedure.

3.  Client will (i) verify that all procedures set out in the Requirements Document are consistent with the Plan legal documents, (ii) interpret the Plan, and (iii) supervise and review the activities of any trustee for the Plan. Client will strive to maintain the Plan legal documents in compliance with applicable law. Client represents to its knowledge that such documents are now in compliance with applicable law. Client agrees to notify Aon Hewitt as soon as possible of any amendments or proposed amendments to the Plan legal documents. Aon Hewitt will have no discretionary authority or control over the management or administration of the Plan. It is not intended that Aon Hewitt be considered a fiduciary of the Plan with respect to the Services described in this Schedule.

4.  Implementation Activity will commence upon the Effective Date of this Schedule. The Ongoing Activity in this Schedule will commence upon the dates prescribed in the Requirements Document.

5.  Services covered by this Schedule commence on the Effective Date and continue until the Agreement is terminated by either party upon thirty (30) days written notice to the other party prior to the end of the initial term or any renewal term.

---

[1] Prorated for partial calendar years.

6. Should the Services set forth in the Schedule be terminated without Cause, as defined in Section 3 of the Agreement, by Client or with Cause by Aon Hewitt before the end of the Initial Term, Client will be invoiced $95,000 if termination is in the first Year, $75,000 if in the second Year, $55,000 if in the third Year, $35,000 if in the fourth Year, and $15,000 if in the fifth year, provided however that the foregoing early termination fees are not due to Aon Hewitt if the Agreement is terminated due the termination of the Plan. These termination fees are in addition to any other fees for services, expenses, or charges due under other provisions in any Schedule or in the Agreement.

7. If Client terminates Services before ongoing Services commence, Client will pay for fees incurred by Aon Hewitt in implementing those Services plus out-of-pocket expenses actually incurred, less any amounts already paid by Client for those Services. If Client delays the implementation date of any of the Services but does not terminate the Services, applicable ongoing fees will commence as originally scheduled.

8. Upon termination, all Aon Hewitt Information and other Aon Hewitt Confidential Information, together with any copies thereof in Client's possession or control will either be returned to Aon Hewitt or destroyed with written certification to Aon Hewitt of such destruction by an executive officer of Client. A copy of the imaged benefit calculations and participant data stored in the "Inactive Database" (defined as data on current retirees and deferred vested participants) may be returned to Client in Aon Hewitt's standard format at Aon Hewitt's then current and customary rates.

9. Conversion data is provided by Client in Aon Hewitt's format (MS Excel, MS Access, CSV file, or TXT file) and provided through electronic file transfer.

10. Client will be responsible for retaining duplicate copies of data or materials it sends to Aon Hewitt and for taking other precautions as it deems necessary in case such data or materials are lost or destroyed, regardless of cause or in case reprocessing is needed for any reason.

11. The implementation and ongoing fees described above assume Aon Hewitt templates are used for employee/participant communications.

12. Data research and correction, exception processing, manual processes resulting from missing or inaccurate data, calculations for participants past age 70 ½ who have not commenced their benefit (or for corrections of other past administrative oversights), calculations for special events (i.e., spinoff, acquisition), and recalculation of a frozen accrued benefit will be billed as additional services. Plan termination calculations fall under Schedules 4 and 6.

13. Supporting administrative changes requested by Client (e.g., plan changes, plan amendments, new plan offerings, changes in service providers or system interfaces, work related to acquisitions and divestitures) after Client approval of the Requirements Document will often result in additional one-time fees and may result in changes to ongoing fees. Aon Hewitt agrees to work with Client in developing a change control process to facilitate the budgeting and management of these events.

14. Participant Call Center hours of operation are from 9:00 a.m. until 5:00 p.m., Monday-Friday, except for the following holidays: New Year's Day, Memorial Day, Independence Day (July 4th), Labor Day, Thanksgiving Day, Day After Thanksgiving, Christmas Eve, and Christmas Day.

15. Aon Hewitt uses a subcontractor for the routing, recording and storage of phone calls into the Participant Call Center (included in fee provided above).

IN WITNESS WHEREOF, authorized representatives of the parties have executed this Schedule as of the last date set forth below:

**Plan Administrator of the**
**Citrus Memorial Health Foundation, Inc. Pension Plan**                    **Hewitt Associates, LLC**

By: Pension Committee                                                       By: _____

By: _Carlton E. Fairbanks_

Name: _Carlton E. Fairbanks_                                               Name: _Matt Miller_

Title: _Chairman Pension Committee_                                        Title: _VP-Legal_

Date: _10/9/14_                                                            Date: _10/17/14_

## Schedule No. 4 – Pension Administration Services (Lump Sum Initiative)

This Schedule No. 4 ("Schedule 4") is entered into by and between the Plan Administrator of the Citrus Memorial Health Foundation, Inc. Pension Plan ("Plan") ("Client") and Hewitt Associates LLC ("Aon Hewitt"), pursuant to the Master Consulting Agreement between Client and Aon Hewitt and its Affiliates dated _Oct. 8th_, 2014 (the "Agreement").

All definitions, terms and conditions in the Agreement are herein incorporated by reference.  To the extent any provisions of the Agreement and this Schedule conflict, the terms of this Schedule shall govern with respect solely to this Schedule.

**Services and Fees**

| Services | Fees |
|---|---|
| **Implementation Fee**<br>• Development of Requirements Document<br>• Active & Inactive Participant Data Collection and Load<br>• Development of DBCalc<br>   o   Program and test DBCalc system (to record and store elections)<br>   o   Program and test DBCalc system for maintenance activities post lump sum solicitation | Included |
| **Fee for Administration of Lump Sum Window**<br><br><br>▪   Project management services:<br>   –   Kickoff meeting to identify tasks, project milestones, and team roles<br>   –   Twice monthly conference calls to ensure coordination, provide status updates, and track progress<br>▪   Requirements documentation (comprehensive summary of our interpretation of the plan provisions used for coding DBCalc system – we ask client to sign off on their agreement with the information in the document):<br>   –   Plan requirements documentation tailored to lump sum offering outlining plan provisions and plan changes<br>   –   Reconciliation of pension payment instructions with trustee/check writer<br>▪   System programming and testing:<br>   –   Programming and testing of DBCalc system to calculate the lump sum and optional payment forms and to print the complete packet for the window<br>▪   Benefit calculations:<br>   –   Calculation of lump sum and optional payment forms for approximately 700 terminated vested participants | $177,500 (billed in three installments: $60,000 due upon delivery of draft Requirements Document, $60,000 due on the date the announcement flyer is mailed, and $57,500 due in the month distributions are paid) |

| Services | Fees |
|---|---|
| (includes current active participants)<br><br>— Generation of required participant letters and election forms<br><br>— Pre-calculated frozen accrued benefits are provided by the Foundation<br><br>• Printing and distribution services:<br><br>— Production and distribution of lump sum window announcement letter and two reminder notices during the window period<br><br>— Production, assembly and distribution of system generated election packages, which will include a brochure describing the offer, a cover letter, election forms, optional forms of payment description, relative values, a qualified joint and survivor chart, a spousal consent form, and a special tax notice<br><br>• Processing Participant Elections:<br><br>— Collecting participant paperwork and reviewing for completeness<br><br>— Returning any elections with missing or incorrect information – additional fee may result if more than 40 election packages are returned<br><br>— Recording the payment election<br><br>— Generating a MS Excel file for the trustee<br><br>— Weekly reports will be provided regarding participant elections<br><br>— Communicating elections with trustee<br><br>• Pension service center:<br><br>— Call center staffed by consultants educated on the specific features of the Foundation's lump sum offering<br><br>— Consultants available to help participants to understand the election forms and the options available to them<br><br>— Opens when announcement letters are mailed through one month following the lump sum distribution date<br><br>— The same phone number will be used as is used for the ongoing services call center<br><br>— In the year of the Lump Sum Initiative, 3,000 call minutes will be added to the annual included threshold | |

## Service Assumptions/Additional Terms and Conditions

1.  In addition to fees, Client is responsible for reasonable costs associated with the production/fulfillment of communication materials including but not limited to postage/shipping, printing, duplicating, folding, stuffing, and cost of materials such as paper and envelopes, which costs will be passed through to Client without additional mark-up by Aon Hewitt

2.  The Services covered by this Schedule will be performed in accordance with the applicable requirements document(s) (the "Requirements Document") which will be prepared by Aon Hewitt after consultation with Client. Upon approval, the Requirements Document will be incorporated by reference into the Agreement. In the absence of any written comments or objections by Client within fifteen (15) business days of submission, the Requirements Document or portions submitted will be deemed to have been approved. The Requirements Document shall constitute Aon Hewitt Information. Amendments to the Requirements Document will follow a similar procedure.

3.  Client will (i) verify that all procedures set out in the Requirements Document are consistent with the Plan legal documents, (ii) interpret the Plans, and (iii) supervise and review the activities of any trustee for the Plans. Client will strive to maintain the Plan legal documents in compliance with applicable law. Client represents to its knowledge that such documents are now in compliance with applicable law. Client agrees to notify Aon Hewitt as soon as possible of any amendments or proposed amendments to the Plan legal documents. Aon Hewitt will have no discretionary authority or control over the management or administration of the Plans. It is not intended that Aon Hewitt be considered a fiduciary of any Plans with respect to the Services described in this Schedule.

4.  Services covered by this Schedule will have an initial term commencing on the date prescribed in the Requirements Document and ending upon processing the lump sum distributions.

5.  If Client terminates Services before Services commence, Client will pay for fees incurred by Aon Hewitt in implementing those Services plus out-of-pocket expenses actually incurred, less any amounts already paid by Client for those Services. If Client delays the implementation date of any of the Services but does not terminate the Services, applicable ongoing fees will commence as originally scheduled.

6.  Upon termination, all Aon Hewitt Information and other Aon Hewitt Confidential Information, together with any copies thereof in Client's possession or control will either be returned to Aon Hewitt or destroyed with written certification to Aon Hewitt of such destruction by an executive officer of Client. A copy of the imaged benefit calculations and participant data stored in the "Inactive Database" (defined as data on current retirees and deferred vested participants) may be returned to Client in Aon Hewitt's standard format at Aon Hewitt's then current and customary rates.

7.  Data required to perform the Services in this Schedule is either already available to Aon Hewitt or provided by Client in Aon Hewitt's format (MS Excel, MS Access, CSV file, or TXT file) and provided through electronic file transfer.

8.  Client will be responsible for retaining duplicate copies of data or materials it sends to Aon Hewitt and for taking other precautions as it deems necessary in case such data or materials are lost or destroyed, regardless of cause or in case reprocessing is needed for any reason.

9.  The fees described above assume Aon Hewitt templates are used for employee/participant communications. Additional fees would apply for using other communications.

10. Data is of sufficient quality that processing can be performed without human intervention. Data research and correction, exception processing, and any manual processes resulting from missing or inaccurate data is billed as additional services.

11. Supporting administrative changes requested by Client (e.g., plan changes, plan amendments, new plan offerings, changes in service providers or system interfaces, work related to acquisitions and divestitures) after Client approval of the Requirements Document will often result in additional one-time fees and may result in changes to ongoing fees. Aon Hewitt agrees to work with Client in developing a change control process to facilitate the budgeting and management of these events.

12. Participant Call Center hours of operation are from 9:00 a.m. until 5:00 p.m., Monday-Friday, except for the following holidays: New Year's Day, Memorial Day, Independence Day (July 4th), Labor Day, Thanksgiving Day, Day After Thanksgiving, Christmas Eve, and Christmas Day.

13. Aon Hewitt uses a subcontractor for the routing, recording and storage of phone calls into the Participant Call Center the charge for which is included in the fee provided above.

IN WITNESS WHEREOF, authorized representatives of the parties have executed this Schedule as of the last date set forth below:

**Plan Administrator of the**
**Citrus Memorial Health Foundation, Inc. Pension Plan**

By: Pension Committee

By: _Caitlan E. Fairbanks_

Name: _Carlton E. Fairbanks_

Title: _Chairman Pension Committee_

Date: _10/9/14_

**Hewitt Associates LLC**

By: _Matt Miller_

Name: _Matt Miller_

Title: _VP Legal_

Date: _10/17/14_

## Schedule No. 5 – Communication Consulting Services (Lump Sum Distribution)

**This Schedule No. 5 ("Schedule 5") is entered into by and between the Plan Administrator of the Citrus Memorial Health Foundation, Inc. Pension Plan (the "Plan") ("Client") and Hewitt Associates LLC ("Aon Hewitt"), pursuant to the Master Consulting Agreement between Client and Aon Hewitt and its Affiliates dated *Oct 8th*, 2014 (the "Agreement").**

All definitions, terms and conditions in the Agreement are herein incorporated by reference. To the extent any provisions of the Agreement and this Schedule conflict, the terms of this Schedule shall govern with respect solely to this Schedule.

### Services and Fees

| Services | Fees |
|---|---|
| **Communications Campaign:**<br><br>• Announce, inform, remind<br>• Reminder calls and e-mails<br>• On-site meetings<br>• 1:1 discussions<br>• Webinar<br>• Posters, banners, and other print materials | $110,000. (billed in three installments: $65,000 after Announce, Inform, Remind campaign is completed, $20,000 after on-site meetings, and $25,000 after webinar) |

### Description of Services and Fees

**Announce, Inform, and Remind:** We will provide 4 communication touch points with eligible participants to announce, inform, and remind them of the lump sum opportunity:

a. ***Announce:*** Prior to the window period, an announcement flyer (self-mailer) will be sent to inform all eligible participants of the upcoming window period.

b. ***Inform:*** Eligible participants will receive an election kit that includes a 4-page, non-personalized color brochure describing the choices and election process. The brochure will be used to provide participants an overview of their choices and guidance on how to make a decision. The election kit will also contain a personalized system-generated cover letter and election package (programmed on DBCalc)

c. ***Remind:*** A critical aspect of a successful window is to remind eligible participants about the availability of the lump sum. We will send out two reminders—a reminder flyer and postcard to eligible participants.

d. ***Other:*** Aon Hewitt will provide our call center representatives with sample FAQs and a brief script to use in describing the lump sum window to participants.

**On-Site Meetings:** Aon Hewitt will develop an employee meeting presentation to be delivered by two consultants who will conduct two days of employee meetings, and up to four, 90-minute meetings per day.

**1:1 Discussions:** Meeting leaders will be available between sessions to meet with individual participants on the same days as the On-Site Meetings.

**Webinar**: A Webinar presentation will be developed with speaker notes (script) that will provide the context for the changes, describe the choices available, and help participants understand the actions they need to take and how to take them. Aon Hewitt presenters will lead the webinar and record it to be replayed on demand. Participants will be informed of the webinar via e-mail and announcement mailing.

**Posters, Banners, and Other Print Materials:** Custom print materials will be developed for display in the hospital based on discussion with Client around the most effective means of communicating important messages about the pension plan with plan participants.

### Service Assumptions/Additional Terms and Conditions

1. Aon Hewitt will coordinate the production of communication materials. Any outside vendor charges will be billed in addition to the Fee. Additional outside vendor charges include items such as printing, assembly, binding, shipping, etc. We expect total outside vendor charges for all communications to be under $10,000.

2. Changes in the Services or additional projects may also be included as part of this engagement, as agreed to in writing, including email, by the parties. Unless otherwise set forth in such writing, our fees for other projects will be determined on a time and materials basis in accordance with Aon Hewitt's billing rates when the Services are performed and the value of the Services based on the time, complexity, and the level of skill and urgency required.

3. Services covered by this Schedule will have an initial term commencing on the Effective Date and ending December 31, 2015.

IN WITNESS WHEREOF, authorized representatives of the parties have executed this Schedule as of the last date set forth below:

**Plan Administrator of the
Citrus Memorial Health Foundation, Inc. Pension Plan**

By: Pension Committee

By: _Carlton E. Fairbanks_

Name: _Carlton E. Fairbanks_

Title: _Chairman Pension Committee_

Date: _10/9/14_

**Hewitt Associates LLC**

By: _Matt Mullen_

Name: _Matt Mullen_

Title: _VP-Legal_

Date: _10/17/14_

## Schedule No. 6 – Plan Termination Services

This Schedule No. 6 ("Schedule 6") is entered into by and between the Plan Administrator of the Citrus Memorial Health Foundation, Inc. Pension Plan (the "Plan") ("Client") and Hewitt Associates LLC and Hewitt EnnisKnupp, Inc. (collectively, "Aon Hewitt"), pursuant to the Master Consulting Agreement between Client and Aon Hewitt dated *Oct. 8th*, 2014 (the "Agreement").

All definitions, terms and conditions in the Agreement are herein incorporated by reference. To the extent any provisions of the Agreement and this Schedule conflict, the terms of this Schedule shall govern with respect solely to this Schedule.

**Plan Covered (the "Plan")**
Citrus Memorial Health Foundation, Inc. Pension Plan

**Services and Fees**

| Services | Fees |
|---|---|
| **Project Planning and Management**<br>• Facilitate a four-hour planning meeting to develop specific steps, timing, needs, and responsibilities<br>• Develop and manage plan termination activity timelines and coordinate meetings every other week throughout the termination process (up to 24 hours)<br>• Identify open issues and facilitate discussions to resolve<br>• Maintain plan termination documentation to support process followed and benefit information provided to participants in the event of a PBGC audit<br><br>**Funding and Accounting Projections .**<br>• Calculate estimated plan termination liabilities<br>• Determine costs associated with various distribution alternatives<br>• Project curtailment and settlement accounting impacts<br><br>**Plan Document Drafting and Filing for Determination Letter**<br>• Review plan documents to identify necessary/desirable amendments in the plan termination<br>• Review plan amendments as drafted by outside legal counsel<br>• Provide completed IRS Form 5310 including the following data and information<br>  &ndash; Excess assets or contributions<br>  &ndash; Participant counts and reconciliations<br>  &ndash; Benefit values for participants identified for the Form 6088<br><br>**Benefit Data**<br>• Identify all benefits and data elements to be included in | $150,000 (billed in three installments: $50,000 due upon delivering draft plan document/amendment, $50,000 due upon mailing Notice of Plan Benefits, and $50,000 due upon delivery of final file to selected annuity provider) |

| Services | Fees |
|---|---|
| participant communications<br><br>- Identify all required data elements for the Notice of Plan Benefits<br>- Facilitate search for missing participants<br><br>**Participant Communications**<br>- Draft the following non-personalized notices<br>  – Notice of Intent to Terminate<br>  – Notice to Interested Parties<br>  – Notice of Insurers and State Guaranty Associations<br>- Draft personalized Notice of Plan Benefits for all participants (included up to four (4) versions)<br>- Produce Notice of Plan Benefits for all participants using agreed-to data described above<br>- Produce and distribute all participant communications<br>- Assistance with missing participants, billed on a Time and Materials basis<br>*Aon Hewitt assumes that retirees currently in pay status will not be offered an election in the plan termination (i.e. retired employees are included in the annuity purchase only)*<br><br>**Other Governmental filings**<br>- Signature-ready PBGC Form 500 and Schedule EA-S<br>- Signature-ready PBGC Form 501<br>- Signature-ready PBGC Schedule MP<br>- Availability to answer questions or provide information requested by PBGC (filing forms and responding to basic questions is included; services to support a PBGC audit would be billed at Time and Materials)<br><br>**Annuity Placement (annuity provider search process)**<br>- Provide decision-tree and project management framework<br>- Develop insurer request for proposal<br>- Conduct solicitation process<br>- Provide guidance on insurer intricacies and nuances<br>- Negotiate with annuity provider finalists<br>- Deliver detailed documentation and reporting<br>- Make recommendation to Client of annuity provider<br>- Facilitate final asset distribution to selected insurance company at time of annuitization | |

**Service Assumptions/Additional Terms and Conditions**

Services covered by this Schedule are expressly conditioned on execution and closing of the anticipated agreement among the Citrus Memorial Health Foundation, Inc., Citrus County Hospital Board and [HCA Entity] for the sale/lease of substantially all assets of the Hospital. This closing date will serve as the Effective Date for this Schedule.

The following services are considered out of scope and will be billed on a Time and Materials basis:

- Loading and editing of corrections to and changes in participant data;
- Recalculation of benefits where the participant provides updated spousal information or participant data was corrected;
- Notice of Plan Benefit versions in excess of four (4) versions (active, retired, beneficiary, and deferred vested participants have different versions);
- Third party fees for assistance with missing participant search;
- Follow-up with participants if returned paperwork is incomplete;
- Nonstandard calculations including but not limited to QDROs, alternate payees, beneficiaries etc.;
- Coordination of plan provision information and data files for annuity bidders and final file for selected annuity provider
- Production of data for top 25 participants; and
- Services related to PBGC audit (if applicable).

In addition to the fees outlined above, Client is responsible for costs associated with the production/fulfillment of communication materials including but not limited to printing, duplicating, folding, stuffing, and cost of materials such as paper and envelopes for mass mailings to more than 50 participants. Aon Hewitt will coordinate the production of materials for Client. These fees do not include outside supplier fees.

In addition to the projects shown above, there may be other miscellaneous requests that fall outside the defined scope. Fees for any of these miscellaneous requests, not covered by the fees above, or any additional services requested and not defined in the services listed above will be determined on a "Time and Materials" (T&M) basis in accordance with Aon Hewitt's standard billing rates and the value of our services based on our time and the complexity and the level of skill and urgency required, unless Aon Hewitt agrees to a different arrangement. Aon Hewitt agrees to consult with Client before incurring any fees or costs for such additional services. For larger projects, Aon Hewitt will discuss estimated fees in more detail.

Any services that constitute investment advisory services will be performed by Hewitt EnnisKnupp Inc. HEK has supplied a copy of our ADV Form Parts 2A and 2B, which serve as HEK''s firm brochure under the Investment Advisers Act of 1940; this contains general information on HEK, the services HEK provides, its fees and team members.

IN WITNESS WHEREOF, authorized representatives of the parties have executed this Schedule as of the last date set forth below:

**Plan Administrator of the**
**Citrus Memorial Health Foundation, Inc. Pension Plan**

By: _Carlton E Fairbanks_

Name: _Carlton E. Fairbanks_

Title: _Chairman Pension Committee_

Date: _10/9/14_

**Hewitt Associates LLC**

By: _Matt Mill_

Name: _Matt Miller_

Title: _VP-Legal_

Date: _10/17/14_

**Hewitt EnnisKnupp, Inc.**

By: _Matt Mill_

Name: _Matt Miller_

Title: _VP-Legal_

Date: _10/17/14_

# Hewitt ennisknupp

**An Aon Company**

### ERISA 408(b)(2) – Covered Service Provider Reporting

### Hewitt EnnisKnupp, Inc.

| | |
|---|---|
| Covered Service Provider: | Hewitt EnnisKnupp, Inc., an Aon company |
| Plan(s) to which services are provided: | Citrus Memorial Health Foundation, Inc. Pension Plan |
| Services Provided (including description): | Hewitt EnnisKnupp, Inc. provides investment consulting services for the Plan listed above as outlined in Schedule 1. |
| Fiduciary Status: | Hewitt EnnisKnupp, Inc. acknowledges its status as a fiduciary for the investment consulting services it provides. |
| Direct/Indirect Compensation: | Hewitt EnnisKnupp, Inc. receives only direct compensation |
| Description of Compensation: | The fee for the services listed above will be 0.212% (21.2 basis points) of the total portfolio assets contained in the Plan's trust, payable in accordance with the terms of the Master Consulting Agreement based on the value of assets in the Plan.  Fees shall be calculated and due and payable quarterly in arrears, based on the asset value of the Plan on the last business day of the quarter.  All expenses shall also be paid as outlined in the Master Consulting Agreement.  Fees for any partial period shall be pro-rated accordingly. |
| Termination Compensation (if applicable): | None. |
| Related Party Compensation: | Hewitt EnnisKnupp, Inc. has also provided disclosures for the Citrus Memorial Health Foundation, Inc. Pension Plan for Actuarial and Administration services on additional exhibits. |
| Additional Disclosures: | Citrus Memorial Health Foundation, Inc. Pension Plan will be investing in the Aon Hewitt Group Trust Funds.  Ordinary Fund level fees are paid from the assets of the Fund(s).  Such ordinary Fund expenses include, among other things, investment management fees, custodial and trustee service fees, and audit service fee.  Fees for the funds invested in are anticipated to be approximately:<br><br>US Large Cap Active Fund      0.50%<br>US Large Cap Passive Equity Fund      0.01%<br>US Small/Mid Active Fund      0.78%<br>US Small Cap Passive Equity Fund      0.06%<br>Non US Active Equity Fund      0.54%<br>Non-U.S. Equity Index Fund      0.11% |

| | | |
|---|---|---|
| | Global Real Estate Fund | 0.60% |
| | High Yield Fund | 0.38% |
| | Mid Duration Long Credit Fund | 0.23% |
| | US Long Fixed Income Fund | 0.12% |
| | US Intermediate Fixed Income Fund | 0.19% |
| | Global Equity Fund | 0.55% |
| | 20+ Year Treasury STRIPS* | 0.02% |
| | Aon Hewitt Offshore Fund of Hedge Funds | 0.15% |

*The 20+ Year STRIPS Fund was funded in June 2013 and may not be representative of actual 2013 expense ratios.

The expense ratios shown above are the actual expense ratios of the funds in 2013 and may not be representative of the 2014 expense ratios.

These fees do not represent compensation to HEK of any kind, but are paid to unrelated parties for services rendered to the AHGT funds in which the Plan has invested.

# Hewitt ennisknupp

### An Aon Company

## ERISA 408(b)(2) – Regulatory Reporting

## Appendix for Hewitt EnnisKnupp Affiliates

| | |
|---|---|
| Covered Service Provider: | Hewitt Associates, LLC (doing business as Aon Hewitt), an affiliate of Hewitt EnnisKnupp, Inc., an Aon company |
| Plan(s) to which services are provided: | Citrus Memorial Health Foundation, Inc. Pension Plan |
| Services Provided (including description): | Aon Hewitt provides actuarial services for the Plan listed above as outlined in Schedule 2. |
| Fiduciary Status: | Aon Hewitt is not a fiduciary with respect to any of the services provided in this appendix. |
| Direct/Indirect Compensation: | Aon Hewitt receives only direct compensation |
| Description of Compensation: | The fee for the services listed above will be 0.0705% (7.05 basis points) of the total portfolio assets contained in the Plan's trust, payable in accordance with the terms of the Master Consulting Agreement based on the value of assets in the Plan.  Fees shall be calculated and due and payable quarterly in arrears, based on the asset value of the Plan on the last business day of the quarter.  All expenses shall also be paid as outlined in the Master Consulting Agreement.  Fees for any partial period shall be pro-rated accordingly. |
| Termination Compensation (if applicable): | None. |
| Related Party Compensation: | Hewitt EnnisKnupp, Inc. has also provided disclosures for the Citrus Memorial Health Foundation, Inc. Pension Plan for Investment Consulting and Administration services on additional exhibits. |
| Additional Disclosures: | None. |

# Hewitt ennisknupp

### An Aon Company

## ERISA 408(b)(2) – Regulatory Reporting

## Appendix for Hewitt EnnisKnupp Affiliates

| | |
|---|---|
| Covered Service Provider: | Hewitt Associates, LLC (doing business as Aon Hewitt), an affiliate of Hewitt EnnisKnupp, Inc., an Aon company |
| Plan(s) to which services are provided: | Citrus Memorial Health Foundation, Inc. Pension Plan |
| Services Provided (including description): | Aon Hewitt provides administration services for the Plan listed above as outlined in Schedule 3. |
| Fiduciary Status: | Aon Hewitt is not a fiduciary with respect to any of the services provided in this appendix. |
| Direct/Indirect Compensation: | Aon Hewitt receives only direct compensation |
| Description of Compensation: | The fee for the services listed above will be 0.10% (10.0 basis points) of the total portfolio assets contained in the Plan's trust, payable in accordance with the terms of the Master Consulting Agreement based on the value of assets in the Plan.  Fees shall be calculated and due and payable quarterly in arrears, based on the asset value of the Plan on the last business day of the quarter.  All expenses shall also be paid as outlined in the Master Consulting Agreement.  Fees for any partial period shall be pro-rated accordingly. |
| Termination Compensation (if applicable): | Termination fees apply for the pension administration services. The fees will be $95,000 if termination is in the first year of the contract, $75,000 if in the second year, $55,000 if in the third year, $35,000 if in the fourth year, and $15,000 if in the fifth year.  No termination fees will apply if the agreement is terminated due to the termination of the plan. |
| Related Party Compensation: | Hewitt EnnisKnupp, Inc. has also provided disclosures for the Citrus Memorial Health Foundation, Inc. Pension Plan for Investment Consulting and Actuarial services on additional exhibits. |
| Additional Disclosures: | None. |