UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

| | |
|---|---|
| FOUNDATION RESOLUTION CORP., f/k/a Citrus Memorial Health Foundation Inc., and FOUNDATION RESOLUTION CORP. PENSION COMMITTEE, as an administrator of the Citrus Memorial Health Foundation, Inc. Pension Plan,<br><br>            Plaintiffs,<br><br>v.<br><br>AON HEWITT INVESTMENT CONSULTING, INC., f/k/a Hewitt EnnisKnupp, Inc. and ALIGHT SOLUTIONS LLC, f/k/a Hewitt Associates LLC,<br><br>            Defendants. | Case No.: 5:18-cv-458-Oc-30PRL |

## DEFENDANTS' ANSWER AND AFFIRMATIVE AND OTHER DEFENSES TO PLAINTIFFS' AMENDED COMPLAINT

Defendants Aon Hewitt Investment Consulting, Inc. and Alight Solutions LLC (collectively "Defendants"), by and through their counsel, Jenner and Block LLP, answer Plaintiffs' complaint, as follows:

### I.     OVERVIEW OF ACTION[1]

1.      This action primarily concerns Aon's deceptive, imprudent and incompetent performance of its obligations as a fiduciary to the Citrus Memorial Health Foundation, Inc. Pension Plan (the "Plan"), and violations of the Employee Retirement Income Security Act of

---

[1] The headings contained in the Amended Complaint are reproduced in this Amended Answer. Those headings contain no allegations and do not require a response. To the extent they require a response, Defendants deny them.

1974, as amended ("ERISA").  FRC hired Aon to terminate the Plan, which entailed a combination of paying lump sum benefits to eligible Plan participants who chose that option, as well as purchasing a terminal annuity to cover future periodic benefit payments to Plan participants who did not elect lump sums, and to invest and manage the Plan's assets accordingly up until the time of termination.

      **ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants admit to being hired to provide services in connection with Plan termination, as reflected in the Master Consulting Agreement ("MCA").  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

      2.    Aon Investing presented and sold FRC on a liability-driven "Hedge Path" investment strategy in which Aon Investing was to monitor and adjust the duration of Plan assets in relation to its liabilities so as to "lock in" improvements in the Plan's funded status as interest rates rose.  In that regard, Aon Investing acted as a fiduciary in designing, implementing, and monitoring its "Hedge Path" strategy; and Aon Investing was a fiduciary investment manager with respect to Plan assets that it invested in the Aon Hewitt Group Trust mutual funds ("AHGT funds"), including the AHGT Long Credit Bond ("Long") Fund and AHGT Mid Duration Long Credit Bond ("MidL") Fund.

      **ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants refer to the MCA, which sets forth the contracting parties' respective duties and responsibilities.  Defendants admit that a "Hedge Path" investment strategy was presented.  Defendants admit that Plan assets were invested in

the AHGT Long Credit Bond Fund and AHGT Mid Duration Long Credit Bond Fund as reflected in Quarterly Investment Reviews and other financial records for the Plan.  Except as expressly admitted herein, Defendants deny the remaining allegations in this paragraph.

3.      The complete breadth and depth of Aon Investing's misconduct is not yet fully known.  Despite its status as a fiduciary, Aon Investing has refused to provide all its investment-related records for the Plan in pre-suit dispute resolution and other proceedings.  From the information that Aon Investing has provided to date, however, FRC has discovered that Aon Investing pursued a different, far more risky investment strategy than it presented and sold to FRC as being a suitable, prudent approach to take in light of the Plan's needs—one that ultimately resulted in millions of dollars of losses to the Plan.

**ANSWER:**      This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations in this paragraph.

4.      Adding to that harm, in reliance on Aon's advice, FRC did not make an early lump sum benefits offer to eligible Plan participants.  Such an offer would have quickly reduced over $25 million in Plan liabilities by satisfying benefit obligations to hundreds of participants at a favorable discount rate and spared ongoing investment management fees that Aon Investing levied on Plan assets under its management.  Yet, in reliance on Aon's advice, the lump sum election window was delayed for approximately 18 months, awaiting an (unnecessary) IRS determination letter.  Rather than warn FRC of the significant risks and costs associated with delaying the lump sum window, Aon advised FRC to pursue a "Hedge Path" strategy to improve the Plan's funded status.

**ANSWER:**      Defendants deny the allegations in this paragraph.

5.     Contrary to Aon's representations, Aon Investing did not tailor its "Hedge Path" strategy to the actual or weighted duration of the Plan's liabilities; nor did Aon Investing closely monitor and increase the "hedge" as the Plan's funded status improved.  Rather, Aon Investing purchased assets with improperly weighted durations, thereby exposing the Plan to serious, latent mismatches between the duration of assets and liabilities.  As a consequence of Aon Investing's deficient design, implementation, and monitoring of its "Hedge Path" strategy, the Plan's funded status unexpectedly deteriorated by about $3.3 million in the six months, *after* the Plan achieved a funded status at which Aon, as it proposed, should have hedged the Plan to a degree that it was practically immune from interest rate volatility.

**ANSWER:**     Defendants deny the allegations in this paragraph.

6.     Moreover, after its handling of the "Hedge Path" strategy demonstrably failed to work, Aon Investing continued to let the strategy ride to a bitter end – culminating in millions of dollars more in losses at times when: (a) Aon Investing knew of the Plan's approaching need to pay lump sum benefits and purchase a terminal annuity with cash at a cost of more than approximately $89 million; (b) Aon Investing was predicting an imminent (observable) increase in interest rates that would result in declining fixed income (bond) values; (c) such declining values could make it difficult to liquidate Plan holdings; (d) Aon Investing had invested most of the Plan's assets in proprietary AHGT funds with a very small pool of authorized investors (comprised of other pension plans); and (d) the proper alternative was to shift to cash and cash equivalents to secure the value of Plan assets and provide immediate liquidity.

**ANSWER:**     Defendants deny the allegations in this paragraph.

7.     Adding insult to injury, after Aon agreed to perform a comprehensive communications campaign to notify Plan participants of a lump sum benefit option, Aon later tried to exact additional fees to perform the same scope of work it originally contracted to perform.  Then, Aon quietly failed to carry out the comprehensive communications campaign as originally agreed, after FRC refused to pay more for the same scope of services.  As a consequence, even with FRC's own last-minute efforts to notify participants, only 67% of eligible participants elected to take lump sums - a take rate far short of the 80% rate that Aon touted its comprehensive notice program would yield.  FRC did not get the services or reasonably anticipated results on which it relied in deciding to hire Aon.

**ANSWER:**     Defendants deny the allegations in this paragraph.

8.     In the interim, due to Aon's investment-related advice and failure to disclose associated risks, over $25,000,000 more in Plan assets remained at risk in Aon Investing's deficient "Hedge Path" strategy for an additional 18 months, the Plan paid Aon Investing many thousands of dollars more in investment management fees, and fewer participants were eligible to elect, and ultimately did not elect, to take cost-saving lump sum benefits.

**ANSWER:**     Defendants deny the allegations in this paragraph.

## II.     PARTIES, JURISDICTION AND VENUE

9.     Plaintiff Foundation is a Florida not-for-profit corporation with its principal place of business in Citrus County, Florida. Foundation is the sponsor and, both independently and through its Pension Committee, an administrator of the Plan.  For purposes of diversity, Foundation is a citizen of the State of Florida. Plaintiff Pension Committee is an unincorporated committee of Foundation and authorized agent of its Board of Directors. At all

times material to Plaintiffs' claims, members of the Pension Committee were selected from and jointly served as members of Foundation's Board of Directors. In light of their overlapping membership, as a practical matter, Foundation and its Committee jointly operated as a single, coordinated entity insofar as they conducted administrative and fiduciary functions on behalf of the Plan. Except with respect to investments, the Pension Committee is the named "Plan Administrator" appointed by Foundation in Plan documents; and Foundation and the Pension Committee are Plan fiduciaries as designated in Plan documents and/or based on the functions each performed on behalf of the Plan. For purposes of diversity, the Pension Committee's citizenship is at most derivative of or coextensive with Foundation's citizenship and, accordingly, Foundation's Pension Committee is also a citizen of the State of Florida.

**ANSWER:**   Defendants admit that the Plan document, as amended and restated effective January 1, 2009, identifies the Pension Committee as the "Plan Administrator." Defendants lack knowledge sufficient to form a belief about the truth of the allegations in this paragraph regarding Foundation's and the Pension Committee's principal place of business and citizenship, as well as the Pension Committee's and Foundation's memberships, operations, and functions, and on that basis deny those allegations.  Defendants deny the remaining allegations of this paragraph.

10.     Defendant Aon Investing (Aon Hewitt Investment Consulting, Inc., f/k/a Hewitt EnnisKnupp, Inc.) is an Illinois Corporation with its principal place of business in Chicago, Illinois. For purposes of diversity, Aon Investing is not a citizen of the State of Florida.

**ANSWER:**   Defendants admit Aon Hewitt Investment Consulting, Inc. is an Illinois corporation with its principal place of business in Chicago, Illinois.  Defendants further admit

Aon Hewitt Investment Consulting, Inc. is a not a citizen of the State of Florida for purposes of diversity.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

11.     Defendant Aon Consulting (Alight Solutions LLC, f/k/a Hewitt Associates LLC) is an Illinois limited liability company.  Upon information and belief, all of Aon Consulting's constituent members – including the natural persons or corporations who are members or partners of any limited liability company or partnership that is a member of Aon Consulting – are citizens of the State of Illinois or, at a minimum, not citizens of the State of Florida. Accordingly, for purposes of diversity, Aon Consulting is not a citizen of the State of Florida.

    **ANSWER:**     Defendants admit Alight Solutions LLC is an Illinois limited liability company and has no constituent members that are Florida citizens for purposes of diversity. Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

12.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, as this case arises under the laws of the United States, including Section 502 of ERISA, 29 U.S.C. § 1132.

    **ANSWER:**     This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations in this paragraph and demand strict proof thereof.

13.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000, exclusive of interest, costs and attorneys' fees; and there is complete diversity of citizenship inasmuch as FRC is not a citizen of the same state as either Defendant.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants admit that this Court has subject matter jurisdiction, but otherwise deny the allegations in this paragraph and demand strict proof thereof.

14.     This Court also has supplemental jurisdiction under 28 U.S.C. § 1367, because it has original jurisdiction over Plaintiffs' ERISA claims and Plaintiffs' other claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations in this paragraph and demand strict proof thereof.

15.     This Court has personal jurisdiction over Defendants because Section 502(e)(2) of ERISA, 29 U.S.C. § 1132(e)(2), provides for nationwide service of process and Defendants have continuous and systematic contacts with the United States; and Defendants transact business in this District, which is also where the Plan is administered and Defendants' breaches occurred.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants admit that this Court has personal jurisdiction, but otherwise deny the allegations in this paragraph and demand strict proof thereof.

16.     Venue is proper in the U.S. District Court for the Middle District of Florida because, pursuant to 28 U.S.C. § 1391(b), this is the district in which a substantial part of the

events or omissions giving rise to Plaintiffs' claims occurred and Defendants are subject to the Court's personal jurisdiction; and pursuant to 29 U.S.C. § 1132(e)(2), this is the district in which the Plan is administered and the place where Aon breached its fiduciary obligations.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants admit that venue is appropriate in this Court, but otherwise deny the allegations in this paragraph and demand strict proof thereof.

### III.   SUBSTANTIVE ALLEGATIONS

### The Hospital, its Employees & the Plan

17.     In 1949, the State of Florida created the Citrus County Hospital Board ("CCHB") as an independent special district charged with operating hospitals and related healthcare facilities for the benefit of the citizens and taxpayers of Citrus County. CCHB thereafter developed the real property, improvements, and other property comprising the Citrus Memorial Health System, an approximately 200-bed inpatient facility and healthcare system located in Citrus County, Florida (the "Hospital")

**ANSWER:**   Defendants lack knowledge sufficient to form a belief about the truth of the allegations in this paragraph and on that basis deny them.

18.     In 1987, Foundation was incorporated as a separate and distinct not-for-profit corporation to assist CCHB in carrying out the purposes of CCHB's enabling act.

**ANSWER:**   Defendants lack knowledge sufficient to form a belief about the truth of the allegations in this paragraph and on that basis deny them.

19.     Before 1990, CCHB operated the Hospital and Hospital employees participated in the Florida Retirement System.

**ANSWER:**     Defendants lack knowledge sufficient to form a belief about the truth of the allegations in this paragraph and on that basis deny them.

20.     In 1990, CCHB leased the Hospital to Foundation, which began to operate the Hospital pursuant to a long-term lease. Foundation established and became the sponsor of the Plan, and certain Hospital employees who previously participated in the Florida Retirement System began instead participating in the Plan.

**ANSWER:**     Defendants lack knowledge sufficient to form a belief about the truth of the allegations in this paragraph and on that basis deny them.

21.     On October 1, 2004, Foundation closed the Plan to new entrants and, as of December 31, 2010, "froze" the Plan, such that its approximately 1,100 participants ceased accruing new benefits. As a result, the duration of expected benefits to participants (Plan liabilities) predictably began to decrease every year.

**ANSWER:**     Defendants lack knowledge sufficient to form a belief about the truth of the allegations in this paragraph and on that basis deny them.

**The HCA Transaction**

22.     In October 2012, CCHB commenced an independent evaluation to determine whether Citrus County residents would benefit from the sale or lease of the Hospital in accordance with Section 155.40, Florida Statutes (2012). That evaluation eventually led CCHB to solicit and receive qualified proposals, including a proposal from affiliates of Hospital Corporation of America ("HCA").

10

**ANSWER:**    Defendants lack knowledge sufficient to form a belief about the truth of the allegations in this paragraph and on that basis deny them.

23.    CCHB and Foundation negotiated a long-term lease of the Hospital and sale of related property to HCA. The agreements for the transaction were ultimately executed at its closing on October 31, 2014 (the "HCA transaction").

**ANSWER:**    Defendants lack knowledge sufficient to form a belief about the truth of the allegations in this paragraph and on that basis deny them.

24.    Before the HCA transaction closed, CCHB and Foundation anticipated it would no longer be feasible to administer the Plan because, after the HCA transaction, Foundation was set to wind down its operations and dissolve. Accordingly, Foundation solicited proposals for professionals to administer and terminate the Plan.

**ANSWER:**    Defendants refer to the text of the proposal solicitations referenced in this paragraph for their true meaning and effect.  Defendants lack knowledge sufficient to form a belief about the truth of the remaining allegations in this paragraph and on that basis deny them.

**Aon's Proposal & Engagement**

25.    On May 29, 2014, FRC received a proposal for services from Aon (the "Proposal"). In it, Aon touted itself as having the experience to provide turnkey pension management services towards the objective of plan termination after a hospital sale; touted that FRC could save an estimated "$6 million through execution of a strategic lump sum window relative to annuitizing the entire liability"; and touted that Aon Investing's delegated investment program would result in substantial savings to the Plan.

**ANSWER:**   Defendants admit that on May 29, 2014, Aon Hewitt Investment Consulting, Inc. sent a proposal to Mark Williams of Citrus Memorial Health Foundation, Inc. Defendants refer Plaintiffs to the full text of the May 29, 2014 Proposal for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

26.     At the time of the Proposal, Aon was aware of the HCA transaction, and was aware that FRC's resources for Plan management would be limited after the HCA transaction, and that FRC's primary objective for the Plan was to terminate it as quickly and cost-effectively as possible after the HCA transaction.

**ANSWER:**   Defendants refer Plaintiffs to the full text of the May 29, 2014 Proposal referenced in this paragraph for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

27.     In regard to Plan termination, Aon understood that the Plan's active participants would become terminated vested participants ("TVPs") upon the closing of the HCA transaction, and that each TVP would be eligible to elect a lump sum benefit, if offered, unless or until becoming eligible and electing to receive periodic retirement benefits. At the time of the Proposal, Aon estimated that the Plan's termination liability was about $120 million (based on interest rates as of April 30, 2014), if TVPs were not given the opportunity to elect lump sums, or $114 million, if 80% of TVPs elected to take lump sum benefits.

**ANSWER:**   Defendants refer Plaintiffs to the full text of the May 29, 2014 Proposal for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

28.     From the outset, Aon informed FRC that an 80% lump sum take rate was consistent with Aon's experience with over 100 lump sum offerings since 2012. And, to illustrate the financial effect of incremental increases in the lump sum take rate, Aon estimated that the Plan's termination deficit would decrease $900,000 for every 10% increase in the take rate.

**ANSWER:**     Defendants refer to the full text of the May 29, 2014 Proposal for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

29.     Aon proposed a "turnkey delivery model" in which a single point of contact would coordinate a "comprehensive" scope of services through a so-called "Delegated Pension Manager" solution. Aon's Delegated Pension Manager solution was to include components of "Plan Administration," "Actuarial and Compliance Services," "Investments," "Participant Communications," and "Plan Termination." Aon presented the Delegated Pension Manager solution as designed to guide FRC through three phases of plan management (pre-transaction, preparation for plan termination, and plan termination) from the Plan's then-current state to, and through, plan termination as quickly and cost effectively as possible.

**ANSWER:**     Defendants refer to the full text of the May 29, 2014 Proposal for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

30.     As to the Investments component of Aon's Delegated Pension Manager solution, an Aon affiliate would serve as a fiduciary in, among other things, asset-liability modeling, funded status monitoring and reporting, and execution of "glide and hedge paths."

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants refer to the full text of the May 29, 2014 Proposal and the MCA for their true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

31.     As to the Plan Termination component of Aon's Delegated Pension Manager solution, an Aon affiliate would provide professional services including, among other things, advice on lump sum window strategy and execution, participant communications and benefit calculations, and managing the lump sum election process.

**ANSWER:**   Defendants refer to the full text of the May 29, 2014 Proposal and the MCA for their true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

32.     At the time of the Proposal (and at all other times), Foundation's Board of Directors was composed of volunteers who served as a public service and without compensation, including all members of Foundation's Board of Directors who served on the Foundation's Pension Committee; they were not, and never have been, investment professionals, pension consultants, or actuaries.

**ANSWER:**   Defendants lack knowledge sufficient to form a belief about the truth of the allegations in this paragraph and on that basis deny them.

33.     In light of the purported quality and comprehensive scope of the services Aon offered, in reliance on Aon's purported expertise, and with a view toward making an early lump sum benefits offering to Plan participants, Foundation, through its Board of Directors, authorized and directed Foundation's Chief Financial Officer and the Chair of the Foundation's

Pension Committee to hire Aon on October 8, 2014, by executing a Master Consulting Agreement ("MCA") that Aon prepared.

**ANSWER:**    Defendants admit that the MCA's effective date is October 8, 2014. Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

34.    A true and correct copy of the MCA is attached hereto as Exhibit 1.

**ANSWER:**    Defendants deny the allegations in this paragraph.

**Aon's Scope of Services & Delegated Investment Management**

35.    Under the MCA, the scope of Aon's agreed-upon services were broken down into the following six general categories: (1) investment consulting and delegated investment management, (2) actuarial services, (3) ongoing pension administration services, (4) implementation and administration of lump sum window, (5) communications consulting services regarding lump sum window, and (6) plan termination services.

**ANSWER:**    Defendants state the MCA speaks for itself.  Defendants refer to the full text of the MCA for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

36.    In providing delegated investment management, Aon's investment management affiliate, Aon Investing, agreed to serve as the Plan administrator's attorney-in- fact and agent to perform investment consulting, investment management, and other services in lieu of FRC. In doing so, Aon Investing acted in the Plan administrator's place and stead with the same force and effect, as if FRC, as designated and/or functional fiduciary, had taken the action directly

on behalf of the Plan. As such, Aon described the associated duties as including, among others, to:

    a.   Develop a customized investment strategy and program with a view toward achieving the Plan's investment objectives – namely, to improve and sustain the Plan's funded status;

    b.   Implement the program according to its description and design,

    c.   Assess changes in the estimated valuation of Plan liabilities on a daily basis, using the best available information; and

    d.   Monitor the program daily and implement changes to portfolio allocations as necessary.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants refer to the full text of the MCA, for its true meaning and effect.   Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

37.   Aon Investing also had the duty to monitor and recommend changes to the program it originally recommended, if appropriate. As a fiduciary, it could not simply stand by if, after implementing an initial strategy, its strategy failed to work as anticipated and latent risks in the strategy surfaced, as an appropriately vigilant fiduciary would note.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.   To the extent an answer is required, Defendants deny the allegations in this paragraph.

38.   In providing its services, Aon Investing knew or should have known that Aon Consulting's services and recommendations could have an impact on whether it was appropriate to undertake or continue with Aon Investing's recommended investment strategy.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.   To the extent an answer is required, Defendants deny the allegations in this paragraph.

39.   In providing consulting services related to Plan Termination, Aon Consulting knew or should have known that Aon Investing's services and recommendations could be undermined or rendered more risky by Aon Consulting's recommendations or the manner in which Aon Consulting executed its services.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.   To the extent an answer is required, Defendants deny the allegations in this paragraph.

40.   Aon Investing and Aon Consulting, as Aon, presented themselves as acting in a coordinated and integrated fashion in advising FRC through Aon's Delegated Pension Manager solution, so as to reduce risk exposure through multiple phases of plan management up to and including Plan Termination. Indeed, Aon representatives were routinely copied on, or participated as a group in, communications with FRC about the coordinated process. Accordingly, references herein to "Aon" intentionally refer to both Aon Investing and Aon Consulting acting in a coordinated fashion though a small integrated group of representatives or single delegated point of contact.

**ANSWER:**   Defendants state the MCA speaks for itself and refer Plaintiffs to the full text of the communications referenced in this paragraph and the MCA for their true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

**<u>Aon's Investment Strategy</u>**

41.     In early proposal materials, Aon previewed that its customized investment strategy and program for the Plan would involve using actively managed long duration corporate fixed income assets (including bonds capable of supposedly being transferred in-kind) as the best way to hedge the Plan's portfolio against interest rate changes and in relation to the lump sum widow, if one were offered.

**<u>ANSWER:</u>**     Defendants refer to the full text of the May 29, 2014 Proposal for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

42.     As to the lump sum window, Aon previewed that its customized investment strategy and program would evolve once the rate basis for paying out lump sums was set, and contemplated that investment management fees would be reduced by the lump sum payout, as Aon Investing's fees were based on the amount of assets under management.

**<u>ANSWER:</u>**     Defendants refer to the full text of the MCA for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

43.     Aon also previewed that it estimated a $72 million annuity purchase would be required to satisfy the Plan's pension liabilities after lump sum payments, and that Aon would monitor the Plan's funded status and investments daily to ensure that it properly executed its liability hedging strategy.

**<u>ANSWER:</u>**     Defendants refer to the full text of the May 29, 2014 Proposal and the MCA for their true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

18

44.     At the time of Aon's engagement, FRC had decided to make a lump sum offering. FRC also contemplated, and was led by Aon to believe, that Aon Investing would develop a customized investment strategy and program for the Plan as Aon had previewed – including, in particular, a strategy that would be customized to mitigate the risk of funded status deterioration primarily up until the interest rate basis for paying out lump sums was set.

**ANSWER:**     Defendants refer to the full text of the MCA for its true meaning and effect.  Defendants lack knowledge sufficient to form a belief about FRC's state of mind and on that basis Defendants deny those allegations.   Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

45.     At the time of its engagement, Aon contemplated that an early lump sum window would be offered to the Plan's TVPs in mid-2015 and that the lump sum window would substantially reduce the amount of Plan liabilities and exposure to interest rate risk. Indeed, many of the Plan's participants with the highest anticipated future benefits (corresponding to future Plan liabilities) would be among the Plan's TVPs.  Accordingly, with a shorter management horizon in mind for a significant portion of the Plan's assets, Aon Investing began the phase of developing a customized investment strategy and program.

**ANSWER:**     Defendants deny the allegations in this paragraph.

46.     In February 2015, however, Aon Consulting recommended a different timeline for the lump sum window. Rather than having an early lump sum window for TVPs in 2015, Aon Consulting urged FRC to wait for an IRS determination letter – confirming whether the Plan was "qualified" for tax purposes – which Aon anticipated would take 12 to 18 or more months to receive. While an IRS determination letter is not needed to terminate a plan or offer

lump sums, Aon Consulting presented the IRS determination letter as being an essential item that FRC should wait for the Plan to receive. Aon Investing was aware of Aon Consulting's recommendation and the associated delay it would have on the lump sum window.

**ANSWER:**   Defendants deny the allegations in this paragraph.

47.   FRC did not have any experience with lump sum windows, let alone Aon Consulting's purported experience with over 100 lump sum windows since 2012.  In deciding to await for an IRS determination letter, FRC relied on Aon Consulting's expertise, without the benefit of any warning from Aon Consulting or Aon Investing about, among other things:

   a.   A likelihood that the number of TVPs would decline, as participants achieved retirement age and began taking periodic benefit payments in the intervening 12 to 18 or more months;

   b.   A likelihood that the lump sum take rate would decline if Aon Consulting waited over a year after the HCA transaction to notify TVPs about the availability of a lump sum benefit option;

   c.   A magnified risk of keeping Plan assets, including those needed to pay lump sum benefits, in Aon Investing's investment strategy and program over the longer time horizon;

   d.   A likelihood that Aon Consulting would later demand more fees to perform a comprehensive communications campaign for the lump sum window; and

   e.   The IRS determination letter was not essential or important under the circumstances, nor worth waiting for.

**ANSWER:**   Defendants admit that the May 29, 2014 Proposal stated that Aon Hewitt had executed the administration of approximately 100 lump sum windows since the beginning of 2012.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

48.     Rather than mention such risks, Aon made repeated representations to FRC that interests rates were expected to rise from then-historic lows and that FRC could use a customized "Hedge Path" strategy to improve the Plan's funded ratio in the intervening period before the lump sum window and Plan termination.

**ANSWER:**     Defendants refer Plaintiffs to the full text of the PowerPoint file entitled "Asset-Liability Match Portfolio Analysis" dated February 20, 2015 and its transmittal email for their true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

49.     On or about February 20, 2015, as an example of how its proposed "Hedge Path" strategy would work, Aon gave FRC a presentation entitled "Asset-Liability Match Portfolio Analysis" (the "Hedge Presentation") along with a written explanation that provided, among other things:

a.     An estimate of $118 million in Plan assets as of January 1, 2015 (including $25 million that was not in the Plan trust but in a segregated pension escrow account under the control of CCHB);

b.     An estimate of $124 million in Plan liabilities as of January 1, 2015;

c.     A corresponding funded status of 95%, with a Plan deficit of $6 million;

d.     The strategy of investing in assets with a shorter duration than Plan liabilities (i.e., benefits to be paid in future years), so that the Plan's funded status would improve "as rates rise back to more expected levels";

e.     Aon Investing would dynamically adjust the duration of assets using a "Hedge Path" to lock in gains along the way as the Plan's funded ratio improved;

f.     So, for example, if rates increased by 1% (or 100 basis points or "bps"),

i.     Plan assets at a duration of 7.2 years would drop in value from $118 million to $108 million, but

       ii.       Plan liabilities at a duration of 13.7 years would disproportionately drop from $124 million to $109 million, thereby

       iii.     Resulting in the Plan's funded ratio improving by $5 million to over 99%; and

   g.     Such gains would be "locked in" by incrementally increasing the hedge ratio as the Plan's funded status improved to the point that the durations of Plan assets and Plan liabilities matched.

**ANSWER:**   Defendants refer Plaintiffs to the full text of the PowerPoint file entitled "Asset-Liability Match Portfolio Analysis" dated February 20, 2015 and its transmittal email for their true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

50.     Aon's Hedge Presentation reflected its representation that a 100% hedge ratio could be achieved under its investment strategy, and that the Plan's funded status could be "locked in" such that the ratio would not fluctuate materially with changes in interest rates – in other words, that, at a 100% hedge, the value of assets and liabilities would essentially move in lock step as rates fluctuated.

**ANSWER:**    Defendants refer Plaintiffs to the full text of the "Asset-Liability Match Portfolio Analysis" PowerPoint file and its transmittal email for their true meaning and effect. Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

51.     Latent defects in Aon's "Hedge Path" strategy included, inter alia, that it could not achieve a true hedged status for at least the following reasons:

   a.     First, Aon Investing did not, and would not, have custody or investment control over $25 million in cash or cash-equivalent funds that were held in a segregated escrow account under the control of CCHB and were not a part of Plan trust (the "Pension Escrow");

b.   Second, implementing the proposed "Hedge Path," particularly as the Plan approached fully funded status, would entail investing in a manner in which the durational baskets of Plan assets matched or nearly matched the durational baskets of Plan liabilities (known as key rate interest rate duration investing); and

c.   Third, Aon Investing invested in proprietary AHGT mutual funds in which the durational baskets of underlying assets did not match, nor were ever likely to match, the durational baskets of the Plan's liabilities.

**ANSWER:**   Defendants deny the allegations in this paragraph.

52.   At that time, FRC was not aware of the latent defects in Aon's "Hedge Path" strategy. Rather, FRC was concerned with Aon's estimate of the Plan deficit. In its initial Proposal (in mid-2014), Aon estimated Plan liabilities of $114 million and assets of $94 million, which would yield a *$5 million surplus*, when counting a $25 million fund set aside as part of the HCA transaction (i.e., the Pension Escrow). In contrast, Aon's Hedge Presentation (in early 2015) reflected a *$6 million deficit*, even with the inclusion of the $25 million Pension Escrow and notwithstanding that Plan assets stood barely changed at about $93 million.

**ANSWER:**   Defendants lack knowledge sufficient to form a belief about what FRC was "aware of" or what FRC "was concerned with" and on that basis deny those allegations. Defendants deny the remaining allegations contained in this paragraph.

53.   Aon led FRC to believe that the deterioration in the Plan's funded status was a result of failing to hedge against interest rate fluctuations. The effect was to present Aon's "Hedge Path" strategy and investment program as the most reasonable way to shield against such funded-status deterioration and "lock in" funded-status improvements.

**ANSWER:**    Defendants lack knowledge sufficient to form a belief about what FRC was "aware of" or what FRC "was concerned with" and on that basis deny those allegations. Defendants deny the remaining allegations contained in this paragraph.

54.    In a later, Aon-prepared Investment Policy Statement, dated effective March 30, 2015, Aon once again set out its "Hedge Path" strategy – to purchase liability- hedging assets with a *shorter* duration than Plan liabilities (so as to capture funded status improvements as interest rates rise), then adjust the hedge (asset duration) with "the primary goal . . . to reduce interest rate risk as funded status improves towards the end state and fixed income pricing becomes more attractive." In that regard, FRC would "accept some mismatch risk to seek improvements to the Plan's funded position" (emphasis added), but Aon did not set out, nor did FRC accept, the above-listed defects and risks in Aon's investment strategy.  Nor did FRC accept the risk that Aon would purchase liability-hedging assets with a *longer* duration than Plan liabilities, as Aon Investing later did.  Far from "some" mismatch risk designed to improve the Plan's funded status with rising interest rates, Aon exposed the Plan to imprudent and unintended mismatch risks of a character that would, and ultimately did, cause significant funded status deterioration.

**ANSWER:**    Defendants admit that an Investment Policy Statement, dated effective March 30, 2015, was prepared.  Defendants refer Plaintiffs to the full text of the Investment Policy Statement for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

55.    Likewise, in quarterly investment reviews that Aon later gave FRC for the first and second quarters of 2015, Aon Investing reiterated its strategy to adjust the duration of Plan

assets along a "Hedge Path" toward a 100% hedged state as the Plan's funded status improved toward 100%.

**ANSWER:** Defendants refer to the full text of the quarterly investment reviews for the first and second quarters of 2015 for their true meaning and effect. Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

## Aon's Implementation & Management of the "Hedge Path" Strategy

56. In separate transactions on February 20 and 24, 2015, Aon Investing transitioned the Plan's trust assets from publicly traded funds into Aon's proprietary AHGT mutual funds. On or about February 20, 2015, Aon Investing purchased $41.9 million in the AHGT Long Fund and $37.4 million in the AHGT MidL Fund on behalf of the Plan. And, on or about February 24, 2015, Aon Investing purchased 9.5 million in the AHGT Long Fund on behalf of the Plan. At that time, the AHGT Long Fund comprised over 80% of the AHGT MidL Fund, such that $81.3 million – over 85% of Plan assets – were invested, directly or indirectly, in Aon's proprietary AHGT Long Fund.

**ANSWER:** Defendants admit that on or about February 20, 2015, the Plan purchased $41.9 million in the AHGT Long Fund and $37.4 million in the AHGT MidL Fund. Defendants also admit that on or about February 24, 2015, the Plan purchased $9.5 million in the AHGT Long Fund. Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

57. At about the time Aon Investing first purchased shares in the AHGT Long Fund and AHGT MidL Fund on behalf of the Plan, there were thirteen AHGT mutual funds, and fewer than 90 investors who were authorized and able to trade in those proprietary AHGT

funds. This small pool of available investors limited the ability to trade in the AHGT funds, including to purchase the composition of assets Aon Investing originally planned, to adjust the Plan's investments as the Plan's funded status changed, and then, ultimately, to liquidate the Plan's AHGT fund holdings.

**ANSWER:**    Defendants admit that at about the time the Plan first purchased shares in the AHGT Long Fund and AHGT MidL Fund, there were thirteen AHGT collective investment funds.  Except as expressly admitted herein, Defendants deny the remaining allegations contained in this paragraph.

58.    Later, in May and June 2015, Aon Investing undertook a multi-step process to swap AHGT MidL Fund holdings for AHGT Long Fund holdings by directing the Plan to buy $3 million in the AHGT MidL Fund on or about May 7, 2015, sell $1 million in AHGT Long Fund on or about May 18, 2015, then sell $34 million in the AHGT MidL Fund on or about May 18, 2015, buy $14 million in AHGT Long on or about May 18, 2015, and buy $20 million more in the AHGT Long Fund on or about May 20, 2015. In June 2015, Aon Investing directed the Plan to sell a further $5 million in AHGT MidL and to buy $5 million more in the AHGT Long Fund. The end result of these transactions was that, by the end of June 2015, Aon Investing further increased the Plan's holdings in the AHGT Long Fund to a concentration of over **97%** of Plan assets.

**ANSWER:**    Defendants admit that the Plan sold $1 million in the AHGT Long Fund on May 5, 2015, bought $3 million in the AHGT MidL Fund on May 6, 2015, bought $14 million in the AHGT MidL Fund on May 15, 2015, bought $14 million in the AHGT Long Credit Fund on May 18, 2015, sold $20 million in the AHGT MidL Fund on May 19, 2015,

and bought $20 million in the AHGT Long Fund on May 20, 2015. Defendants also admit that the Plan sold $5 million in the AHGT MidL Fund on June 18, 2015 and bought $5 million in the AHGT Long Fund on June 19, 2015. Defendants further admit that as of June 30, 2015, the Plan's holdings in the AHGT Long Fund was over 97%. Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

59.     On or before the end of June 2015, the Plan was near fully funded on an actuarial basis, assuming (as Aon did) that 70% of TVPs elected to take lump sum benefits. According to the Investment Policy Statement, FRC was, on the side of investing in shorter duration assets, "willing to accept some mismatch risk to seek improvements to the Plan's funded position, but once fully funded an objective of the investment policy [was] to minimize mismatch risk to the extent possible using investment derivatives where necessary." In apparent recognition of the Plan's fully or near fully funded status, Aon Investing began a program of trading in derivatives on about July 1, 2015.

**ANSWER:**     Defendants refer to the full text of the Investment Policy Statement for its true meaning and effect. Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

60.     In the six months after June 2015, however, the Plan's funded status deteriorated. Specifically, Plan liabilities increased by about $300,000 due to a slight *decline* in interest rates. Yet, rather than experience the anticipated (albeit lesser) corresponding increase in the value of the Plan's fixed-income (bond) assets, Plan assets declined by over $3 million. In other words, rather than the value of assets and liabilities moving, as anticipated,

in or near lock step and in the same direction, Plan assets declined by at least ten (10) times the magnitude of an opposing increase in Plan liabilities.

**ANSWER:**   Defendants admit that as of June 30, 2015, the Plan had a deficit of about $1.8 million, and as of December 31, 2015, the Plan had a deficit of about $5 million, reflecting a decrease in assets from $113.4 million to $110.5 million and an increase in liabilities from $115.2 to $115.5 million.   Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

61.     In and after at least June 2015, Aon Investing failed properly to hedge the Plan against interest rate volatility. Indeed, Aon Investing knew or should have known that its method of hedging – primarily through the use of its AHGT funds – was incapable of achieving the "Hedge Path" that Aon presented to FRC.

**ANSWER:**   Defendants deny the allegations in this paragraph.

62.     In addition, despite initial assurances that it would carefully monitor and adjust the Plan's hedge to "lock in" improvements in funded status, Aon Investing did not make any significant adjustments to the composition of Plan assets as the Plan's funded status significantly deteriorated from June 2015 through December 2015. During that time, Aon Investing merely cashed the Plan out of $350,000 from the AHGT MidL Fund and $650,000 (less than 1%) from its AHGT Long Fund holdings.

**ANSWER:**   Defendants deny the allegations in this paragraph.

63.     By no later than the second half of 2015, Aon knew or should have known that its investment strategy was flawed and bore far greater risk of durational mismatch than reflected in its "Hedge Path" materials. Aon nevertheless failed to disclose the risk, or call

attention to, or explain the real cause of the deterioration in Plan's funded status. Indeed, while Aon Investing gave FRC investment review presentations for the first and second quarters of 2015 – when the Plan's funded status improved – Aon Investing did not do so for the third quarter of 2015 – when most of the Plan's funded status deterioration in 2015 occurred.

**ANSWER:**   Defendants admit that there were investment reviews in the first and second quarters of 2015.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

### Aon's Continued Hedge-Duration Error & Failure to Timely Liquidate

64.    A contributing factor in the deterioration of the Plan's funded status in 2015, and in its funded status failing to improve before Plan termination, is that Aon Investing caused or allowed the effective duration of the Plan's invested assets to shift from having a shorter to a longer effective duration than Plan liabilities.

**ANSWER:**   Defendants deny the allegations contained in this paragraph.

65.    Aon expected and predicted a rise in interest rates in 2016.

**ANSWER:**   Defendants deny the allegations contained in this paragraph.

66.    As Aon's Hedging Presentation reflects, such a rise in interest rates would result in: (1) the Plan's liabilities declining, due to an increase in the yields of fixed-income assets (bonds) used to fund future pension benefits; (2) an equal rate of decline for assets and liabilities of equal duration; (3) a smaller decline for assets of shorter duration versus longer duration liabilities; (4) a larger decline in assets of longer duration versus shorter duration liabilities; and (5) cash and cash equivalents, as liquid (i.e., zero-duration) assets, holding fairly steady value as (long-term) pension liabilities declined substantially.

**ANSWER:**     Defendants refer Plaintiffs to the full text of the "Asset-Liability Match Portfolio Analysis" PowerPoint dated February 20, 2015 referenced in this paragraph for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

67.     In January 2016, Aon Investing cashed out $16 million of the Plan's holdings in the AHGT Long Fund. At that point, a combined one-third (over $40,000,000) of Plan assets and the Pension Escrow were in cash. This was consistent with – indeed, reflects the bullishness of – Aon's expectation that interest rates were bound to increase in 2016.

**ANSWER:**     Defendants admit that in January 2016, the Plan sold $16 million of AHGT Long Fund investments.  Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

68.     Through the first half of 2016, Aon Investing nevertheless kept essentially the same mix of invested Plan assets – overwhelmingly concentrated in the AHGT Long Fund, with a longer effective duration than Plan liabilities – that had contributed to the Plan's funded status deteriorating significantly from July 2015 to December 2015.

**ANSWER:**     Defendants deny the allegations contained in this paragraph.

69.     Mostly by inaction, and contrary to its promises to closely monitor and dynamically adjust the Plan's hedge, Aon Investing caused a gross durational imbalance to develop and persist between Plan liabilities and assets in 2016. On the liability side, the Plan had batches of periodic (mostly monthly) benefit payments that fluctuate in amount over an expected span of years as participants start and cease receiving benefits. On the asset side, with about one third (over $40,000,000) of Plan assets and the Pension Escrow in cash, Aon

Investing kept about three-quarters (roughly $75,000,000 on average) in the AHGT Long Fund. In effect, rather than invest in assets keyed to the duration of Plan liabilities, Aon Investing broke with prudent hedging strategy, and kept the Plan's invested assets at a longer effective duration than Plan liabilities and that was far longer in duration than the sizable blocks of (zero-duration) cash held in the Plan trust and Pension Escrow.

**ANSWER:**   Defendants deny the allegations contained in this paragraph.

70.   Not only did the polarized mix of assets present a risky durational mismatch and threat to the Plan's funded status – that is, a bad hedge – it failed to account for the Plan's need for liquidity to terminate and had no likelihood of improving the Plan's (deteriorated) funded status, particularly when interest rates rose as Aon expected. By leaving the Plan's invested assets heavily concentrated in the AHGT Long Fund rather than shifting to needed cash, Aon Investing could well expect that the Plan's invested assets, at a longer effective duration, would decline in value more than Plan liabilities and would wipe out most or all of the relative gains from holding cash as interest rates rose.

**ANSWER:**   Defendants deny the allegations contained in this paragraph.

71.   By about July 2016, with interest rates still having been at or near historic lows, Aon Investing all the more expected that interest rates would snap upward in the second half of 2016.  At that point, six months before the Plan was to pay lump sum benefits to electing TVP's and purchase a terminal annuity to cover the Plan's remaining participants, Aon Investing was (according to its own schedule) supposed to review the Plan's need for liquidity with the FRC. It did not.

**ANSWER:**   Defendants deny the allegations contained in this paragraph.

31

72.     Also, by August 2016, FRC was already scheduling meetings with Aon for early- and mid-December 2016, in order to review annuity proposals, select an annuity provider, and purchase an annuity to cover the remaining Plan participants who were not eligible for, or did not elect, lump sum benefits. Aon Investing well knew that the Plan needed liquidity.

**ANSWER:**     Defendants deny the allegations contained in this paragraph.

73.     Continuing into the second half of 2016, however, Aon Investing left the Plan's investments virtually unchanged, with substantially all the Plan's invested assets directly or indirectly in the AHGT Long Fund, while interest rates rose as Aon expected.

**ANSWER:**     Defendants refer Plaintiffs to the November 30, 2016 investment review for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

74.     As a consequence, between July and December 2016, when interests rose as Aon expected, the Plan experienced an approximately $6 million decline in the value of its AHGT fixed-income assets.

**ANSWER:**     Defendants admit that, as described in the Investment Review for FRC dated November 30, 2016, the Plan's assets declined from about $118.1 million on June 30, 2016 to $112.9 million on November 30, 2016; during that period, the Plan's funded ratio improved from 95.6% to 96.6%.  Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

75.     Further exposing the Plan to risk, the AHGT funds in which Aon Investing kept the vast majority of the Plan's assets were propriety funds, not publicly traded, and had a

limited market of fewer than 90 other pension clients, all of whom were owed fiduciary duties by Aon. It was foreseeable to Aon that, in a rising interest rate environment, it may well be difficult to move these clients into fixed income assets that were declining in value. Likewise, Aon could also imminently foresee that it may well be difficult to generate market interest to purchase underlying long-duration bonds that were declining in value.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants refer to the AHGT Confidential Offering Memorandum for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

76.     Yet, as interest rates rose month after month in the second half of 2016, Aon let the Plan's portfolio continue to ride with over $72 million invested primarily in Aon's proprietary AHGT Long Fund up through the date lump sums were paid on December 1, 2016. In fact, on December 14, 2016, at what was to be the final FRC meeting to approve the purchase of an annuity at a cost of more than $89 million and direct payment therefor, Aon Investing surprised FRC with the news that it had not yet liquidated over $70 million of the Plan's assets from the AHGT funds. Aon was unable to complete the annuity purchase according to Aon's own schedule because of Aon Investing's failure to liquidate. By then, the Chair of the Foundation's Board of Directors and its Pension Committee had been demanding, for weeks and weeks, that Aon Investing liquidate the Plan's assets for final distribution. Aon Investing should have done so months earlier.

**ANSWER:**   Defendants deny the allegations contained in this paragraph.

77.     In effect, Aon Investing failed to liquidate Plan assets at times when: (a) Aon knew of the Plan's approaching need to pay lump sum benefits and purchase a terminal annuity; (b) Aon's hedging strategy had demonstrably revealed itself to pose serious durational mismatch risks; (c) Aon was predicting an imminent (observable) increase in interest rates, which would naturally result in a decline in fixed income (long-duration bond) values; (d) the pool of available investors to purchase AHGT funds was so small as to limit the ability to trade in AHGT funds; (e) the declining value of long-term fixed income holdings would likely make it difficult to liquidate such holdings; and (f) while Plan liabilities were declining (as the interest rate yields improved), liquid cash and cash equivalents would retain their value and immediate availability.

**ANSWER:**     Defendants deny the allegations in this paragraph.

78.     All the while, up until it finally liquidated the Plan's holdings, Aon Investing continued to charge the Plan significant investment management fees.

**ANSWER:**     Defendants refer to the MCA and their invoices for their true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations contained in this paragraph.

79.     The Plan thus suffered significant losses, expenses, and consequent damages from Aon Investing's faulty design, implementation, and monitoring of the Plan's asset mix.

**ANSWER:**     Defendants deny the allegations in this paragraph.

**Aon's Deficient Lump Sum Initiative**

80.     Alongside Aon Investing's investment management, Aon Consulting agreed to provide professional services to design, administer, and promote the lump sum window.

34

**ANSWER:**   Defendants admit Hewitt Associates LLC agreed to provide pension administrative services for the lump sum initiative for the Plan as described in the MCA. Defendants refer to the full text of the MCA for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

81.     The basic goal of the lump sum window was to maximize the lump sum election (take) rate among eligible participants, TVPs. Aon estimated that for every 10% increase in the take rate, the Plan's liabilities would be reduced by $900,000. Initially, Aon estimated that its comprehensive communications campaign would yield an 80% take rate among TVPs. As bases for its take rate estimates, Aon cited its experience in over 100 lump sum windows since 2012.

**ANSWER:**   Defendants refer Plaintiffs to the full text of the May 29, 2014 Proposal for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

82.     As to the design of the lump sum window, Aon agreed to advise FRC on the strategy and execution of the lump sum windowing, including its requirements and timing. In that regard, as indicated in Paragraphs 45 – 47 above, Aon urged FRC in early 2015 to delay implementation of the lump sum window until after receipt of an IRS determination letter, which was expected to come between 12 and 18 months later.

**ANSWER:**   Defendants refer Plaintiffs to the full text of the MCA for its true meaning and effect.  Defendants incorporate their answers to paragraphs 45-47 above.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

83.     At the time Aon recommended delaying the lump sum window, it was aware of the risks, among others, that delay could result in a reduced lump sum election rate; that the amount of Plan assets needed to pay lump sum benefits would remain at risk in Aon's investment strategy and program; that the Plan would incur greater investment management fees; and that the foregoing risks could contribute to the Plan deficit. Aon, however, did not disclose those risks to FRC. Rather, Aon advised delay in implementation of the lump sum window as part of a broader theme that the additional time would supposedly permit the Plan's funded status to improve through Aon's "Hedge Path" strategy and anticipated increases in interest rates.

**ANSWER:**     Defendants deny the allegations in this paragraph.

84.     Over the next year and several months up to mid-2016, each of the foregoing undisclosed risks or consequences of delay came to pass, with the result that fewer Plan participants were eligible and/or ultimately elected to take lump sums; and the Plan's deficit was greater than if Aon had disclosed such risks and properly advised FRC to proceed with a lump sum window at the outset. An early lump sum window would have avoided these undisclosed risks and consequences and resulted in an increased lump sum take rate and associated savings.

**ANSWER:**     Defendants deny the allegations in this paragraph.

85.     By mid-2016, Aon admitted that further delay would result in a significant increase in Plan liabilities and recommended that FRC move ahead with implementing the lump sum window, notwithstanding the lack of an IRS determination letter. Indeed, the IRS determination letter never came.

**ANSWER:**    Defendants deny the allegations in this paragraph.

86.    As to the administration and promotion of the Plan and lump sum window, Aon Consulting agreed to, among other things:

    a.    Produce and distribute a lump sum window announcement;

    b.    Collect participant election paperwork and review for completeness;

    c.    Operate a call center for participants that was staffed by consultants educated on the specific features of the Plan's lump sum offering; and

    d.    Carry out a comprehensive communications campaign to announce, inform, and remind participants of the lump sum window through:

      i.    Announcement flyers,
      ii.    Delivery of election kits,
      iii.    Reminder flyers and post cards,
      iv.    Reminder calls and emails,
      v.    On-site meetings,
      vi.    1-on-1 discussions,
      vii.    Webinars, and
      viii.    Posters, banners, and other printed materials.

**ANSWER:**    Defendants refer Plaintiffs to the full text of the MCA for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

87.    Over a year after the MCA was signed, and as the (delayed) time approached when Aon Consulting would finally begin the lump sum communications campaign, Aon Consulting sought to increase its fees by $105,000 to perform communications services. In the MCA, Aon Consulting had agreed to provide the lump sum administration services for $177,500, and to provide the lump sum communications campaign services for $110,000.

**ANSWER:**   Defendants refer Plaintiffs to the full text of the MCA for its true meaning and effect.  Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

88.   In response to Aon Consulting's demand, FRC initially discussed potential cost savings efforts, and Aon Consulting eventually dropped its demand to $60,000 in additional fees, based on a proposal to limit its communications campaign with participants.

**ANSWER:**   Defendants deny the allegations contained in this paragraph.

89.   FRC, however, declined to pay Aon Consulting the additional $60,000 in fees and demanded that Aon Consulting timely perform its obligations under the MCA in full.

**ANSWER:**   Defendants admit that FRC declined to pay Hewitt Associates LLC $60,000 for proposed work.  Except as expressly provided herein, Defendants deny the allegations contained in this paragraph.

90.   Thereafter, Aon Consulting failed to implement the "robust" and "comprehensive" communications campaign that it agreed (and was paid) to perform. Specifically, Aon Consulting failed to implement a communications plan, with multiple participant touch points and reminders, as to attain election levels reasonably approximating those that Aon Consulting opined the Plan could achieve.

**ANSWER:**   Defendants deny the allegations in this paragraph.

91.   Aon Consulting failed accurately to identify and contact participants, failed to send the number of communications promised, failed to conduct webinars or one-on-one meetings, failed to post notices on site at the Hospital, failed to staff the call center with a

sufficient number of staff members and sufficiently knowledgeable staff, and failed to adequately follow up with participants who returned incomplete election forms.

**ANSWER:**    Defendants deny the allegations in this paragraph.

92.    As an example of Aon Consulting's basic failure to execute a comprehensive communication campaign, Aon Consulting failed to locate and notify a Plan participant who had long worked at, and remained working at, the Hospital for more than about 20 years.

**ANSWER:**    Defendants deny the allegations in this paragraph.

93.    In addition, Aon Consulting's deficient call center performance led to FRC receiving repeated complaints about the call center's failure to answer or return calls and complaints that the call center lacked familiarity with features of the lump sum window or the basic terms of the Plan. In fact, one participant's experience with Aon Consulting's call center led him to report at a Foundation meeting: "They don't know jack.  I've tried talking to Aon. They are like mammary glands on a bull."

**ANSWER:**    Defendants lack knowledge sufficient to form a belief about the truth of the allegations concerning an unidentified participant's alleged comments at a Foundation meeting and on that basis deny them.  Defendants deny the remaining allegations in this paragraph.

94.    In light of the above-referenced delay and likelihood that participants would be less attuned or attentive to the later-scheduled lump sum election opportunity, it was important for Aon Consulting to perform the entire scope of comprehensive communications campaign services that they initially agreed to perform.

**ANSWER:**    Defendants deny the allegations in this paragraph.

95.     In the end, Aon Consulting's communications campaign yielded an election rate of less than 67%. Indeed, in light of Aon Consulting's deficient performance, FRC took upon itself Aon Consulting's (unfulfilled) contractual duties to reach out to dozens of participants whose election forms would otherwise have been rejected.  As a result of FRC performing duties that Aon Consulting agreed to and should have performed, FRC was able to obtain dozens more valid lump sum elections, with the result of an approximately 67% election rate.

**ANSWER:**     Defendants deny the allegations in this paragraph.

96.     This final lump sum take rate, however, was far less than Aon Consulting opined as being consistent with its experience in over 100 lump sum windows since 2012. In light of its deficient efforts, Aon Consulting claimed fees to which it was not entitled and caused the Plan to have fewer lump sum elections and a greater deficit than would otherwise have resulted.

**ANSWER:**     Defendants deny the allegations in this paragraph.

**IV.     SCOPE OF LOSSES, CONDITIONS PRECEDENT & ATTORNEYS' FEES**

97.     Aon's failure to properly manage and prudently invest the Plan's assets and failure to implement a timely, comprehensive campaign for lump sum benefit elections caused an unanticipated, multi-million dollar shortfall in Plan assets. As a result, the Plan ultimately needed to borrow millions of dollars to fulfill its obligations to Plan participants.

**ANSWER:**     Defendants deny the allegations in this paragraph.

98.     All conditions precedent to the bringing of this action have occurred, been waived or satisfied, or would be futile to further attempt to satisfy (including, but not limited to, the pre-suit dispute resolution process in Section 10 of the MCA).

40

**ANSWER:**     Defendants deny the allegations in this paragraph.

99.     FRC has retained counsel from the law firm of King, Blackwell, Zehnder & Wermuth, P.A. and agreed to pay same their reasonable attorneys' fees to represent FRC in this action on behalf of FRC and the Plan.

**ANSWER:**     Defendants lack knowledge sufficient to form a belief about the truth of the allegations in this paragraph and on that basis deny them.

100.     FRC is entitled to an award of reasonable attorneys' fees pursuant to ERISA and/or Section 13(h) of the MCA.

**ANSWER:**     Defendants deny the allegations in this paragraph.

### COUNT I – VIOLATIONS OF ERISA

### (Against Aon Investing)

101.     Plaintiffs re-allege and incorporate the allegations set forth above in Paragraphs 1 – 100 as though fully set forth herein.

**ANSWER:**     Defendants incorporate by reference their answers to paragraphs 1 through 100.

102.     Under Section 3(21) of ERISA, 29 U.S.C. § 1002(21), Aon Investing was an ERISA fiduciary as to the Plan and Plan assets invested as part of Aon's "Hedge Path" strategy and in the AHGT funds.

**ANSWER:**     This paragraph contains legal conclusions to which no answer is required.   To the extent an answer is required, Defendants deny the allegations in this paragraph.

103.     As a fiduciary and as an investment manager under ERISA, Aon Investing owed a duty of care and loyalty to the Plan with respect to the management of, and communications about, the investments of the Plan and the AHGT funds. Pursuant to Section 404(a) of ERISA, 29 U.S.C. § 1104(a), Aon Investing was obligated to discharge its responsibilities as a fiduciary with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.   To the extent an answer is required, Defendants deny the allegations in this paragraph.

104.     Aon Investing breached its duties to the Plan, in violation of Section 404(a) of ERISA, 29 U.S.C. § 1104(a), by *inter alia*: (a) failing adequately to investigate the suitability of the "Hedge Path" strategy in relation to the Plan's stated goals and lack of control over the assets in the Pension Escrow; (b) misrepresenting the quality, character, and suitability of the "Hedge Path" strategy and failing to notify FRC of latent defects in that strategy; (c) exposing the Plan to excessive undisclosed risks; (d) failing to monitor and appropriately adjust the investments of the Plan; and (e) failing timely to liquidate and convert Plan assets from the AHGT funds into cash.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.   To the extent an answer is required, Defendants deny the allegations in this paragraph.

105.    Pursuant to Section 409 of ERISA, 29 U.S.C. § 1109, any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by ERISA is personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and is subject to such other equitable or remedial relief as the Court may deem appropriate.

**ANSWER:**    This paragraph contains legal conclusions to which no response is required.  To the extent an answer is required, the statute speaks for itself and, except as expressly admitted herein, Defendants deny the allegations in this paragraph.

106.    Under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), a civil action may be brought by a fiduciary for appropriate relief under Section 409 of ERISA, 29 U.S.C. § 1109. Plaintiffs are fiduciaries with respect to the Plan within the meaning of Section 502(a)(2).

**ANSWER:**    This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, the statute speaks for itself and, except as expressly admitted herein, Defendants deny the allegations in this paragraph.

107.    Under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), a civil action may be brought by a fiduciary to enjoin any act or practice that violates any provision of ERISA or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or the terms of the plan. Plaintiffs are fiduciaries within the meaning of Section 502(a)(3) of ERISA.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, the statute speaks for itself and, except as expressly admitted herein, Defendants deny the allegations in this paragraph.

108.    Plaintiffs have a legal and equitable right to obtain relief on behalf of the Plan for losses resulting from Aon Investing's violations of ERISA.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations in this paragraph.

### COUNT II – VIOLATIONS OF ERISA

### (Against Aon Consulting)

109.    Plaintiffs re-allege and incorporate the allegations set forth above in Paragraphs 1 – 100 as though fully set forth herein.

**ANSWER:**   Defendants incorporate by reference their answers to paragraphs 1 through 100.

110.    Notwithstanding any language in the parties' MCA to the contrary or otherwise purporting to disclaim Aon Consulting's status as a fiduciary, under Section 3(21) of ERISA, 29 U.S.C. § 1002(21), Aon Consulting acted as an ERISA fiduciary in rendering investment advice as to the Plan and Plan assets invested as part of Aon's "Hedge Path" strategy and in the AHGT funds.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations in this paragraph.

44

111.    As a fiduciary under ERISA, Aon Consulting owed a duty of care and loyalty to the Plan with respect to communications about the investments of the Plan and the AHGT funds. Pursuant to Section 404(a) of ERISA, 29 U.S.C. § 1104(a), Aon Consulting was obligated to discharge its responsibilities as a fiduciary with the care, skill, prudence and diligence that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

**ANSWER:**    This paragraph contains legal conclusions to which no answer is required.   To the extent an answer is required, Defendants deny the allegations in this paragraph.

112.    Aon Consulting breached its duties to the Plan, in violation of Section 404(a) of ERISA, 29 U.S.C. § 1104(a), by *inter alia*: (a) failing adequately to investigate the suitability of the "Hedge Path" strategy in relation to the Plan's stated goals and lack of control over the assets in the Pension Escrow; (b) misrepresenting the quality, character, and suitability of the "Hedge Path" strategy and failing to notify FRC of latent defects in that strategy; (c) exposing the Plan to excessive undisclosed risks; and (d) failing to coordinate with Aon Investing the timely liquidation and conversion of Plan assets from the AHGT funds into the cash required to purchase a terminal annuity.

**ANSWER:**    This paragraph contains legal conclusions to which no answer is required.   To the extent an answer is required, Defendants deny the allegations in this paragraph.

113.    Aon Consulting also breached its duties to the Plan in recommending that FRC delay the lump sum window, when Aon Consulting knew or should have known and failed to

disclose to FRC, among other things, that delay could result in a reduced lump sum election rate; that the amount of Plan assets that would be used to pay lump sum benefits would remain at risk in Aon's investment strategy and program; that the Plan would incur greater investment management fees; and that the foregoing risks were likely to causes losses to the Plan.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, Defendants deny the allegations in this paragraph.

114. Rather than disclose the foregoing risks, Aon Consulting advised delay in implementation of the lump sum window as part of a broader theme that the additional time would supposedly permit the Plan's funded status to improve through Aon's "Hedge Path" strategy and anticipated increases in interest rates.

**ANSWER:** Defendants deny the allegations in this paragraph.

115. Pursuant to Section 409 of ERISA, 29 U.S.C. § 1109, any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by ERISA is personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and is subject to such other equitable or remedial relief as the Court may deem appropriate.

**ANSWER:** This paragraph contains legal conclusions to which no answer is required. To the extent an answer is required, the statute speaks for itself and, except as expressly admitted herein, Defendants deny the allegations in this paragraph.

116.    Under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), a civil action may be brought by a fiduciary for appropriate relief under Section 409 of ERISA, 29 U.S.C. § 1109. Plaintiffs are fiduciaries with respect to the Plan within the meaning of Section 502(a)(2).

**ANSWER:**    This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, the statute speaks for itself and, except as expressly admitted herein, Defendants deny the allegations in this paragraph.

117.    Under Section 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), a civil action may be brought by a fiduciary to enjoin any act or practice that violates any provision of ERISA or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of ERISA or the terms of the plan.  Plaintiffs are fiduciaries within the meaning of Section 502(a)(3) of ERISA.

**ANSWER:**    This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, the statute speaks for itself and, except as expressly admitted herein, Defendants deny the allegations in this paragraph.

118.    Plaintiffs have a legal and equitable right to obtain relief on behalf of the Plan for losses resulting from Aon Consulting's violations of ERISA.

**ANSWER:**    This paragraph contains legal conclusions to which no answer is required.  To the extent an answer is required, Defendants deny the allegations in this paragraph.

### COUNT III – PROFESSIONAL MALPRACTICE

### (Against Aon Consulting)

119.    Plaintiffs re-allege and incorporate the allegations set forth above in Paragraphs 1 – 100 as though fully set forth herein.

**ANSWER:**    Defendants incorporate by reference their answers to paragraphs 1 through 100.

120.    At relevant times, FRC was a client of Aon Consulting, and hired Aon Consulting for, among other things, professional advice and consulting services regarding lump sum windows and related matters.

**ANSWER:**    Defendants deny the allegations in this paragraph.

121.    Aon Consulting provided its advice and consulting services through licensed professionals, with qualifications including chartered financial analyst, professional actuary, and enrolled agent, who acted in those capacities in providing advice and consulting services regarding lump sum windows and related matters.

**ANSWER:**    Defendants admit that Hewitt Associates LLC provided certain services to the Plan through licensed professionals.  Defendants deny that all of the services that Hewitt Associates LLC provided to the Plan were provided by licensed professionals. Except as expressly admitted herein, Defendants deny the allegations in this paragraph.

122.    Through the course of its engagement, Aon Consulting owed FRC and the Plan a duty of care to exercise the competence and diligence normally exercised by professional advisors under similar circumstances. Included in that duty is the duty to notify of risks that Aon Consulting knew or should have known were posed by its advice.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.   To the extent an answer is required, Defendants deny the allegations in this paragraph.

123.    Aon Consulting breached its duty to FRC and the Plan, and rendered negligent professional advice, when Aon Consulting recommended FRC delay the lump sum window, when Aon Consulting knew or should have known and failed to disclose to FRC, among other things, that delay could result in a reduced lump sum election rate, that the amount of Plan assets that would be used to pay lump sum benefits would remain at risk in Aon Investing's investment strategy and program, the Plan would incur greater investment management fees, and these foregoing risks could contribute to the Plan deficit.

**ANSWER:**   This paragraph contains legal conclusions to which no answer is required.   To the extent an answer is required, Defendants deny the allegations in this paragraph.

124.    Rather than disclose the foregoing risks, among others, Aon Consulting advised delay in implementation of the lump sum window as part of a broader theme that the additional time would permit the Plan's funded status to improve through Aon's "Hedge Path" strategy and anticipated increases in interest rates.

**ANSWER:**   Defendants deny the allegations in this paragraph.

125.    FRC and the Plan were injured by reason of Aon Consulting's breach of its duty of care; and, as a direct and proximate result of Aon Consulting's negligent and incomplete advice, FRC and the Plan suffered losses.

**ANSWER:**   Defendants deny the allegations in this paragraph.

## COUNT IV – BREACH OF CONTRACT

### (Against Aon Consulting)

126.    Plaintiffs re-allege and incorporate the allegations set forth above in Paragraphs 9, 11 – 16, 33 – 35, 80 – 81, and 86 – 100 as though fully set forth herein.

**ANSWER:**    Defendants incorporate by reference their answers to paragraphs 9, 11-16, 33-35, 80-81, and 86-100.

127.    Aon Consulting materially breached the MCA by failing to provide the comprehensive communications campaign as agreed for the Plan's lump sum window, including each and every element outlined in Schedules 4 and 5 of the MCA.

**ANSWER:**    Defendants deny the allegations in this paragraph.

128.    In addition, in the course of administering the lump sum window and associated communications campaign, Aon Consulting materially breached the MCA in failing appropriately to carry out contractual obligations, including but not limited to adequately notifying Plan participants of the lump sum option and working with participants to complete lump sum election forms.

**ANSWER:**    Defendants deny the allegations in this paragraph.

129.    FRC and the Plan were injured by reason of Aon Consulting's breach of its contractual duties; and, as a direct and proximate result of Aon Consulting's incomplete and deficient contractual performance, FRC and the Plan suffered losses.

**ANSWER:**    Defendants deny the allegations in this paragraph.

## DEFENDANTS' AFFIRMATIVE AND OTHER DEFENSES

Defendants give notice that they assert the following defenses as a matter of law and/or supported by facts to be determined through discovery.  The Affirmative and Other Defenses are not intended to be exclusive.  By alleging the defenses set forth below, Defendants are not in any way agreeing or conceding that they have the burden of proof or persuasion that would otherwise rest on Plaintiffs.

### FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted, for reasons including but not limited to the reasons stated in Defendants' Motion to Dismiss and accompanying memoranda.

### SECOND DEFENSE

The Defendants were not acting as fiduciaries within the meaning of ERISA Section 3(21), 29 U.S.C. § 1002(21), with respect to the purported misconduct alleged by Plaintiffs. To the extent Defendants had any fiduciary obligations to the Plan under ERISA, Defendants fulfilled them.

### THIRD DEFENSE

Plaintiffs' claims are barred, in whole or in part, by its lack of standing, privity, or capacity to sue.

### FOURTH DEFENSE

Plaintiffs' claims are barred by the MCA.

### FIFTH DEFENSE

Plaintiffs' claims are barred in whole or in part, because Defendants at all times acted reasonably and in good faith, and did not undertake any conduct that was malicious, egregious, in bad faith, grossly negligent, or in willful or reckless disregard to Plaintiffs' legal rights.

## SIXTH DEFENSE

Plaintiffs' claims are barred, in whole or in part, by Plaintiffs' assumption of risk.

## SEVENTH DEFENSE

Plaintiffs' claims fail because there are no damages to FRC, the Plan, the Plan's participants, and/or the Pension Committee.

## EIGHTH DEFENSE

Plaintiffs' claims fail because any damages were caused by people and/or events other than Defendants.

## NINTH DEFENSE

Plaintiffs have failed to mitigate any and all losses they claim.

## TENTH DEFENSE

Plaintiffs' claims are barred by Plaintiffs' comparative or contributory negligence or are otherwise barred because any harm was caused by Plaintiffs.

## ELEVENTH DEFENSE

Plaintiffs' claims are time-barred, in whole or in part, by contractual limitations provided for in the MCA, by the relevant statutes of limitation and repose, and by the doctrines of laches.

## TWELFTH DEFENSE

Plaintiffs' claims are barred by the doctrine of estoppel and/or waiver.

## THIRTEENTH DEFENSE

Plaintiffs' claims are barred by the economic loss doctrine.

## FOURTEENTH DEFENSE

Plaintiffs' claims are barred because FRC and/or the Pension Committee materially breached the MCA and/or otherwise failed to perform their contractual obligations under the MCA.

## FIFTEENTH DEFENSE

Plaintiffs are obligated, pursuant to the MCA, to indemnify Defendants for any losses to third parties (including the Plan) which Defendants may be obligated to pay in connection with services provided under the MCA.

## SIXTEENTH DEFENSE

Plaintiffs' claims are barred by the doctrine of accord and satisfaction and/or release.

## SEVENTEENTH DEFENSE

To the extent Defendants and Plaintiffs are all found to be ERISA fiduciaries, Plaintiffs may not recover under ERISA from Defendants because they are co-fiduciaries who participated equally in any alleged fiduciary breaches.

## EIGHTEENTH DEFENSE

Plaintiffs' claims are barred by the doctrines of impossibility, frustration of purpose, and/or failure of an essential term of the MCA.

## NINETEENTH DEFENSE

Plaintiffs' claims are barred by the doctrine of unjust enrichment.

### TWENTIETH DEFENSE

Plaintiffs' claims fail because ERISA, as an equitable statute that does not permit double recovery, does not allow Plaintiffs to recover amounts they were required to contribute to the Plan absent Defendants' alleged conduct.

### TWENTY-FIRST DEFENSE

To the extent the Complaint refers to or quotes from external documents, statutes, or other sources, Defendants' responses may refer to such materials for a full and accurate statement of its contents; however, Defendants' references are not intended to be, and should not be construed as, an admission that the cited materials: (a) are correctly cited or quoted by Plaintiffs or (b) are relevant to this, or any other, action.

### TWENTY-SECOND DEFENSE

Defendants presently have insufficient knowledge or information to form a belief as to whether there are additional defenses or affirmative defenses than those stated above, and have not knowingly or intentionally waived any applicable defenses or affirmative defenses. Defendants explicitly reserve the right to assert, and hereby give notice that they intend to rely upon, any other defense that may become available or appear during discovery proceedings or otherwise in this case and hereby reserve the right to amend their Answer to assert any such defense.

### PRAYER FOR RELIEF

**WHEREFORE**, Defendants respectfully request that this Court enter a judgment dismissing Plaintiffs' Complaint with prejudice and awarding Defendants their costs and

reasonable attorneys' fees to the maximum extent allowed by the law and such other relief as the Court deems just and proper.

Date:  July 25, 2019

*/s/ Craig C. Martin*
Craig C. Martin
Amanda S. Amert
Matthew J. Thomas
Rachel S. Morse
Caroline L. Meneau
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654-3456
Telephone: (312) 923-2776
Facsimile: (312) 527-0484
cmartin@jenner.com

Respectfully submitted,

Paul M. Sisco,
The Law Office of Paul M. Sisco
101 E. Kennedy Blvd.
Tampa, Florida 33602
Telephone: (813) 225-1988
Facsimile:  (813) 225-1392
psisco@paulsiscolaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, on July 25, 2019, I electronically filed the foregoing with the Clerk of the Court by using the CM.ECF system, which will send a notice of electronic filing to all counsel of record.

*/s/ Craig C. Martin*