## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**FOUNDATION RESOLUTION CORP.
and FOUNDATION RESOLUTION
CORP. PENSION COMMITTEE,**

     **Plaintiffs,**

**v.**                                  **Case No: 5:18-cv-458-Oc-30PRL**

**AON HEWITT INVESTMENT
CONSULTING, INC, f/k/a Hewitt
EnnisKnupp, Inc., and ALIGHT
SOLUTIONS, LLC, f/k/a Hewitt
Associates LLC,**

     **Defendants.**

---

### REPORT AND RECOMMENDATION[1]

This ERISA action arises out of the termination of Citrus Memorial Health Foundation, Inc.'s defined benefit pension plan (the "Plan") and a comprehensive set of pension plan termination services provided by Aon Hewitt Investment Consulting, Inc. f/k/a Hewitt EnnisKnupp, Inc. ("AHIC"), and Alight Solutions, Inc. f/k/a Hewitt Associates LLC ("Alight") (together "Aon").

### I.    Background

In 1990, the Citrus County Hospital Board ("CCHB"), as owner of Citrus Memorial Hospital and related property ("Hospital"), leased the Hospital to Citrus Memorial Health

---

[1] Within 14 days after being served with a copy of the recommended disposition, a party may file written objections to the Report and Recommendation's factual findings and legal conclusions. *See* Fed. R. Civ. P. 72(b)(3); Fed. R. Crim. P. 59(b)(2); 28 U.S.C. § 636(b)(1)(B); Local Rule 6.02. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1.

Foundation Inc., n/k/a Foundation Resolution Corp. ("FRC"), to operate. Doc. 64, Amended Complaint at ¶¶ 17, 20. FRC offered employees a defined benefit pension plan, known as the Citrus Memorial Health Foundation, Inc. pension plan. *Id.* at ¶20. FRC was the sponsor and, both independently and through its Pension Committee, an administrator of the Plan. *Id.* at ¶¶ 9, 20. On October 1, 2004, FRC closed the Plan to new entrants and, as of December 31, 2010, "froze" the Plan, such that its approximately 1,100 participants ceased accruing new benefits. *Id.* at ¶ 21.

In October 2012, CCHB commenced an independent evaluation to determine whether Citrus County residents would benefit from the sale or lease of the Hospital. *Id.* at ¶ 22. Ultimately, CCHB solicited and received proposals, including a proposal from affiliates of Hospital Corporation of America ("HCA"). *Id.* CCHB and FRC negotiated a long-term lease of the Hospital and sale of related property to HCA. *Id.* at ¶ 23. The agreements for the transaction were ultimately executed at its closing on October 31, 2014 (the "HCA transaction"). *Id.* Before the HCA transaction closed, CCHB and Foundation anticipated it would no longer be feasible to administer the Plan because, after the HCA transaction, FRC was set to wind down its operations and dissolve. *Id.* at ¶ 24.

Accordingly, in May 2014, FRC issued a request for proposal for lump sum advisory and annuity placement services to prepare for termination of the Plan. *Id.*; Doc. 140-1 at 4-12. Aon submitted a proposal to provide services related to termination of the Plan, including administration, actuarial and compliance, investments, communications related to a lump sum offer, and plan termination services, including lump sum window strategy and execution and annuity placement services for Plan participants that did not elect to take a lump sum. Docs. 126 at ¶6; Doc. 126-1.

As of June 20, 2014, the estimated market value of the Plan assets was $94.5 million. Doc. 140-4 at 12. At that time, the Plan's assets were invested in accordance with a strategy developed by FRC and the Plan's previous investment consultant, PFM Advisors. Doc. 125 at ¶¶ 16, 17. The Plan assets were subject to substantial interest rate exposure because they were invested primarily in short-term fixed income assets. *Id;* Doc. 125-1 at 2. According to Aon, "[t]he risks posed by the plan's investments represent perhaps the most significant exposure facing the Foundation as it pursues a plan termination." Doc. 140-3 at 6. Aon's analysis showed that the Plan's assets had a "duration" of 1.6 years, covering only about 10% of the "13.0" year duration (i.e., a 10% hedge) of the Plan's liabilities. Doc. 140-4 at 12.[2] FRC had been unaware of the Plan's underhedged status. Doc. 125-1 at 2 ("They thought they were hedged until I explained that this allocation has cost them $4.1M this year in funded status deterioration due to declining interest rates."). Aon explained that "actively managed long duration corporate fixed income will serve as the best liability hedge for the portfolio until the interest rate basis for paying out lump sums is set" and that its proprietary Aon Hewitt Group Trust ("AHGT") funds would offer costs savings. Doc. 140-3 at 7. Aon advised that the risk to FRC would be reduced because "[w]e serve as an ERISA 3(38) fiduciary,

---

[2] Aon explained the "hedge" concept as follows:

Both assets and liabilities are sensitive to changes in interest rates. If interest rates fall, the value of your liabilities will rise, and the value of your fixed income assets will also rise. The degree that the change in liabilities is "covered" or "matched" by the change in assets is a measure of your hedge ratio. A hedge ratio of 100% means that assets and liabilities will move in tandem (theoretically, subject to real-world imperfect matching). A hedge ratio of 50% means that only half of the change in liabilities is covered by the change in assets. This 50% example is unfavorable if liabilities are going up and assets are going up by only half as much. Conversely, the 50% hedge ratio example is good if liabilities are going down and assets are going down by only half as much.

Doc. 140-6 at 2.

meaning we take on fiduciary responsibility for the execution of the investment strategy." Doc. 140-3 at 7.

Aon made initial projections related to the Plan termination deficit and lump sum window based on then available information. Doc. 140-3. Offering a lump sum option could reduce the total cost of terminating the Plan, because it is often less expensive to pay a lump sum benefit than to purchase an annuity. However, the size of the reduction would depend on a number of factors, including the take rate—the percentage of eligible Plan participants who elect to take a lump sum benefit instead of an annuity to cover future periodic benefit payments—and interest rate movements. Aon anticipated a lump sum window in mid-2015 and projected that if 80% of eligible Plan participants elected to take a lump sum instead of an annuity, the Plan termination deficit could be reduced by $6 million. Aon explained that a robust communications initiative could substantially increase the lump sum election rate (by 10%-20% on average). Aon estimated that for every 10% increase in the election rate, the Plan termination deficit would be reduced by $900,000.

On September 22, 2014, FRC confirmed that it was closing the HCA transaction and that Aon had the "go to begin." Doc. 140-16 at 2. On October 8, 2014, FRC formally signed Aon's Master Consulting Agreement and began charging the Plan for investment management. Doc. 140-18. The HCA transaction closed on October 30, 2014. As part of the transaction, a $25 million pension escrow account had been established to fund the Plan's liabilities at termination, which Aon took into account as a source of funding termination liabilities when estimating the Plan's funded status. *See e.g.*, Doc. 125-28 at 2 (explaining that $118 million in assets included $25 million that was not currently in the pension trust).

Accordingly, FRC shed its employees and focused on its goal of terminating the Plan as quickly and cost effectively as possible.

Pursuant to the MCA, Aon would provide services outlined in six schedules: investment consulting and delegated plan management services (Sched. 1); actuarial services (Sched. 2); pension administration services (Sched. 3); pension lump sum services (Sched. 4); communication consulting services (Sched. 5); and plan termination services (Sched. 6). Doc. 140-17 at 9–36. Hewitt expressly undertook responsibility for the services outlined in Schedules 2 through 6, and AHIC expressly undertook responsibility for the services in Schedules 1 and 6. *Id.* at 11–36. While the MCA clearly delineated responsibility between the two Aon entities, employees of Hewitt provided investment services under Schedule 1. Doc. 123-14 at 105:15–22 (explaining that Gary Faber and Paul Bray, both of whom were employees of Hewitt provided investment services under Schedule 1).

On October 15, 2014, Aon proposed a timeline to transition the Plan into AHGT funds on November 18, 2014. Doc. 140-20 at 14. Internally, AHIC's transition specialist, William Judy, acknowledged that the transition schedule was "very aggressive" and questioned if "[b]ased upon the movement in the market today should we discuss internally whether going into Bonds right now would be best thinking." (Doc. 140-21). One of the preconditions to investing in Aon's proprietary AHGT funds was for the Plan's trustee to sign a subscription agreement. Doc. 140-22 at 2. In late October 2014, Aon realized that the Plan did not have a trustee, and Judy concluded that the transition into AHGT funds would be delayed into "December or possibly January." Doc. 140-23 at 2. On February 4, 2015, SunTrust was made Trustee of the Plan. Doc. 125-18 (copy of an email attaching the SunTrust Agreement signed by FRC).

Aon also encountered delays in obtaining actuarial information from FRC's prior actuary, Gabriel, Roeder, Smith & Company ("GRS"), plan administration information from FRC's human resources group, and legacy portfolio information from PFM advisors. Doc. 125 at ¶ 20, 23-26, 30-32. As explained in Schedule 1, Appendix A of the MCA, AHIC would use that information to complete an asset-liability study to have a full picture of the Plan's specific circumstances, which it needed to make recommendations for changes to the Plan's legacy portfolio and legacy investment strategy. Doc. 140-17 at 15. In late November 2014, FRC was advised that other transition-related items that required action by FRC were still outstanding, such as board resolutions, signed minutes of meetings, and board meeting agenda items. According to Aon, given the outstanding items, FRC was comfortable with the transition happening in January 2015. Doc. 125 at ¶ 27; Doc. 125-10 (November 21, 2014 email memorializing the discussion with FRC about a January transition).

In mid-December, Aon and FRC began discussing the use of an interim IPS that would reallocate and protect Plan assets from the interest rate risk exposure posed by the legacy portfolio. Doc. 125-11 at 2 (December 18, 2014 email noting that Faber "fe[lt] an urgency to move forward with an interim IPS despite some of our hurdles. . . and that he would "rather give them a much better solution now than wait further for the perfect one."). Aon determined that it had enough information to design an interim strategy that would provide the Plan's assets with better protection than they currently had. Doc. 125-11 at 4 ("I think if we can develop a target portfolio which we are confident is more appropriate than the current allocation (despite the data constraints), then we should move on that basis knowing that tweaking will be necessary when we ultimately get data."); Doc. 125 at ¶ 29; Doc. 125-12

(email chain in December 2014 discussing possibility of moving forward without obtaining cash flows split by status).

On January 22, 2015, Aon presented FRC an interim IPS to fully hedge the Plan's assets, which allocated 79.3% of Plan assets to a Long Credit Index, 20.2% to an overlay, and 0.5% to cash, with rebalancing ranges of 75%-85%, 15%-25%, and 0%-1%, respectively. Doc. 125-21 (email attaching draft IPS sent to FRC on January 22, 2015); Doc. 125-22 (a copy of the draft Asset-Liability study dated January 16, 2015 that Aon used in preparing interim IPS). Aon also presented a revised termination timeline calling for delaying the lump sum offering until late 2016. Doc. 140-42 at 8.

On January 29, 2015, Aon realized that in the fourth quarter of 2014, "the PPA daily yield curve dropped 30 bps," causing the Plan's unhedged portfolio to decline by four million dollars from Aon's prior working estimate. Doc. 140-46 at 2, 3. Aon considered whether it should implement a strategy to give them a chance to lower the underfunding. *Id.;* Doc. 125-24 (January 29, 2015 email to FRC advising update on liability increase due to interest rate drops; and that AHIC was considering a hedge path that could lower the underfunding instead of locking in an underfunding midpoint that is over $25 million); Doc. 125-25 (February 3, 2015 internal email soliciting opinion on hedge path and noting that Faber would "like to give them an alternative that doesn't lock them down until the underfunding is back down to about $25m.").

On February 12, 2015, Aon presented and discussed a revised interim IPS. Doc. 125-26. Rather than a 100% hedge, the new plan was to take some interest rate risk by moving to a 50% hedge, with hopes that the hedge could be adjusted upward as interest rates rose, improving the Plan's funded status. The revised February interim IPS allocated 55% of Plan

assets to Long Credit, 40% to MIDLOC, and 5% to cash, with rebalancing of 50%-100%, 0%-45%, and 1%-6%, respectively. The revised February interim IPS was reviewed and approved by FRC and implemented by Aon. Doc. 125-27 at 7-8. On February 19, 2015, Aon began investing the Plan into the propriety AHGT funds –AHGT Long Credit Fund and AHGT MIDLOC Fund. Doc. 140-51 at 9, Doc. 125-32 at 3.

Plaintiffs had questions about the hedge ratio concept, so on February 23, 2015, Aon presented an Asset-Liability Matching Portfolio Analysis. (Doc. 125-28) (Email attaching the Analysis). FRC responded that the information was helpful and easy to understand. (Doc. 125-29). FRC acknowledged that "[o]ur employees' financial future is in [Aon's] hands." (Doc. 140-52).

The final draft IPS was presented to FRC on March 26, 2015. Doc. 125-30 (email to FRC attaching draft IPS). FRC approved the final IPS on March 30, 2015. Doc. 125-31 (signed IPS).

As of March 31, 2015, utilizing both the assets in the Plan's trust and the escrow funds, Aon estimated that the Plan was underfunded by approximately $7 million. Doc. 125-32 (Q1 2015 Quarterly Investment Review ("QIR") estimating the Plan's underfunding). Aon subsequently reported the estimated range of plan termination underfunding (including both the assets held in the Plan's trust account and those held in the pension escrow account) as $4.4 million to $6.9 million as of July 31, 2015 (Doc. 125-36); $4.1 million to $6.6 million as of October 6, 2016 (Doc. 125-37); and $4.3 million to $5.6 million as of November 11, 2016 (Doc. 125-38). In August 2015, $10.4 million from the pension escrow fund was deposited into the Plan's trust. (Doc. 140-63). It remained in cash and was never invested. *Id.*

By February 18, 2015, Aon presented a plan termination timeline with plan termination in September 2015 and a lump sum window in 2016 in conjunction with plan termination, specifically a lump sum payment date of December 1, 2016, and final annuity purchase on December 15, 2016. Doc. 125-43. The timeline included consideration of an IRS determination letter. Aon advised FRC that although a favorable IRS determination letter for a terminating plan was not required, it was almost universally requested for several reasons, including that a favorable IRS determination letter would provide that a plan is tax-qualified upon termination when all assets are fully distributed; and that although there were several reasons to request a determination letter, doing so would slow down the termination process and asset distribution because it could take twelve or more months to receive a favorable determination letter. Doc. 125 at ¶54. On July 31, 2015, Sharon Dixon, FRC's ERISA counsel, requested a favorable IRS determination letter on behalf of the Plan. Doc. 125 at ¶ 57. The plan termination date proceeded on September 30, 2015. The lump sum election window, in conjunction with plan termination, occurred between September 6, 2016, and October 28, 2016.

Leading up to the lump sum election window, Hewitt did not perform all the communications services that it contracted to perform under Schedule 5 of the MCA, including announcements, in-person meetings, webinars, brochures, posters, banners, and other print materials. Doc. 160-61 at 147:5–24; Doc. 160-64 at ¶ 23; Doc 160-65, at ¶ 11. Ultimately, only 67% of eligible Plan participants elected to take a lump sum, instead of the projected 80%. Doc. 125 at ¶ 65. On December 1. 2016, lump sum benefits totaling approximately $24.3 million were funded. Doc. 125 at ¶ 66. Two weeks later, an annuity was purchased to satisfy the Plan's obligations to the remaining participants.

To complete Plan termination, the Plan's invested assets were liquidated in two parts, first to pay lump sum benefits, and then to buy annuities. Plaintiffs claim that despite FRC's requests, AHIC refused to liquidate the Plan funds for weeks leading up to December 2016. Doc. 140-64 at 47:4-8, 52:3-5 (asked Faber for weeks and weeks about liquidation); Doc. 123-5 at 162:9-163:19 (Faber "didn't take instructions" and "he told me no" about liquidating assets).

On December 19, 2016, FRC entered into a Pension Loan and Guidance Facility Agreement ("Loan Agreement") where it purported to borrow $17,400,000 from CCHB to cover the Plan termination deficit. (Doc. 120-16). Pursuant to the Loan Agreement, CCHB was given a lien and first priority on proceeds from this lawsuit and FRC assigned to CCHB all interests in the proceeds of this action.

On February 9, 2017, after most of the services had been provided under the MCA and the Plan had been terminated, Hewitt's parent company, Aon Plc, entered into a sales agreement with Tempo Acquisition, LLC for the sale of various business entities, including Hewitt (the "Tempo Agreement"). Doc. 120-10. Thereafter, on May 1, 2017, the sale closed, (Doc. 160-55), and on or about June 30, 2017, Hewitt "changed [its] company name to Alight." Doc. 160-60 at 6; see also Docs. 160-1, 160-2. On August 30, 2018, Plaintiffs filed this action.

In the Amended Complaint, Plaintiffs assert claims against AHIC for breach of fiduciary duty under ERISA (Count I) and against Alight for breach of fiduciary duty under ERISA (Count II), professional malpractice (Count III), and breach of contract (Count IV). Doc. 64.

Currently pending are motions for summary judgment filed by Plaintiffs (Doc. 131), AHIC (Doc. 122), and Alight (Doc. 120), as well as motions to exclude expert reports and testimony from both of Plaintiffs' experts, D. Paul McDonald (Doc. 118) and Dr. Kent Smetters (Doc. 119). The Court heard oral argument on all five motions on February 10, 2021.

## II.     Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In applying this standard, the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the nonmoving party. *See Samples on Behalf of Samples v. Atlanta,* 846 F.2d 1328, 1330 (11th Cir. 1988). As the Supreme Court held in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party who must then come forward with "sufficient evidence of every element that he or she must prove." *Rollins v. Techsouth*, 833 F.2d 1525, 1528 (11th Cir. 1987). The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions, answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.

A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict" for the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Which facts are material depends on the underlying

substantive law. *Id.* "A court need not permit a case to go to a jury ... when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 743 (11th Cir.1996).

### III.    Discussion

#### A.    Daubert Motions

As an initial matter, AHIC has moved to exclude the expert reports and testimony of both of Plaintiffs' experts: D. Patrick McDonald (Doc. 118) and Dr. Kent Smetters. (Doc. 119).

The admissibility of expert testimony at trial is governed by Rule 702 of the Federal Rules of Evidence, which states: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592–93 (1993), the Supreme Court set forth the criteria for the admissibility of scientific expert testimony under Rule 702 by instructing trial judges to "determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue," which includes "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and or whether that reasoning or methodology properly can be applied to the facts in issue." The Supreme Court subsequently held this standard to be applicable to all expert testimony, including testimony "based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 141 (1999).

The Eleventh Circuit has established a three-part test to determine whether expert testimony should be admitted under *Daubert*, explaining that all of the following elements must be established prior to the presentation of expert testimony to the jury: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir.2005). The party seeking to introduce the expert witness bears the burden of satisfying these criteria. *Allison v. McGhan Medical Corp.,* 184 F.3d 1300, 1306 (11th Cir.1999) (holding that the "burden of laying the proper foundation for the admission of the expert testimony is on the party offering the expert and admissibility must be shown by a preponderance of the evidence"). The Eleventh Circuit has recognized that the barriers to opinion testimony are more relaxed in a bench trial situation where the judge is serving as factfinder and the Court is not concerned about "dumping a barrage of questionable scientific evidence on a jury," *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (*quoting Allison v. McGhan Med. Corp.,* 184 F.3d 1300, 1310 (11th Cir.1999).

### 1. Dr. Smetters

With respect to Dr. Smetters, AHIC challenges his qualifications, the factual support and helpfulness of his opinions, the reliability of his model, and the timeliness of his supplemental report. Dr. Smetters opined that AHIC breached its fiduciary duty by leaving the Plan's assets unhedged until February 19, 2015; by investing Plan assets in proprietary AHGT funds; and by leaving $10.4 million of Plan assets in cash. Doc. 140-61. Dr. Smetters

then created an investment model that he used to calculate the returns of alternative investments. Based on his model, Dr. Smetters opined that the Plan sustained at least $5.1 million in losses.

Dr. Smetters is well-qualified in the field of economics and has experience with investments and pension liability issues. Doc. 140-61 at 44-49. AHIC argues that Dr. Smetters is actually just a theorist, who lacks hands on experience pertaining to the fiduciary obligations of investment advisors, to the selection of specific investment funds to use in implementing a liability-driven investment strategy for terminating a pension plan, and to the calculation of damages. These challenges, however, go more to the weight and credibility of Dr. Smetters' opinions and not their admissibility. Similarly, challenges to the reliability of Dr. Smetters' investment model and the helpfulness of his opinions are best assessed at trial by the district judge. Finally, while Dr. Smetters' supplemental report was served after the expert deadline, its late disclosure was not prejudicial to AHIC, since it was prepared in direct response to criticisms raised by AHIC's expert and Plaintiffs offered Dr. Smetters for another deposition. Doc. 140-62; Doc. 150-1.

## 2. McDonald

With respect to Mr. McDonald, AHIC argues that he is not qualified, his opinions are not reliable, and his opinions are not helpful to the trier of fact. Mr. McDonald offered opinions regarding (a) the date by which Aon should have been able to determine the October 2015 segment interest rates and incorporate those interest rates into its modeling of the Plan's liabilities and (b) an estimate of the impact to the Plan's termination liability if Aon had used the actual COLAs for 2015 and 2016 instead of incorrectly assuming a constant 3% COLA for those years. Doc. 118-1.

Mr. McDonald, who has been a practicing consulting actuary for over 36 years with extensive experience related to pension plans, including plan terminations, and estimation of plan termination liabilities, is qualified to testify regarding these matters. Doc. 118-1 at 4-5, 14. AHIC's argument that Mr. McDonald previously used a 3% COLA assumption in his practice, goes more to weight and credibility, than admissibility. While Mr. McDonald's opinions appear less central to the case, the district judge can best determine their helpfulness at trial.

Accordingly, and particularly since the barriers to opinion evidence are more relaxed in a bench trial situation, AHIC's motions to exclude Plaintiffs' experts (Docs. 118, 119) should be denied.

### B.    Count I –Violation of ERISA by AHIC

In Count I, Plaintiffs allege that AHIC breached its fiduciary duties under ERISA related to its management and investment of Plan assets. At the hearing, Plaintiffs identified five key areas in which they contend AHIC breached its duties: (1) the four month delay in allocating Plan funds; (2) selection and use of unsuitable funds; (3) failing to invest $10.4 million in cash; (4) timing of the lump sum window; and (5) failing to timely liquidate Plan assets.

To prevail on a claim for breach of fiduciary duty under ERISA, a plaintiff must show (1) that the defendant was acting as a fiduciary under the plan, (2) that the defendant breached their fiduciary duty, and (3) that the breach caused harm to the plaintiff. *Pegram v. Herdrich*, 530 U.S. 211, 225-26 (2000). Here, Plaintiffs have moved for partial summary judgment on the threshold issue that AHIC was acting as an ERISA fiduciary. (Doc. 131). AHIC has

moved for summary judgment as to the other two elements, and additionally argues that Plaintiffs lack standing to bring the claims under ERISA. (Doc. 122).

## 1. Plaintiff's partial motion for summary judgment (Doc. 131)

An entity performs a fiduciary function under ERISA § 3(21) when it: (a) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (b) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (c) has any discretionary authority or discretionary responsibility in the administration of such plan. 29 U.S.C. § 1002(21)(A). Fiduciary status is not an "all-or-nothing" proposition—an entity's fiduciary status is analyzed "with respect to the particular activity at issue." *Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols., Inc.*, 658 F. App'x 966, 969 (11th Cir. 2016) (quoting *Cotton v. Mass. Mut. Life Ins. Co.*, 402 F.3d 1267, 1277 (11th Cir. 2005)). "Proof of an entity's fiduciary status 'may come from the plan document, but can also come from the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation in the plan document.'" *Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols., Inc.*, 658 F. App's 966, 969 (11th Cir. 2016) (unpublished).

Here, in efforts to secure the contract, and then in the MCA itself, AHIC repeatedly promised and agreed to serve as a fiduciary under ERISA. See, e.g., Doc. 140-3 at 7 (explaining that by choosing Aon, FRC would reduce its investment risk because "[w]e serve as an ERISA 3(38) fiduciary, meaning we taken on fiduciary responsibility for the execution of the investment strategy"). Pursuant to Schedule I to the MCA—entitled "Investment Consulting and Delegated Investment Management—Defined Benefit Plan," HEK expressly

acknowledged, "that, at all times during the term of this Schedule, and with respect to all services provided under Appendix A, it is a "fiduciary" as defined under Section 3 (21). Doc. 130-17 at 12. Appendix A identifies those services to include: (a) work with other professionals to help in "determining the appropriate investment allocation and risk budgeting objectives for the Plan;" (b) "designing a customized investment strategy to hedge (reduce) pension surplus risk (volatility of pension assets relative to pension liabilities;" (c) determining "the funded ratio for purposes of implementing the investment policy;" and (d) to "monitor this program daily and implement portfolio allocation changes as necessary." Doc. 130-17 at 15, §§ 2(a), (b), (c), (d). FRC expressly granted to HEK [AHIC] "the requisite authority to take any and all actions on behalf of the Plan and/or [FRC] to facilitate HEK [AHIC's] performance of all Services under this Agreement and to fulfill HEK's [AHIC's] obligations as an investment manager to the Plan, including the engagement of any Sub-Advisors or investment of Plan assets on behalf of the Plan." Doc. 130-17 at 11, §1.

While Schedule I did not specifically identify the timing of the lump sum window, there is no dispute that it was intertwined with AHIC's investment strategy covered by Schedule I. Doc. 167-1 (initial proposal explaining that relationship between liabilities and lump sums); Doc. 126-2 (June 18, 2014 memorandum to FRC explaining that HEK will serve as co-fiduciary throughout annuity selection process; explaining that integration with the lump sum window will be critical as the outcome of the window will significantly influence the size and characteristics of the liability to be annuitized; and noting that FRC's custom liability-hedging needs will be highly dependent on the lump sum take); Doc. 129 at ¶ 6 (timing of the lump sum window "was interdependent with both the investment transition and the administrative transition."). Moreover, AHIC acknowledged that Plaintiffs were

"looking to HEK [AHIC] to help them determine when and how many Lump Sum windows there should be. We need to advise them . . . ." Doc. 190-14.

Nevertheless, despite marketing itself as a fiduciary, agreeing to fiduciary status in the MCA, acknowledging Plaintiffs' reliance on AHIC for guidance, and charging asset-based investment fees from October 8, 2014 onward (Doc. 130-17 at 37 (confirming AHIC's 21.2 basis-point fee is for investment consulting services as a fiduciary)), AHIC denies fiduciary status. AHIC's argument that it did not act as an ERISA fiduciary because it was merely providing recommendations is unpersuasive since the definition of fiduciary explicitly refers to "investment advice," as does the relevant regulation which appears to specifically contemplate that a party making recommendations could meet the definition of "fiduciary" in at least some circumstances. *See* 29 C.F.R. § 2510.3-21 (defining "fiduciary"). Moreover, AHIC's efforts to blame FRC for various delays (i.e., appointing trustee, providing actuarial data) does not relieve AHIC of its own duties that arose from promising, agreeing, acting, and charging asset-based fees as an investment fiduciary.

Accordingly, because AHIC had fiduciary status with respect to its management and investment of Plan assets at issue in Count I of the Amended Complaint, Plaintiff's motion for partial summary judgment (Doc. 131) should be granted.

### 2. AHIC's motion for summary judgment (Doc. 122)[3]

---

[3] On December 23, 2020, more than three weeks after filing its own thirty-five-page motion for summary judgment (Docs. 108, 120), Alight filed a notice of joinder in portions of AHIC's motion for summary judgment. (Doc. 147). Plaintiffs filed an objection. (Doc. 151). The Court agrees that Alight's attempt to incorporate by reference arguments presented in another document is impermissible because it violates page-limitations imposed by this Court. Moreover, allowing such joinder would lead to even further confusion in a case in which there is already a response, reply, and sur-reply for each of the pending motions for summary judgment. There can be no question that Alight has had ample opportunity to present its arguments without incorporating those of AHIC.

Although only Count I of the Amended Complaint is brought against AHIC, it inexplicably seeks summary judgment as to all four counts. AHIC is not entitled to summary judgment as to Counts II, III, and IV because it is not a party to those claims. *D.G. v. City of Las Cruces*, No. 14-CV-368, 2016 WL 10721467, at \*12 (D.N.M. Feb. 1, 2016) ("[The Court agrees with the procedural argument that a party cannot obtain summary judgment in its favor on a claim to which it is not a party."). Accordingly, the Court will only address arguments raised by AHIC regarding Count I.

### a.   Standing

As an initial matter, AHIC argues that Plaintiffs lack standing to bring claims under ERISA on behalf of the Plan because neither the Plan nor Plaintiffs have suffered any concrete injury. This argument lacks merit.

ERISA explicitly authorizes plan fiduciaries to sue for "losses to the plan." 29 U.S.C. §§ 1109, 1132(a)(2); *see also, Mass. Mut. Life Ins. Co. v. Russel*, 473 U.S. 134, 139–44 (1985) (holding in the context of defined benefit plans, that claims for relief must relate to losses to the plan itself, not individual beneficiaries). Such losses include lost profits and debt incurred to cover excess deficiencies in funding. *See, e,g, La Rue v. DeWolff, Boberg & Assocs., Inc.* 552 U.S. 248, 253 n.4 (2008) (ERISA §502(a)(2), 29 U.S.C. 1132(a)(2), provides fiduciary claim for "lost profits"); *Perez v. Bruister*, 823 F.3d 250, 270–71 (5th Cir. 2016) (rejecting argument that plan losses exclude "debt that remains unpaid or is later forgiven"); *Henry v. U.S. Tr. Co. of California*, 569 F.3d 96, 99 n.4 (2d Cir. 2009) (including a cancelled debt in the plan's loss calculation because of "the obvious fact that the assumption of indebtedness has immediate legal and economic consequences even before the borrower begins to repay the debt"); *Chao*

*v. Merino*, 452 F.3d 174, 184-85 (2d Cir. 2006) (finding employer contributions that covered monies due to plan beneficiaries did not absolve fiduciary from liability for losses to the Plan.).

While the extent of any losses to the Plan is disputed (*see* Doc. 140-61 at 40 ¶75 and Doc. 140-62 at 19 ¶11)[4] it is undisputed that the Plan incurred millions of dollars in debt to fulfill its obligations to Plan participants. *See, e.g.,* Doc. 122 at 17 ¶31 (admitting $17.4 million loan from CCHB to the Plan); Doc. 120-16 at 5-6, 8 (reciting that Aon caused the Plan to lose "millions of dollars in Plan assets," such that it "lacks sufficient funds to . . . make . . . beneficiary payments due" and incurring debt of $17,400,000 to pay benefits). Regardless of the Plan's later payment of participant benefits (made possible by CCHB's loan), the Plan would have been better off without the debt, which carried various obligations. *See* Doc. 120-16 at 11 ¶8 (requiring, for instance, the Plan to participate in this lawsuit and cooperate with records requests)). Moreover, to hold that incurring debt excuses fiduciary misconduct would undermine ERISA's purposes "to enforce strict fiduciary standards . . . ." *See In re Unisys Savs. Plan Litig.*, 74 F.3d 420, 434 (3d Cir. 1996); *see also, In re State St. Bank & Tr. Co. Erisa Litig.*, 579 F. Supp. 2d 512, 516–18 (S.D.N.Y. 2008) (holding that loans to an ERISA plan to cover losses do not render a case moot even when "the terms of the Loans require the Plans to repay . . . the Loan amount from any recovery obtained in [the] litigation."); *Perez v. Bruister*, 823 F.3d 250, 270–71 (5th Cir. 2016) (concluding that "[e]very court to consider this question has rejected Defendants' contention that the proper measure of recovery excludes the debt that remains unpaid or is later forgiven."); *Chao v. Merino*, 452 F.3d 174, 185 (2d Cir. 2006) ("[t]he

---

[4] Dr. Smetters opined that Aon's fiduciary breaches resulted in at least $5.1 million in losses to the Plan.

underlying purposes of ERISA would not be furthered by awarding an errant fiduciary credit for [double] contributions made by an employer or others concerned").

ERISA authorizes suits by a plan fiduciary, such as a plan sponsor or administrator, against another plan fiduciary, such as an investment advisor—to recover "losses to the plan." 29 U.S.C. §§ 1109(a), 1132(a)(2). Here, Plaintiffs are undisputed Plan fiduciaries suing AHIC—the Plan's fiduciary investment advisor—for purported losses AHIC caused to the Plan through its investment and management of Plan assets. (Doc. 64 at 30-34). Accordingly, Plaintiffs have standing to assert their ERISA claims and recover losses caused by breaches of AHIC's fiduciary duty.

### b.   Breach of Fiduciary Duty

In its motion for summary judgment, AHIC argues that it is entitled to summary judgment on Count I as to breach. According to AHIC, the undisputed evidence shows that "AHIC acted promptly to move the Plan's investments into a prudent, hedged portfolio, appropriately monitored, managed, and informed FRC about those investments and the Plan's funded status; and reduced the Plan's funding deficit over time while protecting it against interest rate risk." Doc. 122 at 19. The Court submits that disputed issues of material fact preclude entry of summary judgment.

An ERISA plan's fiduciary investment advisor must discharge "duties . . . solely in the interest of the participants and beneficiaries" and with the care, skill, prudence, and diligence required under the circumstances and tailored to the plan's situation and aims. 29 U.S.C. § 1104(a)(1)(B). Derived from trust law, "[t]he duties charged to an ERISA fiduciary are 'the highest known to the law.'" *In re Cardinal Health, Inc.* ERISA Litig., 424 F. Supp. 2d 1002, 1017 (S.D. Ohio 2006). To determine whether a fiduciary breached its duty, "the primary

question is whether the fiduciaries, 'at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Simons ex rel. Barnette v. Barnette*, No. 2:02-cv-62-FTM-DNG, 2003 WL 23336343, at *6 (M.D. Fla. Sept. 16, 2003) (internal quotation marks omitted) (*quoting Cal. Ironworkers Field Pension Tr. v. Lomis Sayles & Co.*, 259 F.3d 1036, 1043 (9th Cir. 2001)). A fiduciary's actions are "judge[d] . . . based upon information available to the fiduciary at the time and not from the vantage point of hindsight." *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Cntrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 716 (2nd Cir. 2013) (quoting *In re Citigroup ERISA Litig.,* 662 F.3d 128, 140 (2nd Cir. 2011).

There is no dispute that when the MCA was executed, the Plan's investment portfolio was exposed to significant interest rate risk and AHIC knew that the funds needed to be transitioned to a hedged investment as quickly as possible. *See e.g.*, Doc. 140-5 (June 25, 2014 email noting "we need to be prepared to establish an interim IPS ASAP as they have tons of interest rate exposure"). However, the funds were not invested until February 19, 2015.

AHIC attempts to shift blame for the delay to FRC and its vendors. It is undisputed that AHIC's efforts to perform an asset-liability study were stymied by the prior actuary's failure to promptly provide data.[5] These undisputed delays, however, do not excuse AHIC from complying with its duty of prudence.

---

[5] *See e.g.,* Doc. 125-4 (October 31, 2014 email from Aon to FRC emphasizing importance of obtaining projected cash flows and commencing actuarial transition; reiterating request that FRC send GRS the letter that Aon had provided a month earlier, on October 1, 2014; and offering to reach out to GRS to request the information directly); Doc. 125-7 (November 17, 2014 email from Aon to GRS following up on FRC's earlier request for information); Doc. 125-25 (November 20, 2014 email to FRC explaining that GRS had been unresponsive and advising that if GRS provided actuarial information promptly, AHIC expected to begin the process of matching liabilities in the next month or two, which could take two to three months); Doc. 125-8 (November 24, 2014 email from Aon to GRS asking when it could expect to receive cashflows and advising that the failure to provide information was "significantly delaying a time-sensitive project."); Doc. 125-16 (December 18, 2014

Almost immediately after signing the MCA, AHIC knew that it needed to make "an immediate allocation into a full/nearly full hedge" to de-risk the plan. Doc. 140-11 at 2. AHIC internally discussed moving the Plan funds out of the current allocation and questioned if AHIC could "get an interim IPS in place ASAP so we can get them into a long bond portfolio." Doc. 140-10 (October 13, 2014 email). AHIC acknowledged that the schedule to transition into AHGT Funds on November 18, 2014 was "very aggressive;" asked if "[b]ased upon the movement in the market today should we discuss internally whether going into Bonds right now would be best thinking;" and suggested "[w]e may want to present to Citrus what the current situation is and have them give their opinion.".Doc. 140-21 (October 15, 2014 email). It is undisputed that the PPA daily yield curve dropped 30 bps during the last quarter of 2014, causing the Plan's unhedged portfolio to decline by several million dollars. Doc. 140-46 at 2 (January 29, 2015 email). During this time, AHIC did not give FRC any alternatives to waiting and portrayed the asset transition as being on course. *See e.g.,* Doc. 140-31 at 2 (reporting on November 6, 2014, "[i]nvestment transition processing as expected"); Doc. 140-34 at 2 (reporting, on December 10, 2014, "[i]nvestment transition continues to progress . . ."); Doc. 160-64 (describing the "tenor of Aon's communications regarding transition of the Plan investments" as "reassuring."). It was not until January 29, 2015, that AHIC advised FRC that the Plan's funded status had significantly declined from October through December 2014. Doc. 125-24.

Despite AHIC's assertions to the contrary, its own internal communications suggest that even without the actuarial data it could have provided a "better" or "more appropriate"

---

email noting that FHC is "very aware of the lack of responsiveness" and is "going to try to exercise some leverage to keep things moving."); Doc. 125-17 (email chain in January 2015 discussing limited information provided by GRS and its lack of professionalism).

solution. *See* Doc. 125-11 at 4 ("I think if we can develop a target portfolio which we are confident is more appropriate than the current allocation (despite the data constraints), then we should move on that basis knowing that tweaking will be necessary when we ultimately get data."); Doc. 125-11 at 2 (December 18, 2014 email noting that Faber "fe[lt] an urgency to move forward with an interim IPS despite some of our hurdles. . . and that he would "rather give them a much better solution now than wait further for the perfect one."). Doc 125 at ¶ 29; Doc. 125-12 (email chain in December 2014 discussing possibility of moving forward without obtaining cash flows split by status). In addition, Plaintiffs expert, Dr. Smetters opined that AHIC could have de-risked the Plan immediately by using publicly traded, low-costs funds from Vanguard. Doc. 140-61 at 35-36 (showing examples of two, then available funds). And, that AHIC's failure to do so caused more than $2 million in Plan losses. (Doc. 140-61 at 38).

Nevertheless, AHIC waited over four months to invest in the proprietary AGHT funds. In addition to questions about whether the delay was a breach of fiduciary duty, there are disputed issues of fact as to whether the AGHT funds were prudent investments. According to Plaintiffs' expert, Dr. Smetters, the proprietary AHGT funds bore unsuitable credit-mismatch risk to Plan liabilities (Doc. 140-61 at ¶¶24, 32, 34, 57, 59, 65, 73), lacked minimum track-record for proper assessment (*id*. at ¶¶40 42) and did not meet the aim and liability benchmark for the Plan—i.e., to avoid risk and terminate the Plan quickly. *See, e.g.*, Docs. 167-1 at 9; 126-3 at 2; 140-10 at AON_FRC0279949; 140-11 at 2 (showing aim to hedge Plan against funded-status loss and terminate quickly). Dr. Smetters opined that the standard practice for liability-driven investing (hedging) that FRC hired AHIC to do entails matching the duration and credit-quality basis of Plan assets to liabilities, not taking risky unhedged

bets. Doc. 140-61 ¶¶18, 24, 75 (discussing liability-driven-investing practice). Dr. Smetters opined that using the proprietary AHGT funds added significant unhedged credit-mismatch risk, that risked (and led to) millions more in Plan losses, after losses from AHIC leaving the Plan unhedged for months. Doc. 140-61 at ¶ 73. While AHIC disputes Dr. Smetters' analysis and opinions, they nevertheless raise factual disputes that must be resolved by the fact finder.

Moving beyond AHIC's purported failings during the first four months, there are also issues of fact surrounding AHIC's role in the decision to delay the lump sum offering for one year and whether FRC was fully advised of the risks posed by a delay (Doc. 160-64 at ¶¶ 12-13); the decision from August 2015 onward not to invest over $10.4 million in cash; (Doc. 140-63 at 2); and the purported refusal to liquidate Plan assets before benefit payment deadlines in December 2016 despite directives from the FRC Board (Doc. 182-1 ¶¶ 4–8). Dr. Smetters opined that AHIC's failure to properly deploy investible assets and continued investment in unsuitable funds caused the Plan to lose more than $5.1 million by November 30, 2016. Doc. 140-61 at 39.

Accordingly, AHIC's motion for summary judgment should be denied because Plaintiffs have standing and there are disputed issues of material fact as to whether AHIC breached its fiduciary duty, causing losses to the Plan.

### 3. Alight's motion for summary judgment (Doc. 120) and claims against it

In the Amended Complaint, Plaintiffs assert claims against Alight for breach of ERISA fiduciary duty (Count II), professional malpractice (Count III), and breach of contract (Count

IV). (Doc. 120).[6] Alight has moved for summary judgment as to all three counts, arguing primarily that it is not a proper party to this lawsuit.[7]

Plaintiffs seek to impose liability against Alight on the basis that it is the legal successor of Hewitt. On February 9, 2017, Hewitt's parent company, Aon Plc, entered into a sales agreement with Tempo for the sale of various business entities, including Hewitt (the "Tempo Agreement"). Doc. 120-10 at Alight001046 (fourth "whereas" clause), Alight001069 §2.1(a), Alight001208 (Sched. 1.1(c)). The sale closed on May 1, 2017 (Doc. 160-55), and on or about June 30, 2017, Hewitt "changed [its] company name to Alight." Doc. 160-60 at 6; see also Docs. 160-1, 160-2.

a. *Tempo Agreement*

In the Tempo Agreement, Aon Plc and Tempo, who are clearly sophisticated parties, distinguished between Equity Sellers and Asset Sellers in efforts to define what was being sold and purchased in the $4.3 billion deal. This is a legally significant distinction. An asset sale may include some or all the corporate assets, and the asset purchaser does not automatically assume all debts and liabilities of the asset seller. *Corp. Express Office Prods., Inc. v. Phillips*, 847 So. 2d 406, 412 (Fla. 2003). Accordingly, the parties to an asset sale must carefully allocate "the liabilities and responsibilities of each party . . . in the parties' agreement." *Id.* In contrast, a full equity purchase preserves all assets, obligations, and liabilities within an entity—"because the legal entity remains the same" with a new owner. *Sinquefield v. Sears Roebuck & Co.*, 568 N.E.2d 325, 326 (Ill. App. Ct. 1991); *Phillips*, 847 So. 2d at 412 ("fact that there is a

---

[6] Plaintiffs' claims invoke both federal and state law. The MCA includes an Illinois choice-of-law provision. (Doc. 130-17 at 9, ¶13(l). There is no dispute that Illinois law applies to the state law claims.

[7] The Court need not discuss Alight's arguments addressing standing as the Court rejected these arguments above in AHIC's motion for summary judgment.

change in ownership of corporate stock does not affect the corporation's existence or its contract rights, or its liabilities.")

Here, the Tempo Agreement expressly states that Tempo purchased "all of the ownership interest" held by Hewitt. Doc. 120-10 at Alight 001046 ("Seller Parent wishes to cause to be sold . . . to Buyer . . . and Buyer wishes to purchase from Seller Parent . . . (A) all of the ownership interest held directly by the Equity Sellers in the Business Subsidiaries"); *Id.* at Alight 001069 ("Buyer agrees to . . . purchase . . . all of the Equity Sellers' right, title and interest in the Equity Interests"); *Id.* at Alight 001046 (defining "Equity Interests" to include "all of the ownership interests held directly by the Equity Sellers in the Business Subsidiaries"); *Id.* at Alight001208 (defining Hewitt as a "Business Subsidiary")). Only entities identified as "Asset Sellers" under the Tempo Agreement—which Hewitt was not— sold portions of their assets ("Purchased Assets") relating to particular business units (defined as the "Business") and excluded other assets ("Excluded Assets"). Doc. 120-10 at Alight 001205 (identifying "Asset Sellers," not including Hewitt; Doc. 120-10 at Alight 001069–72, §§ 2.1(b)–(c) (identifying "Purchased Assets" and "Excluded Assets"). Accordingly, pursuant to the express terms of the Tempo Agreement, Hewitt was sold in an equity sale, and thus, all its liabilities, assets and obligations transferred to Tempo in the transaction. The subsequent name change to Alight had no effect on the transferred rights and liabilities. *See Gen. Elec. Bus. Fin. Servs. Inc. v. Hedenberg,* 10 C 5094, 2011 WL 1337105, at *2 (N.D. Ill. Apr. 7, 2011) (a corporation retains its corporate identity when it changes its name); *Stewart v. Preston,* 86 So. 348, 349 (Fla. 1920) (change in the name of a corporation has not effect whatever upon its property, rights, or liabilities).

Nevertheless, Alight argues that Hewitt's "business/assets or liabilities related to the FRC Project" were carved out and not included in the transaction. Alight points to the third "Whereas" clause which it contends excludes from the transaction any parts of Hewitt related to "health and benefit consulting, actuarial consulting, investment consulting and asset management services." Doc. 120-10 at Alight 001046. Even if there is some legal basis for this contention, material issues of fact exist as to which parts of Hewitt were retained and which parts were transferred in the Tempo Agreement. Doc. 120 *See e.g.*, Doc. 120-2 at ¶19 ("Only a portion of Aon's communications group transferred"), Doc. 120-9 at ¶¶ 11-17 (explaining that the Tempo Agreement conveyed a number of Aon businesses including the outsourcing large market business, payroll and cloud business, and parts of communication but not the investment consulting or advice business, any of AHIC business or Aon's delegated pension management services, actuary practice group, retirement practice group, or pension administration practice group); Doc. 190-58 (Alight June 6, 2017 press release, announcing "the next chapter in its more than 25-year history as the leading technology-enabled provider of benefits administration and cloud-based HR solutions, with a new name and brand" and claiming to be a market leader in health and welfare administration, defined benefit administration, HR services, and defined contribution administration); Doc. 190-63 (Alight's website touting a "40 year" existence as a leader in pension administration, "For more than 40 years, Alight Solutions has been the leading provider of defined benefit [pension] administration, servicing 124 clients and over 6 million participants. Our vast experience working with large organizations on de-risking pension plans for their people sets us apart, having managed administration for over 100 lump sum projects that impact over one million window participants.").

Accordingly, Alight has failed to prove as a matter of law that it is not a proper party to this action.

### b.   Remaining issues

Alight's remaining arguments on summary judgment start from its position that Alight is not a proper party to this case and that its limited communications role in relation to the Plan cannot expose it to liability under ERISA, in tort for professional negligence, or in contract for a breach of the MCA. Then, in its reply, Alight improperly attempts to add factual arguments regarding Hewitt's investment decisions and lump sum timing. *See Procaps S.A. v. Patheon Inc.*, 141 F.Supp.3d 1246, 1293 (S.D. Fla. 2015) ("It is well established that a party cannot for the first time in a reply memorandum . . . assert new factual arguments to support a summary judgment motion."). Even considering these belated factual assertions, Alight has failed to show that it is entitled to summary judgment as to any of Plaintiffs' claims.[8]

### (i)   ERISA Claim

With respect to the ERISA claim, there is a factual dispute as to whether Hewitt was a fiduciary. While Hewitt did not expressly agree to fiduciary status in the MCA, that is not dispositive.[9] Indeed, as discussed above, proof of an entity's fiduciary status can "come from the factual circumstances surrounding the administration of the plan, even if these factual circumstances contradict the designation in the plan document.'" *Carolinas Elec. Workers Ret. Plan v. Zenith Am. Sols., Inc.,* 658 F. App's 966, 969 (11th Cir. 2016) (unpublished). Typical

---

[8] Presumably, that is why Alight improperly attempted to join in AHIC's motion for summary judgment which addressed claims brought solely against Hewitt.

[9] Hewitt was a signatory to Schedules 2-6 of the MCA, several of which specifically provided that Hewitt was not intended to "be considered a fiduciary of the Plan in connection with the Services under this Schedule." Doc. 130-17 at 20, 23, 28.

fiduciary duties include "proper management, administration, and investment of fund assets." *Ehlen Floor Covering, Inc. v. Lamb*, 660 F.3d 1283, 1287 (11th Cir. 2011).

Here, there is evidence that Hewitt performed fiduciary functions—including investment management, timing of the lump sum window, deciding when to liquidate Plan assets, and timing the Plan's termination. Gary Faber and Paul Bray, both of whom were employed by Hewitt and served as Delegated Pension Managers for the Plan, oversaw the administrative, investment, and actuarial services provided to FRC. Doc. 125 ¶¶ 2, 6; Doc. 123-14 at 105:15–22; Doc. 123-1 at 24:12-25:10; Doc. 123-12 at 41:7–10. Faber expressly assumed leadership over investment and actuarial services to the Plan, apart from being its DPM. Doc. 148-3 at AON_FRC0087450; Doc. 160-10, AON_FRC0280133. Faber and Bray exercised management, control, and discretion over the Plan's assets in the investments. Doc. 140-53 at 2 (Faber noting "we have full discretion" over the Plan); Doc. 190-22, AON_FRC0087328 (Faber and Bray reviewing and editing the Plan's investment policy statement that would guide investment management decisions); Doc.190-27, AON_FRC0273156 (Zagortz requesting approval from Faber and Bray regarding a trade of Plan assets and Faber responding with approval); Doc. 190-23, AON_FRC0086209 (requesting Faber's agreement with selection and approach for investments and Faber responding "Yes, that sounds good"); Doc. 190-29, AON_FRC0274113 (Faber instructing use of Parametric for investment of Plan assets, noting "please facilitate the move"); Doc. 190-52, AON_FRC0284201–02 (Faber instructing liquidation of Plan assets); Doc. 160-24, AON_FRC0286552 (Faber and Bray discussing investment recommendation for the Plan); Doc. 140-11 at 2 (Faber stating that Plan probably won't have risk study but rather immediate allocation into full/nearly full hedge)). FRC's Chairman even advised Faber, that "Our

employees' financial future is in your hands and all of us on our end are confident we made the best choice in selecting AON." Doc. 140-52 at 2. In addition to investment decisions, Hewitt's employees were "responsible for the bulk of the Plan termination services," including "timing of Plan termination, [and] calculations of estimated plan termination liabilities." Doc. 124 at ¶¶ 8, 10-13; Doc. 125 at ¶ 6; Doc. 123-14 at 102:25–103:19; Doc. 129 at ¶¶ 2, 6, 9). Accordingly, material issues of fact exist as to whether Alight (as Hewitt's successor) was an ERISA fiduciary.

(ii)    Lump sum window

There are also factual disputes as to whether Hewitt breached its fiduciary duty regarding the timing of the lump sum window. Doc. 140-17 at 22–30 (Scheds. 3–4); Doc. 124 at ¶ 13 (stating that Faber, Bray, and Niemeyer were "primarily involved in recommendations on the timing of the lump sum window."). Aon initially proposed an early lump sum window in 2015, but subsequently recommended that the lump sum window be pushed to December 2016, which it was. Doc. 190-5 at 3, Doc. 140-4 at 7; Doc. 190-65 at ¶ 8 ("FRC went along with the recommendations presented by Aon, including an investment strategy and the termination timeline for paying lump sums and purchasing a final annuity to settle the Plan's liabilities in December 2016."). While FRC went along with Hewitt's recommendations, Plaintiffs point to evidence that Hewitt did not warn FRC of the associated risks of the delay and incorrectly led them to believe that such a delay was necessary in part because receipt of an IRS determination letter was required before paying lump sums. Doc. 190- 64 at ¶¶ 12, 13 (discussing recommendation about lump sum window and that there was no "mention that a delay in paying lump sums would diminish Plan assets or contribute to an increase in the cost of settling liabilities through lump sum payment"); Doc. 190-46 at AON_FRC0278867

(Hewitt internally acknowledging that payment of lump sums is possible before receipt of determination letter). As for damages, Plaintiffs point to evidence that the delay in paying lump sums prolonged the period that the lump sum payments—valued at $25 million or more in assets[10]—were under Alight's management and incurred ongoing fees under Section 1(a) of the MCA, (Doc. 140-17 at 4 §1(a)), which provided for fees assessed on the asset value of the Plan under Aon's management. *See e.g.,* Doc. 190-21 at 2 (January 23, 2015 invoice assessing fees on asset value of the Plan).

Accordingly, summary judgment should be denied as to Count II of the Amended Complaint. These same factual disputes preclude entry of summary judgment as to Plaintiffs' claim that Alight breached its professional obligations by recommending a delayed lump sum window resulting in damages to the Plan.

(iii)   Breach of contract

Finally, Plaintiffs' breach of contract claim arises out of Hewitt's undisputed failure to perform all the communications services that it contracted to perform under Schedule 5 of the MCA, including announcements, in-person meetings, webinars, brochures, posters, banners, and other print materials. Doc. 160-61 at 147:5–24; Doc. 160-64 at ¶ 23; Doc 160-65, at ¶ 11. There are factual disputes as to whether communications fees were cut to offset underpricing of other services under the MCA (Docs. 160-33, 160-37; 190-45) or whether FRC agreed to amend the MCA or otherwise excused Hewitt's performance of certain communications services. Doc. 160-64 at ¶23 ("FRC did not agree to amend the MCA or approve of AON's failure to provide the communications services"); Doc. 120-27 at 1 (Ms. Dixon noting that

---

[10] SunTrust records reflect that over $25 million in lump sum payments were paid out of the Plan trust to participants in December 2016. Doc. 190-53 at FRCOOO1669.

"Aon literally cannot carry out the agreement as originally signed because too much has happened since then. It effectively has been amended by actions over time"); Doc. S-135 at 1 (FRC wrote to Faber, Bray, Dixon and other advising that "I would definitely like see us [sic] complete this without webinars or onsite meetings.").

There is also a genuine issue of fact as to whether the Plan suffered damages caused by Hewitt's failure to perform the communications services set forth in Schedule 5. To that end, Plaintiffs have asserted two viable theories. First, Plaintiffs seek to recover the fees it paid for services that Alight did not provide (Doc. 16--61 at 160:9–13; Doc. 160-65 at ¶ 11), including reminder calls and emails ($20,000), on-site meetings ($15,000), webinars ($32,500), 1:1 discussions ($5,000), and posters, banners, and other print materials ($5,000). Doc. 140-4 at AON_FRC0090198 (breakdown of fees for services in comprehensive communications campaign). Disgorgement of money paid to the breaching party is a standard measure of damages under Illinois law. *United States ex rel. Morgan v. Champion Fitness, Inc.,* 368 F. Supp. 3d 1198, 1215 (C.D. Ill. 2019) ( "to the extent a party pays another party to perform a service which is not performed, that payment should be recoverable . . . .").

Second, Plaintiffs claim losses to the Plan caused by Hewitt's failure to perform the communications services. Recognizing that damages such as lost profits, cannot "be proven with absolute certainty," Plaintiffs need only "approximate the claimed lost profits by competent evidence . . . and such evidence must with a fair degree of probability tend to establish a basis for the assessment of damages for lost profits." *Tri-G, Inc. v. Burke, Bosselman & Weaver,* 856 N.E.2d 389, 407 (Ill. 2006).

From the beginning, Aon represented that "[t]he purpose of a comprehensive communications campaign was to maximize the lump sum election rate achieved in the lump

sum window." Doc. 140-3 at 5. Aon explained that based on its experience with "over 100 lump sum windows," a "robust communications initiative can substantially increase the lump sum election rate (by 10% - 20% on average)." *Id.* Aon projected that, "consistent with other lump sum windows associated with plan terminations that we have executed," the comprehensive communications campaign would result in an 80% take rate. *Id.* at 4; Doc. 160-65 at ¶ 9); (Doc. 160-61 at 104:10–17 (confirming representation to FRC that "the comprehensive communications campaign would result in an 80 percent take rate. But if you don't do that, it's going to be at least 10 to 20 percent lower"); Doc. 140-4 at 11 n.3 (estimating take rate will be "10-20% lower without comprehensive communications campaign"). The lump sum take rate ultimately was 67%—over ten percent lower than Aon's projections, which was in line with Aon's representation of the value of communications services providing a 10–20% boost in take rate. Doc. 160-65 at ¶¶ 9, 11. According to Aon's own calculations, a 10% shortfall in lump sum elections would cost the Plan $900,000 in savings, which constitute direct damages to the Plan. Doc. 140-2, at AON_FRC0081286; Doc. 140-3 at 5.

Accordingly, summary judgment should be denied as to Count IV of the First Amended Complaint because there are genuine disputes of material fact as to whether Hewitt breached Schedule 5 of the MCA causing damages to the Plan.

## IV.    Recommendation

For the reasons discussed above,

> A.  AHIC's motions to exclude the expert reports and testimony of D. Patrick McDonald (Doc. 118) and Dr. Kent Smetters (Doc. 119) should be **DENIED.**

B. Plaintiffs' motion for partial summary judgment as to AHIC (Doc. 131) should be **GRANTED.** AHIC had fiduciary status with respect to its management and investment of Plan assets at issue in Count I of the Amended Complaint.

C. AHIC's motion for summary judgment (Doc. 122) should be **DENIED**.

D. Alight's motion for summary judgment (Doc. 120) should be **DENIED**.

Recommended in Ocala, Florida on March 10, 2021.


_____
PHILIP R. LAMMENS
United States Magistrate Judge


Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy